ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA            :

            - v. -                   :          **INDICTMENT**

DINO BOUTERSE, and                   :          S2 13 Cr. 635
EDMUND QUINCY MUNTSLAG,
    a/k/a "Blue,"                    :

            Defendants.              :
- - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 0 7 2013

## OVERVIEW

1.    The international terrorist organization
Hezbollah has mounted attacks that have killed hundreds of
Americans. It has been publicly reported that Hezbollah has been
seeking a base of operations in the Western Hemisphere, in the
northern part of South America. One of the countries in that
part of South America is Suriname.

2.    Among the more powerful figures in Suriname is
DINO BOUTERSE, the defendant. BOUTERSE is from a politically
influential Surinamese family, and he has held himself out as a
Commander of Suriname's Counter-Terrorism Unit.

3.    During 2013, DINO BOUTERSE, the defendant, has
worked to give Hezbollah access to Suriname. In exchange for a
multi-million dollar pay-off, BOUTERSE has agreed to allow large
numbers of Hezbollah operatives to use Suriname as a permanent
base for, among other things, attacks on American targets. In
furtherance of his efforts to assist Hezbollah, BOUTERSE has

supplied a false Surinamese passport for the purpose of making clandestine travel easier, including travel to the United States; has begun to determine which heavy weapons might be provided to Hezbollah; and has indicated how Hezbollah operatives, supplied with a Surinamese cover story, might enter the United States.

4.    In addition, during 2013, DINO BOUTERSE, the defendant, has worked to supply cocaine for shipment to the United States. Along with EDMUND MUNSTLAG, a/k/a "Blue," the defendant, BOUTERSE has agreed to ship narcotics from Suriname up through the Caribbean and on to New York. In furtherance of this agreement, BOUTERSE and MUNTSLAG caused 10 kilograms of cocaine to be shipped out of Suriname – and, while in his government office, BOUTERSE removed from his safe one kilogram of cocaine and a rocket launcher.

### COUNT ONE:
### Attempt to Provide Material
### Support to a Foreign Terrorist Organization

The Grand Jury charges:

5.    From at least in or about December 2011, up to and including in or about August 2013, in an offense occurring in and affecting interstate and foreign commerce, begun and committed outside of the jurisdiction of any particular State or District of the United States, DINO BOUTERSE, the defendant, who was first brought to and arrested in the Southern District of

New York, and others known and unknown, unlawfully and knowingly
did attempt to provide "material support or resources," as that
term is defined in Title 18, United States Code, Section
2339A(b), to wit, property, lodging, training, false
documentation and identification, facilities, and weapons to a
foreign terrorist organization, to wit, Hezbollah, which was
designated by the United States Secretary of State as a foreign
terrorist organization on or about October 8, 1997, a
designation that remains in effect as of the date of filing of
this Indictment, knowing that Hezbollah had engaged in and was
engaging in terrorist activity (as defined in section
212(a)(3)(B) of the Immigration and Nationality Act), and that
Hezbollah had engaged in and was engaging in terrorism (as
defined in section 140(d)(2) of the Foreign Relations
Authorization Act, Fiscal Years 1988 and 1989).

      6.    DINO BOUTERSE, the defendant, working together
with EDMUND QUINCY MUNTSLAG and others known and unknown, did
the following, among other things:

<u>February - June 2013: Suriname</u>

<u>BOUTERSE and MUNTSLAG Agree
to Ship Drugs from Suriname to the United States -
and BOUTERSE Displays a Kilogram of Cocaine and a Rocket
Launcher</u>

      a.    On or about February 1, 2013, in Suriname,
BOUTERSE met with two men who purported to be connected to a

- 3 -

Mexican narcotics trafficking organization, but who were in fact confidential sources to the Drug Enforcement Administration (the "DEA") ("CS-1" and "CS-2", collectively, the "CSes"); during the meeting, BOUTERSE stated that he could facilitate narcotics trafficking activities for the CSes in Suriname, and could assist them (the CSes) in obtaining weapons.

      b.   On or about June 27, 2013, in Suriname, BOUTERSE, MUNTSLAG, and a co-conspirator not named as a defendant herein ("CC-1") met with the CSes. The meeting was audio- and video-recorded, and during the meeting:

      i.   With respect to narcotics, BOUTERSE, MUNSTLAG, and CC-1 discussed shipping cocaine from Suriname through the Caribbean and ultimately to the United States; BOUTERSE stated: "we can do transit from here to Trinidad, to Miami."

