UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

UNITED STATES OF AMERICA,

                         -against-

DINO BOUTERSE, et al.,

                                   Defendants.

-------------------------------------------------------------------- x

**DEFENDANT DINO
BOUTERSE'S
MEMORANDUM OF LAW
IN SUPPORTOF PRE-TRIAL
<u>MOTIONS</u>**

S2 13 Cr. 635 (SAS)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................iii

PRELIMINARY STATEMENT ..................................................................................... 1

POINT I: COUNT ONE OF THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED DUE TO THE GOVERNMENT'S VIOLATION OF THE DOCTRINE OF SPECIALTY....................................................................................................................... 2

POINT II: THE OUTRAGEOUS CONDUCT OF THE GOVERNMENT IN ITS INVESTIGATION VIOLATED DUE PROCESS AND REQUIRES DISMISSAL OF THE INDICTMENT ............................................................................................................... 9

    A. Financial Inducement ...........................................................................................9

    B. Totality of the Government's Outrageous Conduct Violated Due Process ...........................12

        1. Investigation ...................................................................................................12

        2.Violations of Surinamese Law ........................................................................13

        3. Misrepresentations to Panama .........................................................................15

POINT III: THE POST-ARREST CUSTODIAL STATEMENTS ATTRIBUTED TO MR. BOUTERSE WERE INVOLUNTARY UNDER THE TOTALITY OF CIRCUMSTANCES AND MUST BE SUPPRESSED ........................................................................................ 16

POINT IV: THE GOVERNMENT SHOULD BE COMPELLED TO PROVIDE ADDITIONAL RULE 16 DISCOVERY ..................................................................... 19

    A. Documents Regarding Bouterse's Conditional Surrender ...................................21

    B. Outstanding Audio and Video Recordings and Reports .......................................21

    C. DEA Operational File ........................................................................................22

POINT V: BOUTERSE REQUESTS DISCLOSURE OF BRADY MATERIAL............... 22

POINT VI: BOUTERSE REQUESTS ADVANCE NOTICE OF 404(b) EVIDENCE ...... 23

POINT VII: BOUTERSE REQUESTS PRESERVATION OF ALL DOCUMENTS ....... 24

POINT VIII: BOUTERSE REQUESTS LEAVE TO FILE ADDITIONAL MOTIONS..... 25

## **Table of Authorities**

### **CASES**

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................22

*Colorado v. Spring*, 479 U.S. 564 (1973) ................................................................18

*Dickerson v. United States*, 530 U.S. 428 (2000) ...............................................16, 18

*Esposito v. INS*, 936 F.2d 911 (7th Cir. 1991) ........................................................11

*Fiocconi v. Attorney Gen. of the United States*, 462 F.2d 475 (2d Cir. 1972) ...........................3, 5

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) ......................................................17, 18

*Hampton v. United States,* 425 U.S. 484 (1976) .......................................................9

*Krishnapallai v. Holder*, 563 F.3d 606 (7th Cir. 2009) ............................................11

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...................................................................23

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177 (2d Cir. 2008) .....16, 19

*Lego v. Twomey*, 404 U.S. 477 (1972) ...................................................................17

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) ......................................................23

*Miranda v. Arizona*, 384 U.S. 436 (1966) .............................................................16

*Navarro v. INS*, 1995 U.S. App. LEXIS 8165 (9th Cir. 1995) ....................................11

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ...................................................17

*Shapiro v. Ferradina*, 478 F.2d 894 (2d Cir. 1973) ..................................................4

*Sinaj v. Holder*, 367 Fed. Appx. 595 (6th Cir. 2010) ..............................................11

*United States v. Agurs*, 427 U.S. 97 (1976) ............................................................23

*United States v. Al Jibori*, 90 F.3d 22 (2d Cir. 1996) ...............................................11

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) .................................... 9, 10, 12

*United States v. Alvarez-Machain*, 504 U.S. 655 (1992) ............................................3

*United States v. Armstrong*, 517 U.S. 456 (1996) ...............................................19, 20

*United States v. Baez*, 349 F.3d 90 (2d Cir. 2003) .................................................3, 21

*United States v. Bagley*, 473 U.S. 667 (1985) .........................................................23

*United States v. Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011) ..................................24

*United States v. Bout*, Docket No. 08 Cr. 365 (SAS), 2011 WL 3369797 (S.D.N.Y. 2011)...........3

*United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013) ..........................................9, 10

*United States v. Cuevas*, 402 F. Supp. 2d 504 (S.D.N.Y. 2005) .................................21

*United States v. Evans*, 667 F.Supp. 974 (S.D.N.Y. 1987) .........................................3

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006)...................................................21

*United States v. Gambino*, 818 F. Supp. 541 (E.D.N.Y. 1993) ......................................................24

*United States v. Ghailani*, 687 F. Supp. 2d 365 (S.D.N.Y. 2010) ..................................................20

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ................................................19, 20

*United States v. Gonzalez*, 275 F.Supp. 2d 483 (S.D.N.Y. 2003) .............................................4, 21

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ......................................................23

*United States v. Jurado-Rodriguez*, 907 F. Supp. 568 (E.D.N.Y. 1995) .....................................20

*United States v. Kelly*, 420 F.2d 26 (2d Cir. 1969)........................................................................24

*United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984) ............................................................14, 15

*United States v. Levy*, 947 F.2d 1032 (2d Cir. 1991)......................................................................3, 8

*United States v. Maniktala*, 934 F.2d 25 (2d Cir. 1991) ...............................................................19

*United States v. Martonak*, 187 F. Supp. 2d 117 (S.D.N.Y. 2002)................................................21

*United States v. Medina*, 985 F.Supp. 397 (S.D.N.Y. 1997) ......................................................3, 21

*United States v. Medina*, 167 Fed. Appx. 161, 162 (11th Cir. 2006) ...........................................11

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) .....................................................................10

*United States v. Paroutian*, 299 F.2d 486 (2d Cir. 1962) ...............................................................5

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974) .............................................................19

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)...............................................................23

*United States v. Rossi*, 545 F.2d 814 (2d Cir. 1976)........................................................................5

*United States v. Russell*, 411 U.S. 423 (1973) ................................................................................9

*United States v. Schmidt,* 105 F.3d 82 (2d Cir.1997) .....................................................................9