      ii.   With respect to weapons, in response to a question from CS-2 about obtaining mines, BOUTERSE stated: "you can play, but not on our side," indicating that CS-2 could obtain the mines, but should not plan to use the mines within Suriname.

      c.   The next day, on or about June 28, 2013, in Suriname, in BOUTERSE's government office, BOUTERSE and MUNTSLAG met with the CSes. The meeting was audio- and video-recorded, and during the meeting:

- 4 -

i.    BOUTERSE filled out forms needed to obtain false Surinamese identification documents for the CSes.

ii.    BOUTERSE told the CSes the ages that would be listed for them in the false documents, saying: "you're going to be 47 and you're going to be 53"; BOUTERSE also told the CSes what their false names would be, jokingly asking "you don't know how to write your own name?"

iii.    CS-1 and BOUTERSE discussed a shipment of "450" of "product," i.e., 450 kilograms of cocaine; BOUTERSE stated: "The day the money comes in, the next Saturday or the next Sunday we will able to fly [the cocaine] out of there. We're ready."

iv.    In connection with placing the "product" on a commercial flight out of Suriname, BOUTERSE indicated that it would be necessary to convey to CS-1 the "tag number" of the "bags," or luggage, in which the "product" had been placed.

v.    BOUTERSE opened an office safe, from which he (BOUTERSE) removed a kilogram-size package. BOUTERSE handed the package to MUNTSLAG and said "You can take it to the airport if you want"; MUNTSLAG indicated that the package had been treated with a chemical so that "the dogs" at the airport could not "smell it."

vi.    MUNTSLAG cut open the package with a knife; the package contained a white powdery substance. MUNSTLAG passed the open package to CS-2, and then took back the package and re-sealed it using tape.

vii. BOUTERSE removed from his office safe a rocket launcher, handed it to CS-2, and then took back the weapon and returned it to the safe; CS-2 asked "what caliber this is," to which BOUTERSE responded: "it's a LAW," referring to a light anti-tank weapon.

d.    On or about July 3, 2013, in Suriname, BOUTERSE, MUNTSLAG, and CC-1 met with the CSes. The meeting was audio- and video-recorded, and during the meeting BOUTERSE handed the CSes Surinamese passports, bearing the CSes' photographs as well as false names and false birthdates.

### July 2013: Suriname

### BOUTERSE Agrees to Allow Hezbollah Operatives Access to Suriname

e.    On or about July 3, 2013, BOUTERSE and CC-1 met with CS-1, and discussed a plan – whereby BOUTERSE would be paid in exchange for allowing access to Suriname for CS-1's associates, which associates CS-1 previously had described to BOUTERSE as members of Hezbollah. The meeting was audio- and video-recorded, and during the meeting:

        i.    In response to CS-1's statement that
"I'm not talking, you know, just sending ten people" to
Suriname, BOUTERSE responded: "done deal."

        ii.   CS-1 stated "we have to get them out of
Lebanon," to which BOUTERSE responded: "I think through
Trinidad."

        iii. BOUTERSE stated that he "want[ed] the
two parties to meet," and CS-1 explained that such a meeting
would take place in Greece.

        iv.   Referring to Hezbollah's need for arms,
CS-1 told BOUTERSE that "they want . . . like anything . . . the
Hezbollah are there [in Lebanon] . . . they're in a war"; CS-1
further said "it's like that thing you showed me in your office.
They need heavier stuff"; BOUTERSE responded: "Just tell me what
you want."