*United States v. Stenberg*, 803 F.2d 422 (9th Cir. 1986) ...............................................................14

*United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993) .................................................................19

*United States v. Sturtz*, 648 F.Supp. 817 (S.D.N.Y. 1986).........................................................4, 5

*United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974)..............................................................12

*United States v. Wang*, 707 F.3d 911 (7th Cir. 2013)......................................................................11

*United States v. Williams*, 705 F.2d 603 (2d Cir. 1982) ................................................................10

*United States v. Williams*, 23 F.3d 629 (2d Cir. 1994) ..................................................................20

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)........................................................................2

## **STATUTES**

18 U.S.C. § 2...........................................................................................................................2

18 U.S.C. § 924(c)(1)(A)(ii) ...................................................................................2

18 U.S.C. § 924(c)(1)(B)(ii) ...................................................................................2

18 U.S.C. § 2339B(a)(1) .........................................................................................2

18 U.S.C. § 2339B(d)(1)(C) ....................................................................................2

18 U.S.C. § 2339B(d)(1)(E) ....................................................................................2

18 U.S.C. § 3238 .....................................................................................................2

21 U.S.C. § 963 .......................................................................................................2

Federal Rule of Criminal Procedure 16 .......................................................19, 20, 21

Federal Rule of Evidence 404(b) .....................................................................23, 24

**TREATIES**

Organization of American States Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance (O.A.S. Document AG/doc. 88 rev. corr.) (1971) .....................................8

Organization of American States General Assembly Resolution on Acts of Terrorism (O.A.S. Document AG/Res. 4 (I-E 170) (1970)...................................................................8

1999 US-Suriname Drug Enforcement and Co-operation Agreement ...........................14

Vienna Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 1988, Article 6.2 ............................................................................................................4

Treaty Providing for the Extradition of Criminals, May 25, 1904, U.S.-Panama,

34 Stat. 2581 ..............................................................................................................4, 16

**SECONDARY SOURCES**

*Friedman, Lissitzyn & Pugh*, *International Law* 493 [1969]...........................................4

*Oppenheimer's International Law* (Oxford Univ. Press) ...............................................3

*Shaw*, *International Law* (Cambridge Univ. Press) ......................................................3

United States Department of State's 2014 INCSR Country Report: Suriname...........................13

United States Department of State's 2014 International Narcotics Control Strategy Report: Major Illicit Drug Producing, Drug-Transit, Significant Source, Precursor Chemical, and Money Laundering Countries..........................................................................................................12

2 *Weinstein's Evidence* 494 (1) (1980) .........................................................................24

## PRELIMINARY STATEMENT

This is a case in which the son of the sitting President of the Republic of Suriname, a small South American country, was targeted in a sting operation abroad without any evidence that he was previously involved in the crimes charged, or had a presence or conducted business in the United States.  It is a case in which paid informants, agents and other representatives of the United States government engaged in outrageous government conduct such as to violate due process, warranting dismissal of the indictment.  At their core, the charges in this case were initiated, instigated and invented solely by paid informants, agents and other representatives of the United States without the involvement of any actual member of a terrorist organization or drug cartel.  Arrested in Panama, defendant Dino Bouterse was transferred to the United States to be prosecuted for an alleged narcotics conspiracy and a related weapons charge. The government then violated the rule of specialty by adding an unrelated count in the superseding indictment.

Accordingly, defendant Dino Bouterse seeks dismissal of the indictment and counts thereof for: (1) a violation of the rule of specialty, and (2) outrageous governmental conduct, including, *inter alia*, impermissible monetary inducement and false statements made to another sovereign–the Republic of Panama–to the detriment of the defendant's due process rights. This motion also seeks (3) the suppression of involuntarily made statements, and (4) the production of discovery that is material and necessary to the defense of the case.

## POINT I

## COUNT ONE OF THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED DUE TO THE GOVERNMENT'S VIOLATION OF THE DOCTRINE OF SPECIALTY

On August 20, 2013, Dino Bouterse was indicted in the Southern District of New York on one count of a narcotics conspiracy, in violation of 21 U.S.C. § 963 and 18 U.S.C. § 3238, and one count of brandishing a firearm during the course of the same narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(B)(ii), 3238, and 2. At the time the indictment was filed, Mr. Bouterse was outside the territorial jurisdiction of the United States. On August 29, 2013, at the request of the United States government vis-a-vis a diplomatic note, which contained a blatant misrepresentation, Panamanian law enforcement arrested Bouterse in Panama and turned him over to United States Drug Enforcement Agency ("DEA") agents for removal to the United States. The government sought the removal of Mr. Bouterse from Panama to the United States so that it could prosecute him for his then-indicted conduct – namely a narcotics conspiracy and possession of a weapon in furtherance of that conspiracy. Panama complied. Bouterse was turned over to United States agents and flown to the Southern District of New York that same day, arraigned and detained pending trial. On November 7, 2013, the government filed a Superseding Indictment against Mr. Bouterse, which included a new Count One: an attempt to provide material support to a foreign terrorist organization in violation of 18 U.S.C. §§ 2339B(a)(1), 2339B(d)(1)(C), 2339B(d)(1)(E), 3238, and 2.

Because Count One of Mr. Bouterse's Superseding Indictment charged conduct that went beyond the requested purpose of his transfer from Panama to the United States, Count One of the Superseding Indictment must be dismissed for violating the doctrine of specialty. *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("The 'doctrine of specialty' prohibits

prosecution of a defendant for a crime other than the crime for which he has been extradited."),

*citing United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992); and *United States v. Levy*,

947 F.2d 1032, 1034 (2d Cir. 1991).

As this Court addressed in *United States v. Bout*, Docket No. 08 Cr. 365 (SAS), 2011 WL

3369797 (S.D.N.Y. 2011):

> Based on international comity, the principle of specialty generally
> requires a country seeking extradition to adhere to any limitations
> placed on prosecutions by the surrendering country.  Accordingly,
> the doctrine of specialty requires that an extradited defendant be
> tried for the crimes on which extradition was granted, and none
> other…. It reflects an agreement between states that persons
> surrendered should not be subjected to indiscriminate prosecution
> by the receiving state.  In order to effect this agreement … [an
> extradited defendant] cannot be tried on counts for which
> extradition was not granted.