### July 2013: Suriname

### BOUTERSE and MUNTSLAG Ship a Test Load of 10 Kilograms of Cocaine

        f.    On or about July 21, 2013, in Suriname,
BOUTERSE and MUNTSLAG met with the CSes. The meeting was audio-
and video-recorded, and during the meeting:

        i.    In response to a question from CS-2 as
to how much CC-1 (who was not present at this meeting) was
"gonna receive for every key" (kilogram) sent from Suriname,

- 7 -

BOUTERSE responded: "If he wants a thousand a key no problem, but every week we are only gonna do twenty [kilograms]." BOUTERSE also said: "it will be one bag [of cocaine] a week, that's it. That's what we're gonna do."

   ii. CS-2 explained the planned route of the first cocaine shipment, stating: "We want to send it from here [Suriname], Trinidad, Trinidad - Fort Lauderdale, Fort Lauderdale - New York . . . [the cost is] one thousand five hundred per key for the guy to drive to New York"; to which BOUTERSE responded: "we are working on it."

   iii. CS-2 indicated that the first cocaine shipment would be a test load, stating: "we have the guys with trucks for bigger amounts . . . right now, we want to test the line"; in response, BOUTERSE indicated that the test load would leave on "Thursday," that is, July 24, 2013.

   iv. CS-2 assured BOUTERSE and MUNTSLAG that the drugs would arrive successfully in New York, stating: "When we grab it . . . anybody can't lose nothing. Just go straight, straight, straight to New York"; BOUTERSE responded by asking: "how the money comes back?"

   v. BOUTERSE and MUNTSLAG then discussed possible methods of being paid for cocaine shipments. BOUTERSE suggested carrying the cash back by air, stating: "how about private plane?"; BOUTERSE went on to explain: "If we hire a

private jet that comes in normally; at the airport we take it [the cash proceeds] out, see that's no problem."

g. On or about July 24, 2013, in Suriname, MUNTSLAG accepted approximately $60,000 in cash as payment for the transportation of a 10-kilogram test load of cocaine.

h. On or about July 25, 2013, MUNTSLAG sent a text message to CS-1 stating that he (MUNTSLAG) was unable to make arrangements to transport the drugs out of Suriname because the person in whose luggage the drugs were going to be placed did not take the flight, stating in his (MUNTSLAG's) text message: "the person who suppose to trav did not show up there;" MUNTSLAG further indicated that he was traveling to the airport in Suriname in order to retrieve the drugs, stating in his (MUNTSLAG's) text message: "I'm coming now to the airp[ort] . . . to get everything back".

i. On or about July 25, 2013, after CS-1 sent a text message to BOUTERSE asking him (BOUTERSE) to arrange to send the drugs on another flight departing Suriname on "saturday" (July 27, 2013), BOUTERSE responded by text message: "Ok bro we will make it work."

j. On or about July 25, 2013, BOUTERSE sent a text message to CS-1: "Blue [MUNTSLAG] is on it, but saturday is ok"; approximately thirteen minutes later, BOUTERSE sent a text message to CS-1 stating "Confirmed!!!"

k.    On or about July 27, 2013, MUNTSLAG informed CS-1 via text message that the drugs had been placed on a particular commercial flight departing Suriname for "tt" (Trinidad and Tobago); MUNTSLAG also provided the flight number, the name of the traveler in whose luggage the drugs were placed, and a photograph of the luggage tag for that traveler's luggage -- which luggage was later seized by law enforcement agents in Trinidad and Tobago, and found to contain 10 kilogram-size plastic bags containing cocaine.

## July 2013: Greece

### BOUTERSE Confirms That Hezbollah Men Will Be Sent to Suriname for Training, and for Operations Outside of Suriname

l.    On or about July 31, 2013, in Greece, BOUTERSE met with CS-1 and: (1) another DEA confidential source ("CS-3"), who purported to be "Hezbollah" and CS-1's "boss"; and (2) an undercover DEA agent (the "UC"), who purported to be a member of Hezbollah. The meeting was audio- and video-recorded, and during the meeting:

i.    In response to the question from CS-3 "you have an idea about Hezbollah?", BOUTERSE stated: "Yeah, I have."

ii.    CS-3 described Hezbollah: "I'm sure . . . you read about the wars that we are fighting with . . . the Americans. And from what I heard from [CS-1] also there is

no much love between you and the Americans." BOUTERSE responded:
"We have a problem with the Dutch. And Americans."

       iii. CS-3 asked: "concerning sending our
guys to your place [Suriname]. You agreed to help receive some
of our guys, to be trained . . . keep there for later, later
operations. Do you agree on it?"; BOUTERSE responded: "Yes, I
agree. The situation in Suriname . . . is good to do that
because we are a multicultural country; Muslims. We have a lot
of Muslims."