*Bout*, 2011 WL 3369797, at *3, *aff'd*, 731 F.3d 233, 240 (2d Cir. 2013), *quoting United States v.*

*Baez*, 349 F.3d 90, 92 (2d Cir. 2003), and *United States v. Medina*, 985 F.Supp. 397, 400

(S.D.N.Y. 1997); *see also Shaw*, *International Law* (Cambridge Univ. Press), at 686 (defining

"specialty" under international law as the principle that "a person surrendered may be tried and

punished only for the offense for which extradition had been sought and granted"), *citing*

*Oppenheimer's International Law* (Oxford Univ. Press), at 961.

Although the doctrine of specialty is typically invoked when a defendant has been

extradited pursuant to a bilateral extradition treaty, the doctrine also applies when the extradition

is completed by other means.  *See Fiocconi v. Attorney Gen. of the United States*, 462 F.2d 475,

479-80 (2d Cir. 1972) (defendants may raise doctrine of specialty even though their extradition

was an "act of comity," not pursuant to extradition treaty); *United States v. Evans*, 667 F.Supp.

974, 979 (S.D.N.Y. 1987) (defendants may raise doctrine of specialty, even though they were

deported by act of comity rather than treaty, since the United States had informed the

surrendering government of the accusations against them and requested cooperation in relation to such offenses); *United States v. Gonzalez*, 275 F.Supp. 2d 483, 484 (S.D.N.Y. 2003) (this Court applying doctrine of specialty to extradition completed pursuant to, *inter alia*, a resolution of the surrendering nation's government, even though no extradition treaty existed between the two countries).

Rather than starting a regular extradition proceeding under its Extradition Treaty with Panama,[1] the United States requested the immediate surrender of Mr. Bouterse, alleging, albeit falsely, *inter alia,* that Mr. Bouterse presented a risk to the national security of Panama if he were to remain in the country.  Instead, Mr. Bouterse was transferred to the United States pursuant to a "Simple and Conditional Surrender" authorized by an Executive Decree signed by Ricardo Martinelli, President of the Republic of Panama.  *See* Executive Decree No. 4, Republic of Panama attached as Exhibit A to the Declaration of Counsel Michael Hueston  ("Counsel's Decl.").

The doctrine of specialty provides that "the requisitioning state may not, without permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited."  *See United States v. Sturtz*, 648 F.Supp. 817, 819 (S.D.N.Y. 1986), *quoting Shapiro v. Ferradina*, 478 F.2d 894, 905 (2d Cir. 1973) (*in turn quoting Friedman, Lissitzyn & Pugh*, *International Law* 493 [1969]).  A superseding indictment which charges offenses "of the same character" as the crime for which the fugitive was extradited does not violate the doctrine; however a superseding indictment that

---

[1] *See* Vienna Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 1988, Article 6.2 at https://www.unodc.org/pdf/convention_1988_en.pdf (last checked March 24, 2014) ("Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between Parties. The Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.").

adds "separate offenses" might. *Sturtz*, 648 F.Supp. at 819, *citing*, *inter alia*, *Fiocconi*, 462 F.2d at 480-81.

In determining whether a separate offense has been added, courts are cautioned against using a "technical standard" but instead should determine whether the extraditing country would consider the offense actually tried separate from the offense that formed the basis for extradition. *Sturtz*, 648 F.Supp. at 819, *citing United States v. Paroutian*, 299 F.2d 486, 490-91 (2d Cir. 1962) ("the test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate'").

Similarly, "[t]he general character of the crime for which the fugitive was extradited is used to determine whether a superseding indictment adds a separate offense." *Id.* If, for example, a superseding indictment charged a defendant with murder, but extradition had been previously sought to prosecute a pending narcotics indictment that at the time contained no murder counts, the doctrine of specialty would be violated if the prosecution for the murder count were permitted to proceed. *See Paroutian*, 299 F.2d at 491; and *United States v. Rossi*, 545 F.2d 814, 815 (2d Cir. 1976).

Here, at the time of his surrender, Mr. Bouterse had only been indicted for conspiracy to import narcotics and possession of a weapon, not terrorism. While to date the government has not agreed to disclose to the defense the specific terms under which the United States sought Mr. Bouterse's apprehension, or to provide a copy of the diplomatic note requesting his surrender, it is known from the Panamanian government's Executive Decree that:

> The Government of the United States of America[], through its Embassy in Panama, by way of Diplomatic Note No. 1541 dated August 29th, 2013, under the provisions of Section 552-A of the Code of Criminal Procedural (Law No. 35 dated May 23, 2013),

> requested the Simple and Conditional Surrender of Mr. Dino
> Bouterse, a citizen of Surinam, also known as "Dino Delano
> Bouterse", who is sought for charges of Conspiracy to import five
> kilograms or more of cocaine to the United States, and distributing
> five kilograms or more of cocaine, knowing that it would be
> imported into the United States from a place outside the United
> States and to waters within 12 nautical miles of the coast of the
> United States.  Also, on Charge Two, for carrying a weapon during
> an offense related to drug trafficking.

*See* Executive Decree No. 4, Republic of Panama annexed to Counsel's Decl. as Exhibit A at 1.

Without question, material support of terrorism is not of the same "general character" as narcotics offenses and is instead quite clearly an entirely different type of crime.

We do not dispute that the United States told Panama that Mr. Bouterse was alleged to be tied to Hezbollah; however, it was through a misrepresentation.  Specifically, Executive Decree No. 4 states:

> That the American authorities have pointed out that Mr. DINO
> DELANO BOUTERSE has indicated his interest in selling
> military-type weapons to Hezbollah, an international criminal
> organization renowned for its participation in international terrorist
> activities; as well as in setting up a training camp in Suriname for
> Hezbollah and for organizations related to drug trafficking.  The
> diplomatic representatives go on to state that, according to their
> opinion, and taking into account information they have, it is
> possible that members of said international organization will
> attempt to free him from custody, whether by attempting to corrupt
> officials or through the use of violence.