       iv.  In response to a question from CS-3
about how many men could come to Suriname in "the first batch,"
BOUTERSE stated: "30 to 60 . . . but we have to organize housing
for them . . . If they're going to . . . live in the city, we
are going to create a security guard for them . . . They're
going to stay under the security compound. Just like us."

       v.  CS-3 asked: "can you supply [the UC]
with the passport," to which BOUTERSE responded: "No problem."

       vi.  CS-3 said: "Hezbollah are very good
. . . we keep our promises. When you are ready with [the UC's]
passport . . . can you come to Haiti [to deliver it]?"; BOUTERSE
responded: "yes."

       vii. CS-3, referring to Hezbollah being
ready to make a payment to BOUTERSE, further explained that "we
are going to give you as a first deposit two million dollars

- 11 -

from our side as goodwill," and that BOUTERSE should pick up the money, deliver the false Surinamese passport to the UC, and travel back to Suriname with the UC. CS-3 stated: "So, [the UC] will be with the jet with the money. You have to bring his [the UC's] passport yourself, and then both of you go to Suriname"; when CS-3 asked "is this okay with you," BOUTERSE responded: "Yes."

        viii.    CS-3 also clarified that the money that the UC was providing was to be used by BOUTERSE to begin making preparations for other Hezbollah men to arrive in Suriname, stating: "when [the UC] comes . . . you guys will have your money . . . when you have money you could prepare for them", and further explained that some of the Hezbollah men going to Suriname would focus on American targets, stating: "we are going to send you also a few ones that might operate in South American against American targets. But you must know it is against American targets"; in response, BOUTERSE stated: "I know the story."

        ix.   In response to BOUTERSE asking "from which country," CS-3 said "they're going to come from Lebanon but how they get to you is what we have to figure out." BOUTERSE stated: "they can come through Trinidad. That's not a problem."

        x.   CS-3 asked "weapon wise, what can you supply us with? You know we need special kind of weapons."

- 12 -

BOUTERSE asked, "which ones?", and CS-3 responded with a list of weapons: "we need surface to air missiles, launchers like SAM-7, we need RPG, or similar to the RPG, what the Americans have, we need explosions"; BOUTERSE responded: "I would need two months for that. Then, I can give you the list of what we can supply."

        xi.   BOUTERSE indicated he (BOUTERSE) wanted a permanent Hezbollah presence in Suriname, stating: "We're going to need maybe 10 people who will stay permanently in Suriname. People that we can depend on and call up every second, any time . . . We need tough guys"; and further confirmed that these men would be used "inside the country . . . we need a little fort that we can depend on. And we can call them at any time."

        xii. CS-1 asked BOUTERSE what would happen when the Hezbollah men in Suriname wanted to leave Suriname to go to America, stating: "what you told me for when they go to the U.S. How are we going to set that up?"; BOUTERSE responded: "what we going to do also is apply a visa for them . . . Yeah, for the U.S., but then . . . we need open bank accounts for them, put some money in the bank account, buy a property, so that they can show that they're Surinamese who are not going to stay and they're coming back. And then they'll get the visa" to travel to the United States.

xiii.     CS-3 stated that "our first step,
first we're going to do is one passport for [the UC]," and
BOUTERSE responded: "consider it done." CS-3 then noted that the
purpose of the UC obtaining a Surinamese passport through
BOUTERSE was for the UC to travel to Suriname with BOUTERSE,
there to review the facilities being prepared for the Hezbollah
men who would later travel to Suriname, stating: "then you go
with [the UC] there [to Suriname], see the ground where these
people [Hezbollah men] are going to train, where they're going
to sleep, how they are going to eat, what type of food, what you
offer security wise, then we are going to send you the ten
[Hezbollah men] first, so you have an idea what caliber they
are. Then we are going to send you the thirty-one, we are going
to send you five, six, seven, nine, three (3), like in this way,
so that nobody will see them people coming inside"; CS-1 asked
"that's good, right? Is that better?", to which BOUTERSE
responded "Yeah."

xiv. CS-3 confirmed that his organization
was focused on harming the United States, stating: "And you know
one thing we want to fuck these Americans my friend. You'll fuck
the . . . Dutch, and we will fuck the Americans"; BOUTERSE
responded: "And the Americans . . . I'm totally behind you."