*See* Exhibit A at 1.  Notwithstanding this statement, the Decree still only grants a "Simple and Conditional Surrender" (*id.*), not a general conveyance for all purposes.  Moreover, it appears that the United States government's Diplomatic Note No. 1541 may have only requested a "Simple and Conditional Surrender" related to the then-pending narcotics offenses, nothing

more, thus undermining any claim that the United States sought a general conveyance for all purposes.  *Id.*[2]

Notably, the United States government appears to have made representations to Panama regarding Mr. Bouterse's alleged connections to Hezbollah, including a claim that Hezbollah "will attempt to free him from custody" (*id.* at 1); allegations the United States government knew to be blatantly false.  *See* Point II (moving to dismiss the indictment due to outrageous governmental conduct).  Regardless of whether Panama credited those false allegations or not, the Executive Decree was limited in scope and did not authorize Mr. Bouterse's transfer for crimes other than narcotics trafficking and related weapons possession.

The very beginning of Executive Decree No. 4, states, "Whereby the Simple and Conditional Surrender of Mr. Dino Bouterse, a citizen of Surinam, to the United States of America, is granted."  *Id.*  The same "Simple and Conditional" character of the surrender is stated in the dispositive section of the Decree, making clear a limited conveyance was intended. *Id*.   The legal grounds stated in the Decree are the "Vienna Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 1988 and Section 552-A of the [Panamanian] Penal Procedural Code (Law No. 35 dated May 23rd 2013)."[3]  It is undisputed that the Vienna Convention against Illicit Traffic of Drugs and Psychotropic Substances of 1988 relates solely to narcotics trafficking and does not encompass terrorism offenses.

Although Executive Decree No. 4 lists the Vienna Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances as a basis for the "Simple and Conditional

---

[2] The defense has not received Diplomatic Note No. 1541, and bases this statement on the first paragraph of Executive Decree No. 4, which references the diplomatic note.
[3] Article 552-A of the Code of Criminal Procedure of Panama establishes a procedure of simple and conditional surrenders of foreign nationals for grounds of public safety. This Article is attached as Exhibit E to Counsel's Decl.

Surrender" of Mr. Bouterse, it makes absolutely no reference to even a single treaty or international convention that targets terrorism. *See, e.g.*, The Organization of American States ("O.A.S.") Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance (O.A.S. Document AG/doc. 88 rev. corr.) (1971) (United States and Panama are both parties to this convention); O.A.S. General Assembly Resolution on Acts of Terrorism (O.A.S. Document AG/Res. 4 (I-E 170) (1970) (United States and Panama are both parties to this resolution).  If the Panamanian government had intended a broader conveyance to include other potential charges, the Executive Decree would have reflected it.

As a result of the clear limitations of Mr. Bouterse's transfer from Panamanian custody to United States custody, pursuant to the doctrine of specialty, this Court does not possess jurisdiction to try Mr. Bouterse on the later-added charge of attempt to provide material support of terrorism. *See Levy*, 947 F.2d at 1034 (holding that the doctrine of specialty limits a court's personal jurisdiction over the defendant).  Instead, Mr. Bouterse may only be charged and tried for the charges included in Mr. Bouterse's original August 20, 2013 Indictment and referred to in the Panamanian Decree.

Accordingly, we respectfully submit that Count One of the defendant's Superseding Indictment, which charges the defendant with an attempt to provide material support to a foreign terrorist organization, must be dismissed for violating the doctrine of specialty.

<u>**POINT II**</u>

**THE OUTRAGEOUS CONDUCT OF THE GOVERNMENT
IN ITS INVESTIGATION VIOLATED DUE PROCESS AND
REQUIRES DISMISSAL OF THE INDICTMENT**

In *Hampton v. United States,* 425 U.S. 484 (1976), the Supreme Court ruled that outrageous government conduct could invalidate a conviction on due process grounds.  The conduct of law enforcement officials must reach a "demonstrable level of outrageousness before it could bar conviction." *Id.,* at 495 n. 7; *see also United States v. Russell*, 411 U.S. 423, 432 (1973).  The Second Circuit has recognized the same principle: "Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *United States v. Al Kassar,* 660 F.3d 108, 121 (2d Cir. 2011).

Admittedly, as the Second Circuit has observed, outrageous governmental conduct is "an issue frequently raised that seldom succeeds." *United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997).  However, the Court has made clear that as a principle, it accepts the legal premise that governmental conduct can be so beyond the pale that it constitutes a due process violation requiring the dismissal of an indictment.  *See United States v. Cromitie*, 727 F.3d 194, 217-221 (2d Cir. 2013); *Al Kassar*, 660 F.3d at 121.  The facts of this case show that such a line has been crossed.

**A.**     **Financial Inducement**

One example of governmental misconduct is the offer by government agents or informants of vast sums of money to individuals in order to induce them to commit crimes.  Even though the Second Circuit has not set forth a monetary limit beyond which an offer violates due process, it is open to the notion that governmental financial inducement may be impermissibly

large. *Cromitie*, 727 F.3d at 221 ("Even if we were to accept the premise that an offer of money might, in some unlikely circumstances, be so large as to constitute outrageous government conduct, we do not believe a line should be drawn at a fixed dollar amount. Such an absolute line would be inconsistent with the flexible standards usually informing due process limitations.").

In *Cromitie* the government offered the defendants $250,000 along with some other benefits to induce them to participate in a fictitious terrorist act.  The Court acknowledged that it "has not encountered a government-offered cash inducement as large as $250,000" in any other case, but noted that it had ruled that an offer of $125,000 in the *Al Kassar* case was not outrageous and that other circuits had not determined offers of $100,000 and $200,000 to violate due process.  *Id.,* at 220.  The Court ultimately concluded that the $250,000 offer, although the largest it had encountered, was not so extreme that it amounted to outrageous conduct, primarily because the defense had not proffered any evidence to suggest that $250,000 was necessarily unusual to purchase the services of someone willing to lead a team to bomb synagogues and attack an air force base, observing, for example, that "[a] large sum reflecting the going rate for a murder-for-hire might exceed due process limits if offered to induce the sale of a small quantity of marijuana." *Id.* at 221."[4]

The situation here is dramatically different, and the financial inducement offered in this case does render the government's conduct outrageous.  At a meeting in Greece in late July

---

[4] *Cromitie* correctly identified $250,000 as the highest governmental inducement it had encountered.  *Cromitie* examined a pair of early cases that were part of the ABSCAM scandal, in which the Second Circuit considered offers of a $100 million loan, and multi-million dollar investments in a Congressman's district.  *See United States v. Williams*, 705 F.2d 603, 620 (2d Cir. 1982); *United States v. Myers*, 692 F.2d 823 (2d Cir. 1982), *cert. denied*, 461 U.S. 961 (1983).  The court in *Myers* concluded that $50,000 was the actual government inducement there because seeking investments in their congressional districts was a "normal" part of the politicians' responsibilities.  In *Williams*, the court considered only the potential profit of the investment to be a theoretical inducement, not the $100 million loan offer, since the loan had to be repaid.