xv. BOUTERSE sought confirmation that the
Hezbollah men coming to Suriname would not attack the United

States embassy in Suriname, stating: "I'll organize everything in Suriname, no problem, but I have a special request. We have an embassy there, the U.S. embassy. But we can't do them nothing"; CS-3 agreed with this request, but added that "outside [of Suriname] we are going to fuck them [the Americans] good," to which BOUTERSE responded: "outside, I agree."

m.   Later in the same day, on or about July 31, 2013, in Greece, BOUTERSE met with CS-1. The meeting was audio- and video-recorded, and during the meeting, BOUTERSE said "small question for you – they [Hezbollah men] want to stay over there [in Suriname] as long as possible, right," to which CS-1 responded "Yeah, they would, would prefer like longer." BOUTERSE responded: "that's a base. That's a home." CS-1 said "Yeah, they want a strong home over in that area."

n.   On or about July 31, 2013, after the meeting with CS-3 had concluded, BOUTERSE sent MUNTSLAG a text message, which read, in part: "we hit the jackpot."

o.   On or about July 31, 2013, after the meeting with CS-3 had concluded, BOUTERSE sent CS-1 a series of text messages asking for identifying information about the UC, including the UC's "Real age" and "Height and eyes," which information BOUTERSE later included in a Surinamese passport bearing false identifying information that he (BOUTERSE) provided to the UC.

- 15 -

### August 2013: Panama

### BOUTERSE Provides a False Passport for the Benefit of Hezbollah

      p.   On or about August 29, 2013, in Panama, BOUTERSE met with CS-1 and the UC. During the meeting:

      i.   In response to the UC noting that CS-3 had not participated in a particular meeting because he did not have the appropriate travel documents, BOUTERSE stated that he (BOUTERSE) would make a "diplomatic" passport for CS-3.

      ii.  BOUTERSE indicated that everything was ready at "home" (in Suriname) for the arrival of the UC's men, and also said that some "toys" (weapons) would be ready for the UC to "inspect" in Suriname.

      iii. The UC said that, as previously discussed, BOUTERSE would be provided $2 million in cash, and BOUTERSE explained that the UC and MUNTSLAG should meet in Trinidad and Tobago, and fly together with the cash from Trinidad and Tobago back to Suriname. BOUTERSE also explained that, after arriving in Suriname, the UC and MUNTSLAG would deliver the cash to BOUTERSE and his associates.

      iv.  BOUTERSE handed a Surinamese passport to the UC, and BOUTERSE indicated that he (BOUTERSE) had picked an "Arabic" name for the passport; that he (BOUTERSE) had himself personally signed the UC's purported signature on the passport; and that he (BOUTERSE) had an exit stamp applied to

the passport, so that it would appear that the UC had previously left Suriname using the passport.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(E), 3238, and 2.)

## COUNT TWO:
## Conspiracy to Import Narcotics into the United States

The Grand Jury further charges:

7.   The allegations set forth in paragraphs one through four and six above are realleged and incorporated by reference as if set forth fully herein.

8.   From at least in or about December 2011, up to and including in or about August 2013, in Suriname and elsewhere, in connection with a conspiracy to commit an act of distribution outside the territorial jurisdiction of the United States, DINO BOUTERSE and EDMUND QUINCY MUNTSLAG, a/k/a "Blue," the defendants, who have and will enter the United States at a point of entry in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

9.   It was a part and an object of the conspiracy that DINO BOUTERSE and EDMUND QUINCY MUNTSLAG, a/k/a "Blue," the defendants, and others known and unknown, would and did import into the United States from a place outside thereof five kilograms and more of a mixture and substance containing a

- 17 -

detectable amount of cocaine, in violation of Sections 812, 952(a), 960(a)(1), and 960(b)(1)(B) of Title 21, United States Code.

10.   It was further a part and an object of the conspiracy that DINO BOUTERSE and EDMUND QUINCY MUNTSLAG, a/k/a "Blue," the defendants, and others known and unknown, would and did distribute a controlled substance, to wit, five kilograms and more of a mixture and substance containing a detectable amount of cocaine, intending and knowing that such substance would be imported into the United States from a place outside thereof, and into waters within a distance of 12 miles of the coast of the United States, in violation of Sections 812, 959(a), 960(a)(3) and 960(b)(1)(B) of Title 21, United States Code.