2013, Bouterse was told that $15 million had been authorized as a payment by Hezbollah for assistance in setting up training camps in Suriname.[5]  There was, however, no agreement to do so, and no action taken by Bouterse up to that point to further that goal.  At the meeting in Greece, Bouterse was offered a clearly separate $2 million in "good faith money" to be paid and done with "as he pleased" upon delivery of a false Surinamese passport.[6]  Getting Mr. Bouterse to accept this inducement was no doubt considered by the agents critical to their ability to bring a charge against him.  There can be no dispute that $2 million represents an extraordinary inducement to provide a single passport.[7]  The conduct of the government should be seen for what it is, an outrageous effort to entice an individual to take the bait they felt was needed to

[5] Discussions about a $15 million payment began in June 2013 between the government informants and Dino Bouterse. (S*ee, e.g.,* 10/9/13 Discovery – Disc N-86 (180) 6/27/13 at 2:31:20). Discussions continued in July 2013, culminating at a meeting in Athens, Greece, between Mr. Bouterse, the informants, and purported Hezbollah operatives, where Mr. Bouterse was told that the $15 million had already been approved.  *See* 10/9/13 Discovery – July 30-August 1 2013 Greece Recordings (232) 7/31/13.vid.chief3 at 1:06.

[6] The undercover agent posing as a Hezbollah operative known as "Chief" told Mr. Bouterse during their meeting in Greece that Mr. Bouterse would receive $2 million as payment for one Surinamese passport for his nephew "Hassan."  The original plan was for Mr. Bouterse to receive the payment in cash during a meeting in Haiti, although the meeting instead took place in Panama.  The $2 million would be paid without requiring Mr. Bouterse to do anything more than to transmit a passport.  *See* 10/9/13 Discovery – July 30-August 1 2013 Greece Recordings (231) 7/31/13.vid.chief2 at 5:34; *see also* Superseding Indictment at 16 ("The UC said that, as previously discussed, Bouterse would be provided $2 million in cash . . .").

[7] *See, e.g.*, *United States v. Wang*, 707 F.3d 911, 913 (7th Cir. 2013) (Between $1,500 and $3,500 paid for package including altered Chinese passports and false United States Social Security cards); *United States v. Medina*, 167 Fed. Appx. 161, 162 (11th Cir. 2006) ($3,500 paid for false Venezuelan passport); *Navarro v. INS*, 1995 U.S. App. LEXIS 8165, at *2-*3 (9th Cir. 1995) ($9,000 paid for fake United States passport); *Esposito v. INS*, 936 F.2d 911, 912 (7th Cir. 1991) (approximately $1,000 paid for fake Italian passport); *Krishnapallai v. Holder*, 563 F.3d 606, 610 (7th Cir. 2009) ($3,000 paid for forged Singaporean passport); *Sinaj v. Holder*, 367 Fed. Appx. 595, 598 (6th Cir. 2010) ($10,000 paid for fake Italian passport); and *United States v. Al Jibori*, 90 F.3d 22, 23 (2d Cir. 1996) ($5,000 paid for fake Swedish passport).

11

make their case, and for which Bouterse had to do so little.  It was fundamentally unjust and a violation of due process.  Accordingly, the Court should dismiss Count One of the indictment.

**B.     Totality of the Government's Outrageous Conduct Violated Due Process**

Where common sense and decency are offended by extreme government conduct the Court is empowered to provide a remedy: dismissal of the indictment.  In addition to the extraordinary monetary inducement, when viewed as a totality, the conduct exhibited by the government throughout the investigation leading to this indictment is both shocking to the conscience and a violation of due process.  *Al Kassar*, 660 F.3d at 121.  While the government is generally permitted wide latitude in its investigative methods, the government's conduct in its investigation and pursuit of Mr. Bouterse, viewed in its totality, violated his due process rights. *United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974) (due process is particularly offended by any "deliberate and unnecessary lawlessness on [the government's] part" during a criminal investigation).

**1.  Investigation**

Without any evidence that Mr. Bouterse had been previously involved in the crimes charged, the investigation leading to this indictment is alleged by the government to have begun in December 2011 by targeting parties in Aruba for money laundering and narcotics trafficking. *See* Counsel's Decl. at ¶ 7.  Discovery produced by the government to date reveals that it was not until late 2012 that the investigation changed its primary focus to Dino Bouterse and Suriname, a country not considered by the United States government to a pose a substantial risk to the United States as a source country for narcotics trafficking or money laundering.[8]  According to the

---

[8] *See* United States Department of State's 2014 International Narcotics Control Strategy Report ("INCSR"): Major Illicit Drug Producing, Drug-Transit, Significant Source, Precursor Chemical, and Money Laundering Countries at http://www.state.gov/j/inl/rls/nrcrpt/2014/vol1/223186.htm

allegations in the indictment, it was not until January 31, 2013 that two of the confidential sources met with Mr. Bouterse for the first time.

The discovery offers no justification for this turn.  For example, in a conversation recorded with an alleged un-indicted co-conspirator in November 2012, the confidential source expressed his interest in "opening a line" from Suriname to Africa.[9]  There was no mention of the United States or Dino Bouterse, and no nexus between Bouterse and the United States. Moreover, the indictment itself does not allege any such pre-existing activity or inclination. Despite having no justification, multiple agents, paid informants, support resources, private planes, foreign trips, and the corresponding large sums of money to finance this operation were used prior to even discussing any alleged unlawful activities with Mr. Bouterse.