## Overt Acts

11.   In furtherance of the conspiracy and to effect the illegal object thereof, DINO BOUTERSE and EDMUND QUINCY MUNTSLAG, a/k/a "Blue," the defendants; a co-conspirator not named as a defendant herein ("CC-1"); and others known and unknown, committed the overt acts as alleged in paragraph six above.

(Title 21, United States Code, Sections 963 and 959(c).)

**COUNT THREE:**
**Use, Carrying, and Brandishing of a**
**Destructive Device During a Drug-Trafficking Crime**

The Grand Jury further charges:

12.   The allegations set forth in paragraphs one through four and six above are realleged and incorporated by reference as if set forth fully herein.

13.   From at least in or about December 2011, up to and including in or about August 2013, in an offense begun and completed outside the jurisdiction of any particular State or District of the United States, to wit, in Suriname and elsewhere, DINO BOUTERSE, the defendant, who was first brought to the Southern District of New York, during and in relation to a drug-trafficking crime for which he may be prosecuted in a court of the United States, namely, the narcotics conspiracy charged in Count Two of this Indictment, knowingly did use, carry, and brandish a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, brandishing, and possession of firearms, including destructive devices, to wit, the defendant brandished a Light-Antitank Weapon, which is a launcher containing a rocket.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii),
924(c)(1)(B)(ii), 3238, and 2.)

### FORFEITURE ALLEGATIONS

14.   The allegations contained in Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c).

15.   The violation of Title 18, United States Code, Section 2339B, alleged in Count One of this Indictment, was a Federal crime of terrorism, as defined in Title 18, United States Code, Section 2332b(g)(5), against the United States, citizens and residents of the United States, and their property.

16.   DINO BOUTERSE, the defendant, was an individual engaged in planning and perpetrating a Federal crime of terrorism, as defined in Title 18, United States Code, Section 2332b(g)(5), against the United States, citizens and residents of the United States, and their property.

17.   Upon conviction of the offense in violation of Title 18, United States Code, Section 2339B, alleged in Count One of this Indictment, DINO BOUTERSE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461:

a.   all right, title, and interest in all assets, foreign and domestic;

b.   all right, title, and interest in all assets, foreign and domestic, affording a source of influence over Hezbollah;

c.   all right, title and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and

d.   all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property;

including, but not limited to, a sum of money representing the value of the property described above as being subject to forfeiture.

18.   Upon conviction of the offense in violation of Title 18, United States Code, Section 2339B, alleged in Count One of this Indictment, DINO BOUTERSE, the defendant, shall pay to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c), a money judgment equal to the value of the assets subject to forfeiture under Paragraph 17 above.

19.   The allegations contained in Count Two are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Sections 853 and 970.

20.   As a result of committing the controlled substance offense alleged in Count Two of this Indictment, DINO BOUTERSE and EDMUND QUINCY MUNTSLAG, a/k/a "Blue," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting or derived from any proceeds they obtained directly or indirectly as a result of said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count Two of this Indictment.

        (Title 18, United States Code, Section 981(a)(1)(G)
     and 2332b(g)(5); Title 21, United States Code, Sections
    853 and 970; and Title 28, United States Code, Section 2461.)

### Substitute Assets Provision

21.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due
             diligence;

        b.   has been transferred or sold to, or
             deposited with, a third party;

        c.   has been placed beyond the jurisdiction of
             the court;

        d.   has been substantially diminished in value;
             or

        e.   has been commingled with other property
             which cannot be subdivided without
             difficulty;

- 22 -

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

- 23 -

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DINO BOUTERSE,
EDMUND QUINCY MUNTSLAG,
a/k/a "Blue,"

Defendants.

INDICTMENT

S2 13 Cr. 635

(18 U.S.C. §§ 2, 924(c)(1)(A)(ii),
924(c)(1)(B)(ii), 2339B, 3238; 21
U.S.C. § 963.)

PREET BHARARA
United States Attorney.

A TRUE BILL

*Susan Marck*
Foreperson.

11-7-13
MB

Filed (S2) Super seding
indictment.ca Ellis, USM