### 2.  Violations of Surinamese Law

Furthermore, government informants here committed numerous serious violations of Surinamese law which, combined with other outrageous acts, require dismissal of the indictment. During the more than year-and-a-half government operation conducted here, a multitude of laws of the Republic of Suriname were violated.  These include but are not limited to (1) entering Suriname using fraudulent travel documents, (2) purposefully avoiding border control when entering Suriname, (3) possession of a false passport in Suriname, (4) bringing a sum greater than $10,000 in cash or its equivalent into Suriname without making the required customs declaration, (5) attempting to obtain a false Surinamese passport, (6) conducting operations on behalf of a foreign government in Surinamese territory without the knowledge or permission of the government of Suriname.  *See* Affidavit of Irvin Dewdath Kanhai attached as Exhibit D to

---

(last checked March 24, 2014); and United States Department of State's 2014 INCSR Country Report: Suriname at http://www.state.gov/j/inl/rls/nrcrpt/2014/vol1/223074.htm (last checked March 24, 2014).
[9] *See* 2/11/14 Discovery N38-N43-WS400150 Recording.

Counsel's Decl.  These are serious violations of Surinamese law as shown by the potential penalties in both incarceration and fines that can be imposed for their violation.  *Id.*

Finally, pursuant to the 1999 US-Suriname Drug Enforcement and Co-operation Agreement,[10] the United States could have requested Surinamese permission to conduct this operation, which would have avoided the need for paid informants to enter Suriname using false passports or avoid border control.  The government's decision to ignore these lawful means of conducting an investigation in Suriname, and instead have its agents and informants deliberately commit numerous unnecessary crimes, is an abuse of power and outrageous conduct requiring the dismissal of this indictment.

Prior violations of law by agents and informants have been considered in the past to constitute outrageous government conduct.  In *United States v. Stenberg*, 803 F.2d 422, 425-27 (9th Cir. 1986), the defendants were charged with killing and dealing in illegal wildlife.  As part of the government's investigation, several federal agents went on illegal hunting trips led by the defendants, during which they themselves killed various animals.  *Id.*  The court stated that if the defendants had not already been engaged in this conduct, this illegal killing of wildlife by government agents would amount to outrageous government conduct.  *Id.,* at 430-431.  This was because "the killing of wildlife, on more than one occasion, by a [government] agent raises significant questions as to the extent to which [the government] may commit serious crimes in order to prevent others from committing similar offenses." *Id.*

Similarly, in *United States v. Lard*, 734 F.2d 1290, 1291 (8th Cir. 1984), the defendant Lard was convicted at trial of offenses related to selling an unregistered "destructive device." During the investigation, government agents allegedly smoked marijuana with Lard after

---

[10] *See* 1999 US-Suriname Drug Enforcement and Co-operation Agreement at http://www.state.gov/documents/organization/121440.pdf (last checked on March 24, 2014).

purchasing the destructive device. *Id.,* at 1292. On appeal, the court ultimately held that Lard had been entrapped as a matter of law. *Id.,* at 1295. However, it went on to state that the government agents' "overzealous efforts to instigate crime" included "rather extreme and questionable measures—including the smoking of marijuana" and suggested that this would violate "[c]oncepts of fundamental fairness" and could constitute outrageous government conduct had entrapment not already been found. *Id.,* at 1296-97.

### 3.  Misrepresentations to Panama

As noted in Point I, Mr. Bouterse was outside the territorial jurisdiction of the United States when the indictment was filed. On August 28, 2013, Bouterse lawfully entered Panama alone. The next day, Panamanian law enforcement arrested him in the streets of Panama City while he was exiting a restaurant. *See* Declaration of Dino Bouterse attached to Counsel's Decl. as Exhibit B. Mr. Bouterse did not enter Panama with or have in his possession any weapons or drugs, and the United States has never alleged otherwise. On the same day, the United States sought the removal of Mr. Bouterse from Panama to the United States so that it could prosecute him for his then-indicted conduct. Rather than starting a regular extradition proceeding under its Extradition Treaty with Panama, the United States requested the immediate surrender of Mr. Bouterse, alleging, *inter alia,* a danger to Panama if he were to remain in the country.

Specifically, the Panamanian Executive Decree No. 4, issued the day of Mr. Bouterse's arrest, references the United States Diplomatic Note's representation that "…members of that international organization [Hezbollah] will attempt to free [Bouterse] from custody, whether by attempting to corrupt officials or through the use of violence." *See* Exhibit A to Counsel's Decl. This was an allegation that the United States knew to be false. The discovery clearly shows that this was a sting operation that never involved actual members or associates from either drug

cartels or Hezbollah.  Rather, government informants and agents portrayed themselves to be members of Hezbollah and drug cartel members.  Panama unwittingly complied and turned Mr. Bouterse over to DEA agents for removal to the United States within hours of his arrest.

The false alarm contained in the diplomatic note was presumably aimed at securing Bouterse's immediate surrender from Panama rather than affording him the rights he would be entitled to under the Extradition Treaty between the United States and Panama.  The United States and Panama have been parties to a Treaty of Extradition since 1904, which establishes which crimes are extraditable and the procedures to be followed when extradition is requested. In an apparent effort to circumvent the lawful procedures of extradition, the United States government seems to have offered blatantly false warnings about dangers to Panama's security to that country's unsuspecting government, resulting in the denial of Mr. Bouterse's rights.  Such misconduct by the government is shockingly outrageous and violated Mr. Bouterse's due process rights, and accordingly the indictment must be dismissed.

## POINT III

### THE POST-ARREST CUSTODIAL STATEMENTS ATTRIBUTED TO BOUTERSE WERE INVOLUNTARY UNDER THE TOTALITY OF CIRCUMSTANCES AND MUST BE SUPPRESSED

Statements adduced during custodial interrogation are not admissible unless it can be demonstrated that an individual's privilege against self-incrimination was effectively and adequately safeguarded.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  Moreover, the Fifth Amendment right against self-incrimination governs the admissibility of statements made to U.S. agents overseas, and the Miranda framework is applicable to such interrogations.  *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177 (2d Cir. 2008).  Custodial statements comport with due process only when they are voluntary.  *Dickerson v. United States*, 530 U.S.

428 (2000).  It is the government's burden to prove voluntariness by a preponderance of the evidence.  *Lego v. Twomey*, 404 U.S. 477 (1972).  The court is referred to the Declaration of Dino Bouterse attached to Counsel's Decl. at Exhibit B regarding facts in support of this application.

The issue of whether statements are voluntary or not turns on "whether a defendant's will was overborne 'by the circumstances surrounding the giving of a [statement].'"  *Dickerson*, 530 U.S. 428 at 434.   That is, whether a statement was the "free and unconstrained choice of its maker[.]".  *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988).  Voluntariness is determined by analyzing the totality of circumstances surrounding the statement to determine whether the statements were in fact the product of free choice or merely acquiescence to authority. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

Here, Mr. Bouterse, a Surinamese national, was arrested on foreign soil by armed Panamanian law enforcement agents.  He was placed in a Panamanian detention facility shackled and handcuffed and kept in a room with armed guards, and was not informed of the reason for his detention.  Nor was he told his destination when removed, still shackled and handcuffed, to a vehicle with armed guards and accompanying police vehicles.  This coercive atmosphere continued when the destination was reached: a hangar guarded by uniformed military personnel at an airport.  He was handed a Panamanian resolution in Spanish not translated to him, and was told for the first time that he was being removed by plane to the United States.   Still Mr. Bouterse was not informed of the reason for his detention or the reason for his forced removal to the United States.

Once on board the plane Mr. Bouterse was confronted by the presence of several U.S. agents.  His leg shackles were removed but he remained handcuffed.  An agent produced an

English language document which purported to advise him of his Miranda rights.  Mr. Bouterse still was not told the reason for his detention and flight to the United States.  Although he signed the form, he refused to initial, when asked, spaces for a waiver of his right to remain silent, to have a lawyer present, that his statements were voluntary and his waiver knowing, and that no promises or threats or pressure of any kind had been used against him.  *See* Exhibit C attached to Counsel's Decl.

As Mr. Bouterse's declaration relates, the interrogating agent threatened him that unless he talked he would face terrorism charges in New York.  It was only then that Mr. Bouterse, a foreign national with no experience in American law or familiarity with the rights of an accused, answered questions.

In analyzing the totality of circumstances present, the interactions between the agents and Mr. Bouterse, his characteristics, the conditions of the interrogation and the conduct of the agents, including psychological coercion and threats, are all relevant.  *Dickerson*, 530 U.S. at 428; *Colorado v. Spring*, 479 U.S. 564, 573 (1973).  Characteristics of the defendant to be examined include his experience and background, his intelligence as well as his physical and mental state.  Characteristics of the interrogation and the conduct of the agents include the duration and conditions of the interrogation, the attitude of the agents, the presence or absence of counsel, psychological coercion, and threats or material misrepresentations.  *Scully*, 850 F.2d at 894.  Here, the facts establish a demonstrably coercive scenario, which had the effect of overcoming free will, resulting in the mere acquiescence to authority and not a willful, knowing and voluntary waiver of rights.

Under the totality of the circumstance as described in Mr. Bouterse's declaration, the statements attributed to him must be suppressed.  In the alternative, a hearing should be held to determine their admissibility.

### POINT IV

### THE GOVERNMENT SHOULD BE COMPELLED TO PROVIDE ADDITIONAL RULE 16 DISCOVERY

Federal Rule of Criminal Procedure 16(a) requires the government to disclose various information and items of evidence "[u]pon request of a defendant."   Bouterse made letter demands to the government, dated September 30, 2013, January 30, 2014, and March 21, 2014, as well as by conferring and email correspondence.  Counsel's Decl. at ¶ 8.  Rule 16 allows for liberal discovery, although not discovery of the government's entire case.  *United States v. Percevault*, 490 F.2d 126, 130 (2d Cir. 1974).

Rule 16(a)(1)(E) requires the government to disclose documents or other tangible objects if: (1) they are material to the defense, (2) the government intends to offer them as evidence in its case-in-chief, or (3) they were obtained from or belong to the defendant.  *See United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991).  "Evidence that the government does not intend to use in its case-in-chief is material if it could be used to counter the government's case or to bolster a defense…."  *United States v. Stevens*, 985 F.2d 1175, 1179-80 (2d Cir. 1993) (interpreting Fed. R. Cr. P. 16(a)(1)(C), the predecessor to Rule 16(a)(1)(E)).  An inquiry under Rule 16 turns on whether the material sought correlates with defenses in the case.  *See In Re Terrorist Bombings of U.S. Embassies in East Africa*, *supra,* at 125 (citing *Stevens*, 985 F.2d at 1180).

In discussing "materiality" the government often invokes *United States v. Armstrong*, 517 U.S. 456 (1996) to conclude that the documents must relate to an argument in response to the prosecution's case-in-chief at trial in order to be material.  *See, e.g., United States v. Giffen*, 379

F. Supp. 2d 337, 342 (S.D.N.Y. 2004).  However, this is incorrect.  As one district court has observed:

> [O]ne might argue that [*Armstrong*] makes Rule 16(a)(1)(E) completely unavailable to compel production of evidence pertinent to an affirmative defense unrelated to the merits of the prosecution's case-in-chief...  The Supreme Court there seemed so to indicate in ruling that the defendant was not entitled to discovery under [Rule 16(a)(1)(E)'s predecessor,] Rule 16(a)(1)(C)...in support of a selective prosecution claim because "in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."  *Id.* at 463.  Nonetheless, this statement was dictum because the Court's necessary finding was only with respect to Rule 16's application to the selective prosecution claim.  Moreover, the Court subsequently resolved the matter on the assumption that the requested discovery would have been available if the defendant could have made the necessary threshold showing regarding the claimed selective prosecution.

*United States v. Ghailani*, 687 F. Supp. 2d 365, 368, fn. 9 (S.D.N.Y. 2010) (holding that Rule 16 disclosure obligations applied to a speedy trial motion).

So "materiality" encompasses information relating to affirmative defenses such as entrapment, *United States v. Williams*, 23 F.3d 629, 635 (2d Cir. 1994) (entrapment is an affirmative defense), and rules such as specialty.  *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 576 (E.D.N.Y. 1995) ("A person extradited has the right to invoke the rule of specialty absent a waiver of such protection from the surrendering state.").

Accordingly, the government should be compelled to provide materials as follows: (1) all communications and documents sent between the United States of America and the Republic of Panama regarding Mr. Bouterse's simple and conditional surrender to the United States, (2) all outstanding audio and video recordings regarding the investigations of unindicted co-conspirators, targets, and Mr. Bouterse, and (3) the DEA Operational File.

**A.      Documents Regarding Bouterse's Conditional Surrender**

Though requested, the government declined to turn over the Diplomatic Note, or other documents related to Mr. Bouterse's surrender.  *See* Counsel's Decl. at ¶ 10.  These documents are material to the arguments raised in Points I and II.  Courts typically analyze such diplomatic notes and correspondence in determining specialty motions.  *See e.g.*, *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003); *United States v. Gonzalez*, 275 F. Supp. 2d 483, 487 (S.D.N.Y. 2003); *United States v. Martonak*, 187 F. Supp. 2d 117, 120 (S.D.N.Y. 2002); *United States v. Cuevas*, 402 F. Supp. 2d 504, 507 (S.D.N.Y. 2005); and *United States v. Medina*, 985 F. Supp. 397, 401 (S.D.N.Y. 1997).

Accordingly, the documents in the possession of any United States government agency should be produced, whether or not they are in the prosecutor's possession.  *See United States v. Giffen*, 379 F. Supp. 2d at 342-343 (Rule 16 is an antiwithholding provision), and *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) (collecting cases) ("Courts have typically required the prosecution to disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team.").

**B.      Outstanding Audio and Video Recordings And Reports**

At the defendant's request for materials involving the activities of the defendant's unindicted alleged co-conspirator during the time frame of the indictment, the government supplemented its disclosures with reports and audio and video recordings from April 2012 through early February 2013.  However, no recordings or reports were provided from the time period from early February 2013 to June 21, 2013.  The supplemental discovery contains recordings of conversations between an unindicted co-conspirator and informants and

undercover agents.  There are also several recordings (N-23, N-35, and N-80) that were not produced to the defense but are referred to in produced DEA reports.  The defense has requested these recordings but the government has not provided them.  For example, N-80 concerns conversations between an unindicted co-conspirator and government informants while on the trip to Suriname where Bouterse was introduced to the informants.  Accordingly, these recordings should be produced as they involve conversations between an unindicted co-conspirator and the government's agents and confidential sources during the time period charged in the indictment.

**C.      DEA Operational File**

Bouterse has requested that the government provide him with all budgetary and authority records regarding his case, and the operational file from the Drug Enforcement Agency or any federal agency directly or indirectly involved in the investigation against him and his unindicted alleged co-conspirators.  Counsel's Decl. at ¶ 12.  A review of the file would allow the defense to determine if the confidential sources or agents involved in the case operated outside their budget and authority, or inapposite to DEA regulations.  Such divergence from proper procedure is discoverable under Rule 16 to discover whether the DEA and/or its operatives violated any federal statute or regulation in its investigation leading to this indictment.

<u>**POINT V**</u>

**BOUTERSE REQUESTS DISCLOSURE OF BRADY MATERIAL**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The Court later refined this ruling, holding that the duty to disclose such evidence is applicable even if there has been no request by the accused, *United*

22

*States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).

In light of *Brady* and its progeny, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  The obligation to disclose *Brady* material "exists without regard to whether it has been recorded in tangible form."  *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  Disclosure must be made "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial."  *Id.* at 226; *see also, e.g., Leka v. Portuondo¸* 257 F.3d 89, 99-103 (2d Cir. 2001).  Close cases and doubtful questions are resolved in favor of disclosure.  *Agurs*, 427 U.S. at 108; *Kyles*, 514 U.S. at 439 (citing *Agurs*).  Mr. Bouterse requested these materials, *see* Counsel's Decl. at ¶¶ 9-13, and they should be disclosed.  *See United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012) ("For *Brady* purposes, it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions, because the purpose of Brady is to apprise the defendant of exculpatory evidence obtained during the fact-gathering that might not otherwise be available to the defendant.").

## POINT VI

### BOUTERSE REQUESTS ADVANCE NOTICE OF 404(b) EVIDENCE

Fed. R. Evid. 404(b) provides that, upon request of a defendant in a criminal case, the government "shall provide reasonable notice in advance of trial" of any evidence of other crimes, wrongs, or acts it intends to introduce at trial.  Mr. Bouterse requested these materials.  *See* Counsel's Decl. at ¶ 9.  Under Rule 404(b), notice is mandatory, and the Court should therefore direct compliance.

23

It is in the interest of sound judicial administration to require pretrial notice under Rule 404(b), and resolve admissibility to the greatest extent possible before the jury is exposed to voir dire examination and opening statements.  2 *Weinstein's Evidence* 494 (1) at 404-13 (1980); *also see United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969) ("[T]rial by ambush in violation of spirit of rules…").  Typically, the government consents to this relief.  *See e.g.*, *United States v. Gambino*, 818 F. Supp. 541, 552-3 (E.D.N.Y. 1993).

## POINT VII

**BOUTERSE REQUESTS PRESERVATION OF ALL DOCUMENTS**

Mr. Bouterse requests that the government preserve all documents from destruction, alteration, mutilation or dilution in regards to his discovery requests or the government's disclosure obligations.  *See, e.g., United States v. Barret*, 824 F. Supp. 2d 419, 457-458 (E.D.N.Y. 2011).

## POINT VIII

## BOUTERSE REQUESTS LEAVE TO FILE ADDITIONAL MOTIONS

The defendant requests leave to file additional motions if made necessary by subsequent disclosures.

Dated:      New York, New York
            March 28, 2014

Respectfully submitted,

_/s/_____
JOSE M. ARRUFAT-GRACIA, ESQ.
*Attorney for Defendant*
Arrufat Gracia PLLC
130 West 42nd Street, Suite 705
New York, New York 10036

RICHARD H. ROSENBERG, ESQ.
*Attorney for Defendant*
217 Broadway, Suite 707
New York, New York 10007

MICHAEL O. HUESTON, ESQ.
*Attorney for Defendant*
350 Fifth Avenue, Suite 4810
New York, New York 10118

FLORIAN MIEDEL, ESQ.
*Attorney for Defendant*
Miedel & Mysliwiec LLP
Trinity Centre
111 Broadway, Suite 1401
New York, New York 10006

To:     Adam Fee, Michael Lockard and Edward Kim (by ecf)
        *Assistant United States Attorneys*