UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                           :

UNITED STATES OF AMERICA

                           :          S2 13 Cr. 635 (SAS)

       - v. -

                           :

DINO BOUTERSE,

                           :

          Defendant.

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
<u>IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS</u>**

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

Michael D. Lockard and
Adam Fee,
Assistant United States Attorneys
     - Of Counsel -

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................2

    A.    Recorded Meetings With Bouterse ................................................................ 2

    B.    Bouterse's Arrest And Expulsion From Panama .......................................... 8

    C.    The Defendant's Post-Arrest Statement...................................................... 10

    D.    The Second Superseding Indictment ........................................................... 13

    E.    Bouterse's Pretrial Motions ......................................................................... 13

ARGUMENT ...........................................................................................................................13

I.     BOUTERSE'S MOTION TO DISMISS ON SPECIALTY GROUNDS SHOULD BE
      DENIED........................................................................................................... 13

    A.    Relevant Law ............................................................................................... 14

    B.    Discussion .................................................................................................... 16

II.    BOUTERSE'S MOTION TO DISMISS BASED ON PURPORTED OUTRAGEOUS
      GOVERNMENT CONDUCT SHOULD BE DENIED ................................................. 18

    A.    Relevant Law ............................................................................................... 18

    B.    Discussion .................................................................................................... 25

III.   BOUTERSE'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENT
      SHOULD BE DENIED WITHOUT A HEARING ........................................................ 31

    A.    Relevant Law ............................................................................................... 31

    B.    Discussion .................................................................................................... 33

IV.   THE DEFENDANT'S REQUESTS TO COMPEL DISCOVERY ARE EITHER
      PREMATURE, MOOT, OR WITHOUT MERIT ......................................................... 36

CONCLUSION........................................................................................................................38

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pre-trial motions of defendant Dino Bouterse ("Bouterse" or "the defendant").[1] The defendant is the son of the current President of Suriname.  At the time of his arrest in this case, the defendant was serving as the head of Suriname's Counter-Terrorism Unit.  While holding that position, during 2013, the defendant worked to give Hezbollah access to Suriname.  In exchange for a multi-million dollar pay-off, Bouterse agreed to allow large numbers of Hezbollah operatives to use Suriname as a permanent base for, among other things, attacks on American targets. In furtherance of his efforts to assist Hezbollah, Bouterse supplied a false Surinamese passport for the purpose of making clandestine travel easier, including travel to the United States; began to determine which heavy weapons might be provided to Hezbollah; and indicated how Hezbollah operatives, supplied with a Surinamese cover story, might enter the United States.

In addition, during 2013, the defendant worked to supply cocaine for shipment to the United States. Along with his co-defendant Edmund Munstlag, a/k/a "Blue," Bouterse agreed to ship narcotics from Suriname up through the Caribbean and on to New York. In furtherance of this agreement, Bouterse and Muntslag caused 10 kilograms of cocaine to be shipped out of Suriname, and, while in his government office, Bouterse removed from his safe one kilogram of cocaine and a rocket launcher.

---

[1] The Government respectfully requests that the Court expand the page limit for this memorandum to 40 pages. The defendant previously sought and obtained an extension of the page limit for their initial memorandum to 30 pages.  The additional length sought here is based on the number and complexity of the legal issues raised in the defendant's motions as well as the extended factual background pertaining to those motions.

The defendant now asks the Court to dismiss the indictment on two grounds, to suppress the defendant's mirandized post-arrest statement, and for various other forms of relief. For the reasons set forth below, the defendant's motions should be denied in their entirety.

## BACKGROUND

As alleged in the superseding indictment, S2 13 Cr. 635 (SAS) (the "Indictment" or "Ind."), during 2013, Bouterse worked towards a large-scale transaction to import cocaine into the United States, during which he and a co-conspirator caused 10 kilograms of cocaine to be dispatched from Suriname; and also worked with individuals whom he believed to be representatives of the terrorist organization Hezbollah to provide that terrorist organization with shelter in Suriname and support for terrorist operations against the United States.  Bouterse, a powerful figure in Suriname, is from a politically influential Surinamese family, and he has held himself out as a Commander of Suriname's Counter-Terrorism Unit ("CTU").

In or about December 2011, the DEA began investigating a co-conspirator not named as a defendant in the Second Superseding Indictment (hereinafter, the "S2 Indictment") – referred to as "CC-1" in the S2 Indictment – who was an associate of Dino Bouterse.  Through an introduction made by CC-1, in or about February 2013, two confidential sources ("CS-1" and "CS-2," referred to collectively as the "CSes") working at the direction and under the supervision of the DEA began meeting with Bouterse and several of his co-conspirators in Suriname, including co-defendant Edmund Munstlag, a/k/a "Blue."  (Ind ¶ 6(a)).  Bouterse's ensuing course of conduct is summarized below.

### A.      Recorded Meetings With Bouterse

#### 1.      February – June 2013: Suriname

Following their arrival in Suriname, on or about February 1, 2013, CS-1, CS-2, and CC-1 were taken to a compound to meet with Bouterse.  During the meeting, Bouterse stated that he

2

could facilitate narcotics trafficking activities for the CSes in Suriname, and could assist them (the CSes) in obtaining weapons.  In a later meeting on or about June 27, 2013, between Bouterse, Muntslag, CC-1 and the CSes, Bouterse and his co-conspirators discussed shipping cocaine from Suriname through the Caribbean and ultimately to the United States.  Bouterse stated: "we can do transit from here to Trinidad, to Miami."  (Ind. ¶ 6(b)).

The next day, on or about June 28, 2013, in Suriname, in Bouterse's government office, Bouterse and Muntslag met with the CSes.  Bouterse filled out forms needed to obtain false Surinamese identification documents for the CSes, telling the CSes the ages that would be listed for them in the false documents and saying: "you're going to be 47 and you're going to be 53"; Bouterse also told the CSes what their false names would be, jokingly asking "you don't know how to write your own name?"  (Ind. ¶6(c)).  Bouterse also discussed with the CSes a shipment of "450" of "product," *i.e.*, 450 kilograms of cocaine.  Bouterse told the CSes that he could fly the cocaine out of Suriname on commercial airline flights, and showed the CSes a kilogram-size package of cocaine that Bouterse stored in a safe in his office.  Bouterse handed the package to Muntslag and said "You can take it to the airport if you want"; Muntslag indicated that the package had been treated with a chemical so that "the dogs" at the airport could not "smell it." Bouterse, who also had discussed weapons trafficking with the CSes, then showed the CSes a rocket launcher that he stored in his safe, handing it to the CSes to inspect.  (*Id.*).

On or about July 3, 2013, in Suriname, Bouterse, Muntslag, and CC-1 met with the CSes; during the meeting Bouterse handed the CSes Surinamese passports, bearing the CSes' photographs as well as false names and false birthdates.  (Ind. ¶ 6(d)).

### 2. July 2013: Suriname
### Bouterse Agrees to Allow Hezbollah Operatives Access to Suriname

On or about July 3, 2013, Bouterse and CC-1 met with CS-1 to discuss a plan for Bouterse to provide access to associates of CS-1 that Bouterse understood to be members of Hezbollah.  (Ind. ¶ 6(e)).  Bouterse discussed bringing the Hezbollah members to Suriname through Trinidad; asked for a meeting with the Hezbollah representatives; and asked the CSes to tell him what weapons Hezbollah wanted to obtain.  (*Id.*).

### 3. July 2013: Suriname
### Bouterse and Muntslag Ship a Test Load of 10 Kilograms of Cocaine

On or about July 21, 2013, Bouterse and Muntslag met with the CSes in Suriname. Discussing the plan to send cocaine to the United States, Bouterse discussed CC-1's commission and the quantities that he and his conspirators could export – up to 20 kilograms per week. Bouterse agreed to export a 10-kilogram test load later that week.  (Ind. ¶6 (f)).  On or about July 24, 2013, in Suriname, Muntslag accepted approximately $60,000 in cash as payment for the transportation of a 10-kilogram test load of cocaine.  (Ind. ¶ 6(g)).

On or about July 25, 2013, Muntslag sent a text message to CS-1 stating that he (Muntslag) was unable to make arrangements to transport the drugs out of Suriname because the person in whose luggage the drugs were going to be placed did not take the flight, stating in his (Muntslag's) text message: "the person who suppose to trav did not show up there."  Muntslag further indicated that he was traveling to the airport in Suriname in order to retrieve the drugs, stating in his (Muntslag's) text message: "I'm coming now to the airp[ort] . . . to get everything back".  After CS-1 sent a text message to Bouterse asking him (Bouterse) to arrange to send the drugs on another flight departing Suriname on "saturday" (July 27, 2013), Bouterse responded by text message: "Ok bro we will make it work."  Bouterse sent another text message to CS-1

stating that: "Blue [Muntslag] is on it, but saturday is ok"; approximately thirteen minutes later, Bouterse sent a text message to CS-1 stating "Confirmed!!!"  (Ind. ¶ 6(h), (i), (j)).

On or about July 27, 2013, Muntslag informed CS-1 via text message that the drugs had been placed on a particular commercial flight departing Suriname for "tt" (Trinidad and Tobago); Muntslag also provided the flight number, the name of the traveler in whose luggage the drugs were placed, and a photograph of the luggage tag for that traveler's luggage – which luggage was later seized by law enforcement agents in Trinidad and Tobago, and found to contain 10 kilogram-size plastic bags containing cocaine.  (Ind. ¶ 6(k)).

4.    **July 2013: Greece**
      **Bouterse Confirms That Hezbollah Men Will Be Sent to Suriname for Training, and for Operations Outside of Suriname**

On or about July 31, 2013, in Greece, Bouterse met with CS-1, along with another DEA confidential source ("CS-3"), who purported to be "Hezbollah" and CS-1's "boss"; and with an undercover DEA agent (the "UC"), who purported to be a member of Hezbollah.  During the meeting, in response to the question from CS-3 "you have an idea about Hezbollah?", Bouterse stated: "Yeah, I have."  CS-3 went on to describe Hezbollah: "I'm sure . . . you read about the wars that we are fighting with . . . the Americans. And from what I heard from [CS-1] also there is no much love between you and the Americans." Bouterse responded: "We have a problem with the Dutch. And Americans."  CS-3 asked: "concerning sending our guys to your place [Suriname]. You agreed to help receive some of our guys, to be trained . . . keep there for later, later operations. Do you agree on it?"; Bouterse responded: "Yes, I agree. The situation in Suriname . . . is good to do that because we are a multicultural country; Muslims. We have a lot of Muslims."  (Ind. ¶ 6(l)).

Bouterse told the CSes and UC that Hezbollah could send 30 to 60 operatives in a first wave, "but we have to organize housing for them . . . If they're going to . . . live in the city, we

are going to create a security guard for them . . . They're going to stay under the security compound. Just like us."  Bouterse also agreed to provide the UC with a false Surinamese passport, as he previously had done for CS-1 and CS-2.  (*Id.*).  CS-3, referring to Hezbollah being ready to make a payment to Bouterse, further explained that "we are going to give you as a first deposit two million dollars from our side as goodwill," and that Bouterse should pick up the money, deliver the false Surinamese passport to the UC, and travel back to Suriname with the UC. CS-3 stated: "So, [the UC] will be with the jet with the money. You have to bring his [the UC's] passport yourself, and then both of you go to Suriname"; when CS-3 asked "is this okay with you," Bouterse responded: "Yes."  CS-3 confirmed with Bouterse that the Bouterse would use the payment from Hezbollah to make preparations for other Hezbollah men to arrive in Suriname.  Bouterse also indicated he (Bouterse) wanted a permanent Hezbollah presence in Suriname, stating: "We're going to need maybe 10 people who will stay permanently in Suriname. People that we can depend on and call up every second, any time . . . We need tough guys"; and further confirmed that these men would be used "inside the country . . . we need a little fort that we can depend on. And we can call them at any time."  (*Id.*).

CS-1 asked Bouterse what would happen when the Hezbollah men in Suriname wanted to leave Suriname to go to America, stating: "what you told me for when they go to the U.S. How are we going to set that up?"; Bouterse responded: "what we going to do also is apply a visa for them . . . Yeah, for the U.S., but then . . . we need open bank accounts for them, put some money in the bank account, buy a property, so that they can show that they're Surinamese who are not going to stay and they're coming back. And then they'll get the visa" to travel to the United States.  (*Id.*).  Bouterse engaged in a discussion with the CSes and the UC about Hezbollah's

targeting of the United States, with Bouterse requesting simply that Hezbollah focus its efforts outside of Suriname and not attack the American Embassy inside Suriname.  (*Id.*).

With respect to Hezbollah's need for weapons, Bouterse said that he would need approximately two months to inform the CSes and UC what kinds of heavy weaponry, like the rocket launcher Bouterse stored in his office safe, that Bouterse could supply.  (*Id.*).

Later in the same day, on or about July 31, 2013, in Greece, Bouterse met with CS-1. During this meeting, Bouterse said "small question for you – they [Hezbollah men] want to stay over there [in Suriname] as long as possible, right," to which CS-1 responded "Yeah, they would, would prefer like longer." Bouterse responded: "that's a base. That's a home." CS-1 said "Yeah, they want a strong home over in that area."  (Ind. ¶ 6(m)).

On or about July 31, 2013, after the meeting with CS-3 had concluded, Bouterse sent Muntslag a text message, which read, in part: "we hit the jackpot."  Bouterse also sent CS-1 a series of text messages asking for identifying information about the UC, including the UC's "Real age" and "Height and eyes," which information Bouterse later included in a Surinamese passport bearing false identifying information that he (Bouterse) provided to the UC.  (Ind. ¶ 6(n), (o)).

### 5. August 2013: Panama
### Bouterse Provides a False Passport for the Benefit of Hezbollah

On or about August 29, 2013, Bouterse met with CS-1 and the UC in Panama.  With respect to the false Suranimese passport for CS-3, Bouterse said that he would make the passport a diplomatic one.  Bouterse also indicated that everything was ready at "home" (in Suriname) for the arrival of the UC's men, and also said that some "toys" (weapons) would be ready for the UC to "inspect" in Suriname.  The UC said that, as previously discussed, Bouterse would be provided $2 million in cash, and Bouterse explained that the UC and Muntslag should meet in

Trinidad and Tobago, and fly together with the cash from Trinidad and Tobago back to Suriname. Bouterse also explained that, after arriving in Suriname, the UC and Muntslag would deliver the cash to Bouterse and his associates.  (Ind. ¶ 6(p)).

Bouterse handed a Surinamese passport to the UC, indicating that he (Bouterse) had picked an "Arabic" name for the passport.  Bouterse said that he had personally signed the UC's purported signature on the passport; and that he (Bouterse) had an exit stamp applied to the passport, so that it would appear that the UC had previously left Suriname using the passport. (*Id.*).

Following this meeting, Bouterse was arrested in Panama by Panamanian law enforcement officers.  Separately, Muntslag – who was awaiting the delivery of the cash and the UC in Trinidad and Tobago – was arrested by Trinidadian law enforcement officers.

### B.    Bouterse's Arrest And Expulsion From Panama

On August15, 2013, Bouterse was charged in a sealed indictment with participating in a conspiracy to import cocaine into the United States, and using and possessing a rocket launcher during and in relation to that conspiracy.  This initial charge was filed shortly after Bouterse and Munstlag worked to deliver 10 kilograms of cocaine to Trinidad and Tobago for shipment on to the United States.  A superseding indictment was filed on August 20, 2013, adding Muntslag as a co-defendant in the narcotics conspiracy count (the "First Superseding Indictment").  Also on August 20, 2013, a magistrate judge in this District issued arrest warrants for the arrests of Bouterse and Muntslag.

Following Bouterse's arrest on August 29, 2013 in Panama, the United States Embassy in Panama transmitted a diplomatic note (the "Diplomatic Note") to the Republic of Panama.  In the Diplomatic Note, the United States requested the "conditional release" of Dino Bouterse from Panamanian custody to the United States based on the charges in the First Superseding

Indictment.  The Diplomatic Note included a copy of the warrant for Bouterse's arrest based on

the charges contained in the First Superseding Indictment.  The Diplomatic Note also stated:

> **Dino Bouterse** represents a danger to Panama's public security
> because he is a supplier to international drug trafficking
> organizations which have access to large amounts of funds derived
> from the trafficking of large quantities of cocaine. These
> organizations and their members also regularly launder proceeds
> derived from their cocaine trafficking activities.
>
> Additionally, **Dino Bouterse,** the son of the current president of
> Suriname, has indicated his interest in selling military type
> weapons to Hezbollah, a transnational criminal organization
> known to participate in international terrorist activities, as well as
> setting up a training camp in Suriname for Hezbollah and narcotics
> trafficking organizations.
>
> Given the detailed information that **Dino Bouterse** has about the
> activities of narcotics organizations, it is possible that he or
> members of these organizations may attempt to secure his release
> from custody, either by attempting to corrupt public officials or
> through the use of violence.

(Aug. 29, 2013 Diplomatic Note, attached as Exhibit A).[2]

Following receipt of the Diplomatic Note, the Republic of Panama issued a decree dated

August 29, 2013 (the "Panamanian Decree") surrendering the defendant to the United States for

prosecution.[3]  (*See* Def.'s Ex. A (translated text of August 29, 2013 decree)). The Panamanian

decree stated, in relevant part:

---

[2]  After the defendant filed his pretrial motions, the U.S. Department of State provided a
copy of the Diplomatic Note to the United States Department of Justice, Office of International
Affairs, who in turn provided it to the prosecution team in this matter.  The prosecution team has
sought, and obtained, the authorization of the State Department to provide the Diplomatic Note
to the defense.  The Government maintains, however, that the Diplomatic Note is neither Rule 16
material nor *Brady* material, because it is neither material to the preparation of the defense nor
exculpatory in any manner.  Nonetheless, so that the Court can consider the defendant's
arguments based on a complete record, we have obtained and disclosed the Diplomatic Note in
this case.

[3]  The Panamanian Decree is signed by the President of Panama and the Minister of
Foreign Affairs.

> That the American authorities have pointed out that Mr. DINO DELANO BOUTERSE has indicated his interest in selling military-type weapons to Hezbollah, an international criminal organization renowned for its participation in international terrorist activities; as well as in setting up a training camp in Surinam for Hezbollah and for organizations related to drug trafficking. The diplomatic representatives go on to state that, according to their opinion, and taking into account information that they have, it is possible that members of said international organizations will attempt to free him from custody, either by attempting to corrupt officials or through the use of violence.

(*Id.* at 2-3). After noting that Bouterse was not in Panama as "a diplomatic agent," the Panamanian Decree states that "[t]hat the ties of Mr. DINO DELANO Bouterse to extremely dangerous criminal organizations make his presence in the Republic of Panama a risk to the community, and his Simple, Conditional Surrender is clearly grounded in reasons of both public safety and social interest." (*Id.* at 3).

### C.   The Defendant's Post-Arrest Statement

On August 29, 2013, following the issuance of the Panamanian Decree, the defendant was transferred to the custody of DEA agents in Panama. Bouterse, who was cooperative throughout this transfer, was then placed on a DEA airplane and transported to this District. While on the plane, a DEA Special Agent ("Agent-1") presented Bouterse with an advice of rights form. (*See* Def.'s Ex. C). Agent-1 asked Bouterse to review the form and sign it if he understood what it said and wished to speak with the agents. The form stated:

- We are American law-enforcement agents. United States law provides you with certain rights in your dealing with us.

- Before we ask you any questions, we want to make sure that you understand your rights.

- You have the right to remain silent.

- If you previously made statements, it is likely that those statements will not be useable against you in a U.S. court.

- Anything you now say can be used against you in court.

- You have the right to talk to a lawyer for advice before we ask you any questions.

- You have the right to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

- We are not interested in any of the statements you may have made to anyone before. We don't care what you said to anyone in the past. We are starting anew. You do not need to speak with us today just because you have spoken with others in the past.

(*Id.*). Bouterse accepted the form, reviewed it, and signed it. Bouterse also told Agent-1 that he understood his rights as outline on the form.

While he signed the form, Bouterse declined to check or initial the blank spaces at the bottom of the form, adjoining the text: "I am willing to make a statement and answer questions"; "I do not want a lawyer at this time"; "I understand my rights and my decision is a knowing and voluntary one"; and "No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (*See id.*). After Bouterse declined to check or initial these items, Agent-1 advised Bouterse orally that he had a right to an attorney present before speaking with agents. Then Agent-1 asked Bouterse if he still wanted to speak with agents without an attorney present. Bouterse stated: "no problem."

Agent-1 told Bouterse that he was indicted on drug charges in New York, New York, and that the 10 kilograms of cocaine he (Bouterse) and Muntslag sent was currently in the custody of the DEA. Bouterse stated, in substance, that there were big drug dealers in Suriname; he then asked why the agents were concerned with only 10 kilograms when others were sending thousands of kilograms. Bouterse also stated that, if the agents wanted to slow drug trafficking in Suriname, they needed to send more agents there. In response to Agent-1's question about who supplied the 10 kilograms of cocaine sent by Bouterse and Muntslag, Bouterse stated that

"Blue" can give that answer but that he (Bouterse) could not.  Bouterse then declined to answer additional questions.

Nearly all of these facts are corroborated by Bouterse in the sworn declaration he submitted with his motion (hereinafter, the "Declaration").  (*See* Def.'s Ex. B).  Specifically, Bouterse has stated under penalty of perjury the following facts corroborating the above-cited version of events:

- On the DEA plane, Bouterse obtained and reviewed the advice of rights form.

- Bouterse signed his name on the form but declined to initial the form.

- Bouterse responded to questions regarding certain of the crimes he committed.

(*See id.* ¶¶ 11-12).  Notably, Bouterse does not offer any statements in the Declaration that place the following matters in dispute:

- Bouterse does not claim that he was threatened, or otherwise pressured, to sign the advice of rights form.

- Bouterse does not contest that he can read and write English – his Declaration is submitted in English – nor does he claim that he did not understand the substance of the advice of rights form provided to him by the DEA.

- Bouterse makes no claim that he was otherwise coerced or pressured into answering some – and only some – of the DEA's questions.

(*See id.* ¶¶ 9-12).  Bouterse does not offer any facts that even remotely suggest he was subjected to duress, mental or emotional stress, or physical threats, during his contact with DEA agents on the plane.

Nor could he plausibly make such claims.  Bouterse's contact with agents was collegial and cooperative throughout the time he was on the DEA plane.  Indeed, after declining to speak further with the agents, Bouterse was provided with food, and asked the agents to retrieve from his luggage a novel, which the agents provided to Bouterse and which Bouterse read during portions of the flight to New York.  Agents documented Bouterse's demeanor and his activities

on the plane by taking several photographs, depicting Bouterse reading, eating, and napping during the flight to New York.  (*See* Exhibit B).

### D.       The Second Superseding Indictment

The S2 Indictment issued on November 7, 2013.  The S2 Indictment added one count against Bouterse for attempting to provide material support to a designated terrorist organization, in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(E), and 2. Bouterse has been detained since his arrival in the United States.

### E.       Bouterse's Pretrial Motions

Bouterse now argues for dismissal on two grounds.  First, the defendant argues that Count One of the Indictment (charging an attempt to provide material support) should be dismissed on the ground that, notwithstanding the fact that Bouterse was not extradited by Panama, the "doctrine of specialty" was somehow violated by the Panamanian authorities transferring custody of the defendant to the United States.  (*See* Def.'s Mem. at 2-3).  Second, the defendant argues that the S2 Indictment should be dismissed on the ground that the Government engaged in "outrageous conduct" during the investigation of the defendant.  (*See* Def.'s Mem. at 9).  Bouterse also moves this Court to suppress his statements to agents after he executed and signed the advice of rights form, on the ground that he was purportedly subject to a "coercive scenario" during his time on the plane.  (*See* Def.'s Mem. at 18).  Bouterse also asks for certain additional disclosures from the Government.  (*See* Def.'s Mem. at 20).

## ARGUMENT

## I.       BOUTERSE'S MOTION TO DISMISS ON SPECIALTY GROUNDS SHOULD BE DENIED

Though Bouterse was not transferred to the custody of U.S. authorities pursuant to an extradition treaty, he nonetheless argues that the doctrine of specialty should apply in this case

and that the doctrine requires the dismissal of Count One, charging the defendant with attempting to provide material support to Hezbollah.  This contention is unsupported by any persuasive legal authorities and should be rejected.  It is well-settled that a defendant's rights under the doctrine of specialty arise only derivatively of an agreement between two countries to limit a prosecution.  There was no such agreement in this case and, thus, no basis for defendant's claim under the doctrine.  As Bouterse concedes, the United States did not ask Panama to extradite him, and Panama did not transfer custody of Bouterse pursuant to extradition proceedings or an extradition treaty.  No agreement between the United States and Panama limited the charges that the defendant may face in the United States.

### A.   Relevant Law

The rule of specialty "generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country."[4]  *United States* v. *Baez*, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam).  Because the rule of specialty is based on principles of international comity, the rule requires that the United States honor those limitations that it accepts as a condition of obtaining extradition from a foreign country.  *See United States* v. *Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007); *Baez*, 349 F.3d at 92).  For any such limiting conditions to be binding on the United States, however, they must either be part of the extradition treaty itself or be mutually agreed upon by the United States and the surrendering country prior to the defendant's extradition. *Cuevas*, 496 F.3d at 263; *United States* v. *Banks*, 464 F.3d 184, 191-92 (2d Cir. 2006).  Indeed, even a "unilateral belief" on the part of the surrendering country that a particular condition will apply to a defendant's extradition, "is

---

[4]  While the Second Circuit has questioned whether a defendant has standing to assert a specialty violation, *see United States* v. *Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007), the Court need not resolve that question because Bouterse's claim plainly fails on the merits.

insufficient to bind the United States." *Cuevas*, 496 F.3d at 263 (citing *Banks*, 464 F.3d at 192);

*cf. Benitez* v. *Garcia*, 495 F.3d 640,643-44 (9th Cir. 2007) (per curiam) (noting that while

agreed-upon conditions on extradition are enforceable, the Supreme Court has never held that

unilaterally imposed conditions are enforceable).

It is well-settled that the mere fact that the United States made a request to another

country obtain custody of a person subject to criminal charges, and that there was some

cooperation between the two countries, does not transform a surrender or other form of informal

expulsion into an "extradition."  In *United States* v. *Struckman*, 611 F.3d 560, 572 (9th Cir.

2010), the defendant was a United States citizen charged with a crime here.  He traveled to

Panama on a tourist visa and stayed there, and "the U.S. government vigorously sought

[defendant's] return to the United States to stand trial."  *Id.* at 565.  In *Struckman*, the U.S.

government's efforts included communications with the Panamanian government, including the

transmission of a "note."  *Id.* at 566.  In rejecting the argument that the defendant's removal from

Panama violated the extradition treaty, the court held:

> The U.S. government was indisputably involved in efforts to
> convince Panamanian authorities to deport [the defendant] and
> facilitate his return.  But persuasion and cooperation do not
> necessarily add up to extradition.  "Neither deportation nor
> surrender other than in response to a demand pursuant to Treaty
> constitutes extradition."  Nations may in practice alter the process
> for extradition requests, but "[w]hile the formalities of extradition
> may be waived . . . , a demand in some form by the one country
> upon the other is required, in order to distinguish extradition from
> the unilateral act of one country, for its own purposes, deporting or
> otherwise unilaterally removing unwelcome aliens.

*Id.* at 571-72 (quoting *Oen Yin-Choy* v. *Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988); citing

*Stevenson* v. *United States*, 381 F.2d 142, 144 (9th Cir. 1967), and Michael Abbell, *Extradition*

*To and From the United States* § 7-2(2)-(4) (2008)).

Notably, the *Struckman* court held that the extradition treaty between Panama and the United States permitted the expulsion or surrender of a fugitive through means other than formal extradition. *Id.* at 573 ("[T]he Treaty [ *i.e.*, Providing for the Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851] does not prohibit the use of means other than extradition to obtain a defendant's presence in the United States and did not bar [the defendant's] transfer to the United States."). This same conclusion has been reached by every court to have considered the question as it specifically relates to the extradition treaty between the United States and Panama. *See, e.g., United States* v. *Mejia*, 448 F.3d 436, 443 (D.C. Cir. 2006) ("the U.S.-Panama treaty contains no prohibition against procuring the presence of an individual outside the terms of the treaty – let alone one barring the signatories from informally cooperating with each other as they did in this case"); *United States* v. *Noriega*, 117 F.3d 1206, 1212-13 (11th Cir. 1997) (rejecting the argument that a Panamanian citizen "abducted to the United States from a nation with which it has an extradition treaty [Panama], thereby acquires a defense to the jurisdiction of this country's courts"); *United States* v. *Cordero*, 668 F.2d 32, 37 (1st Cir. 1981) ("Nothing in the treaty [between the United States and Panama] prevents a sovereign nation from deporting foreign nationals for other reasons and in other ways should it wish to do so.").

**B.     Discussion**

The rule of specialty does not apply in this case. As the above-cited precedents make clear, the rule of specialty applies to "a person who has been brought within the jurisdiction of the court *by virtue of proceedings under an extradition treaty*." *United States* v. *Alvarez-Machain*, 504 U.S. 655, 659 (1992) (emphasis in original) (quotation and citation omitted). In short, because Bouterse was not extradited from Panama, the rule of specialty does not provide him any protection from being subject to additional charges in the United States.

16

Bouterse does not – and could not – cite any provision of the United States' extradition treaty with Panama that would warrant a different result here.  Indeed, it is undisputed in this case that the defendant was transferred to United States custody absent any formal extradition proceedings.  The term "extradition" was not mentioned in the United States Diplomatic Note, the Panamanian Decree, or any other relevant document, nor were any steps taken that are typically employed in cases where one country seeks the extradition of a fugitive pursuant to a treaty.  Further, all of the case law relating to the specific extradition treaty at issue here holds that the treaty allows for the return or surrender of fugitives to the United States absent any extradition proceedings, and that such an informal return does not subject the defendant to the protections of the rule of specialty.  *See, e.g.*, *Struckman*, 611 F.3d at 566; *Mejia*, 448 F.3d at 443; *Noriega*, 117 F.3d at 1212-13; *Cordero*, 668 F.2d at 37; *see also United States* v. *Bout*, 08 Cr. 365 (SAS), 2011 WL 3369797, at *3 (S.D.N.Y. Aug. 2, 2011).

The defendant contends that "the doctrine [of specialty] also applies when the extradition is completed other means [than a treaty-based extradition]," (Def.'s Mem. at 3-4 (citing cases)), but the cases upon which he relies do not support his argument.  In *Fiocconi* v. *Att'y Gen. of U.S.*, 462 F.2d 475, 478-79 (2d Cir. 1972), the Second Circuit rejected the defendant's challenge to his formal extradition from Italy on a charge not specifically enumerated in the extradition treaty.  And in *United States* v. *Gonzalez*, 275 F. Supp. 2d 483, 489-90, this Court considered and rejected the defendant's challenge to a U.S. indictment based on purported flaws in his formal extradition from Colombia to the United States.  *See id.* at 488-90 (analyzing the Colombian extradition order).  *See also United States* v. *Evans*, 667 F. Supp. 974, 979 (S.D.N.Y. 1987) (rejecting the defendant's challenge on specialty grounds to his prosecution in the United States following deportation from Bermuda).  But here, unlike in the cases upon which the

defendant relies, Bouterse was not extradited pursuant to an extradition treaty, or under any other agreement that would impose limits on the charges for which he may be tried.

Accordingly, the defendant's motion to dismiss Count One on this ground should be denied.

## II. BOUTERSE'S MOTION TO DISMISS BASED ON PURPORTED OUTRAGEOUS GOVERNMENT CONDUCT SHOULD BE DENIED

The defendant argues that the Government engaged in "outrageous conduct" during the investigation that justifies dismissal of the S2 Indictment pursuant to the Due Process clause of the Constitution.  These purported instances of misconduct include (i) the CSes and Bouterse's discussions concerning Bouterse receiving multi-million dollar payments from Hezbollah in exchange for Bouterse's work to establish an infrastructure in Suriname – including homes, bank accounts, weaponry, schools, security, and more – for teams of terrorist operatives looking to organize attacks against the United States (*see* Def.'s Mem. at 11); (ii) the Government's decision to "change[] its primary focus to Dino Bouterse" without "justification" (*id.* at 12); (iii) purported violations of Surinamese law by individuals working on the investigation of Bouterse, including "possession of a false passport" (*id.* at 14-15); and (iv) purported misrepresentations made to Panama in the Diplomatic Note (*id.* at 15-16).  Put simply, there is no legal authority supporting his argument that the Government's conduct in investigating this case merits dismissal of the S2 Indictment.

### A. Relevant Law

More than a century ago, in *Ker* v. *Illinois*, 119 U.S. 436 (1886), the Supreme Court rejected a claim that the due process clause of the Fourteenth Amendment was violated by the claimed kidnaping of Ker in Peru by an emissary of the president of the United States.  Ker alleged that he had been arrested in Peru "forcibly and with violence," kept a "close prisoner" on

a ship that transported him to Honolulu, then transferred "in the same forcible manner" to another ship that brought him to San Francisco.  From San Francisco he claimed he was transferred as a prisoner to Illinois, where he was tried and convicted in the criminal court of Cook County.  *Ker* v. *Illinois*, 119 U.S. at 437-39.  Ker also claimed that from the time of his arrest in Peru until he was delivered to the authorities in Cook County, he was refused any opportunity to communicate with anyone or seek any advice or assistance.  119 U.S. at 439. This manner of apprehending and delivering Ker to the authorities in Illinois, the Supreme Court held, did not violate the due process clause, which "is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled."  119 U.S. at 440.  "[F]or mere irregularities in the manner in which [a prisoner] may be brought into custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment." *Id.*  "There are authorities of the highest respectability which hold that . . . forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court."  119 U.S. at 444.

During the next 66 years the Supreme Court "never departed from the rule announced in *Ker*, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'"  *Frisbie* v. *Collins*, 342 U.S. at 522 (footnote omitted).  Echoing *Ker*, the Court in *Frisbie* explained that "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional

procedural safeguards.  There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."  342 U.S. at 522.

In 1974, in *Toscanino,* 500 F.2d at 267, the "Second Circuit, faced with particularly gruesome facts, blurred the bright line rule of *Ker-Frisbie.*"  *United States* v. *Yousef*, 08 Cr. 1213 (JFK), 2011 WL 2899244, at *6 (S.D.N.Y. June 30, 2011).  Toscanino, an Italian citizen convicted in federal court of a drug conspiracy charge, alleged that he had arrived in court after being forcibly abducted in Uruguay by paid agents of the United States, who lured him from his home, knocked him unconscious with a gun, placed a gun to his head during the abduction, and took him to Brazil where he was tortured and interrogated before being drugged and placed on a plane to the United States.  *Toscanino*, 500 F.2d at 268-70.  Toscanino claimed that his torture and interrogation lasted for 17 days, during which electrodes were attached to his genitals, toes and earlobes, and he was shocked into unconsciousness.  *Id.*   He also claimed that alcohol was flushed into his eyes and nose and other fluids were forced up his anal passage.  *Id.*  In addition, he said, his fingers were pinched with metal pliers, he was forced to walk for seven or eight hours at a time and then kicked and beaten when he could no longer stand.  *Id.*  During this period of torture and interrogation, Toscanino claimed, he was denied sleep and all forms of nourishment for days at a time; moreover, only enough nourishment was provided, intravenously, to keep him alive.  *Id.*  Toscanino further alleged that a member of the Bureau of Narcotics and Dangerous Drugs of the U.S. Department of Justice was present at times and "actually participated in portions of the interrogation," and the federal prosecutor handling the case was aware of the interrogation and received reports as to its progress.  *Id.*

The Second Circuit recognized that under "the so-called '*Ker-Frisbie*' rule, due process was limited to the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained over the defendant. Jurisdiction gained through an indisputably illegal act might still be exercised, even though the effect could be to reward police brutality and lawlessness in some cases." *Toscanino*, 500 F.2d at 272. But the *Toscanino* court reasoned that other Supreme Court decisions had "expanded the interpretation of 'due process' . . . to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial." *Id.* at 272 (citations omitted). *Toscanino* relied especially on the decision in *Rochin* v. *California*, 342 U.S. 165 (1952), which although decided shortly before *Frisbie* appeared to the *Toscanino* court to have "anticipated" the "erosion of *Frisbie*", *Toscanino*, 500 F.2d at 273, and the decision in *Mapp* v. *Ohio*, 367 U.S. 643 (1961). Those decisions, the *Toscanino* Court wrote, "unmistakably contradict [the Supreme Court's] pronouncement in *Frisbie* that 'due process of law is satisfied when one present in court is convicted of crime after being fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.'" 500 F.2d at 274. *Toscanino* also viewed the "force of *Rochin*" as "continu[ing] to be recognized" in the Supreme Court's *dictum* in *United States* v. *Russell*, 411 U.S. 423 (1973), that it "'may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .'" *Toscanino*, 500 F.2d at 274 (quoting *United States* v. *Russell*, 411 U.S. at 431-32 (citing *Rochin*, 342 U.S. at 165)). The Circuit remanded the case for an evidentiary hearing with respect to Toscanino's allegations. *Id.* at 281.

As Judge Keenan has noted, "[l]ess than one year later, the Second Circuit backed away from the broad holding of *Toscanino*, essentially restricting it to its facts." *United States* v. *Yousef*, 2011 WL 2899244, at *7. The Second Circuit wrote that "[i]n recognizing [in *Toscanino*] that *Ker* and *Frisbie* no longer provided a *carte blanche* to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstance of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court." *United States ex rel. Lujan* v. *Gengler*, 510 F.2d at 65. Further, the *Lujan* court noted, *Toscanino* "scarcely could have meant to eviscerate the *Ker-Frisbie* rule, which the Supreme Court has never felt impelled to disavow. Although we cited other cases in *Toscanino* as evidence of the partial erosion of *Ker* and *Frisbie*, the twin pillars of our holding were *Rochin* v. *California*, 342 U.S. 165 (1952), and *dictum* in *United States* v. *Russell*, 411 U.S. at 431-32, both of which dealt with government conduct of a most shocking and outrageous character." *Id.* (footnote omitted). The *Lujan* Court was "forced to recognize that, absent a set of incidents like that in *Toscanino*, not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment." *Id.* at 66. Lujan, a citizen of Argentina, alleged that he was lured by someone paid by American agents from Argentina to Bolivia where he was taken into custody by Bolivian police, who were acting as paid agents of the United States. *Id.* at 63. He claimed to have been held incommunicado for six days in Bolivia until he was placed, by Bolivian police and American agents, on a plane to New York, where he was arrested. *Id.* These allegations, the Circuit held, were not the "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due

22

process," *id.* at 66, and it affirmed the dismissal without a hearing on Lujan's petition for a writ of habeas corpus.  *Id.* at 63-64.

Since *Toscanino* was decided, the Supreme Court has reaffirmed the rule of *Ker* and *Frisbie* at least five times, most recently in *United States* v. *Alvarez-Machain*, 504 U.S. 655 (1992).  In that case a Mexican national was brought to federal court in the United States for trial on kidnaping and murder charges after being forcibly kidnaped himself from Mexico.  Although they did not participate personally in the abduction, United States Drug Enforcement Administration agents were found responsible for it because they had offered to pay a reward and expenses for the delivery of the defendant to the United States.  *United States* v. *Alvarez-Machain*, 504 U.S. at 657 & n.2.  The Supreme Court held that although the defendant's abduction "may be . . . 'shocking'" and "may be in violation of general international law principles," since it was not in violation of the extradition treaty between the United States and Mexico, "the rule of *Ker* v. *Illinois* is fully applicable to this case.  The fact of respondent's forcible abduction does not therefore prohibit his trial in a court in the United States for violation of the criminal laws of the United States."  504 U.S. at 669-70 (citation omitted).  *See INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984) ("[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred") (citing *Frisbie*; other citations omitted); *United States* v. *Crews*, 445 U.S. 463, 474 (1980) ("[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution") (citing *Frisbie* and *Ker*; other citation and footnote omitted); *Stone* v. *Powell*, 428 U.S. 465, 484-85 (1976) (Court rejects argument in part because it "would require . . . retreat from the proposition that judicial proceedings need not abate when the defendant's person is unconstitutionally seized")

(citing *Frisbie*; other citation omitted); *Gerstein* v. *Pugh*, 420 U.S. 103, 119 (1975) ("[n]or do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction") (citing *Frisbie* and *Ker*).

 In light of this authority, other circuits have questioned the continued viability of *Toscanino*. "Subsequent decisions of the Supreme Court indicate that there is reason to doubt the soundness of the *Toscanino* exception, even as limited to its flagrant facts . . . In light of these cases, it appears clear that the *Ker- Frisbie* doctrine has not eroded and that the exception described in *Toscanino* rests on shaky ground." *United States* v. *Best*, 304 F.3d 308, 312-13 (3d Cir. 2002) (citations omitted). *See United States* v. *Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) ("[i]n the shadow cast by *Alvarez-Machain*, attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in [*Toscanino*], have been cut short"); *United States* v. *Mitchell*, 957 F.2d 465, 470 (7th Cir. 1992) ("we have declined to follow the exclusionary rule grounds of *Toscanino* and have questioned its continuing constitutional vitality") (citation omitted); *United States* v. *Darby*, 744 F.2d 1508, 1531 (11h Cir. 1984) ("the continuing validity of the *Toscanino* approach is questionable after the intervening decision in [*Gerstein*], in which the Supreme Court refused to 'retreat from the established rule that illegal arrest or detention does not void a subsequent conviction'") (quoting *Gerstein* v. *Pugh*, 420 U.S. at 119) (footnote omitted).  And the Second Circuit itself has cast doubt on the sturdiness of the "twin pillars" on which it said, in *Lujan,* that *Toscanino* rested.  In *Brown* v. *Doe*, 2 F.3d 1236 (2d Cir. 1993), the Circuit noted that the *dictum* in *Russell* was "brought into question by *Hampton* v. *United States*, 425 U.S. 484 (1976)," 2 F.3d at 1242, and also noted that "viewed in light of the Supreme Court's subsequent exclusionary rule decisions, *Mapp v. Ohio*, 367 U.S. 643 (1961), and *Wong Sun v. United States*, 371 U.S. 471 (1963), *Rochin* stands at most for the

proposition that a prosecution may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation." 2 F.3d at 1243 (citing *United States v. Crews*, 445 U.S. at 474 n. 20 (1980)).[5]

Several district courts in this circuit have also recognized that *Toscanino* likely is no longer good law. *See United States* v. *Ghailani*, 751 F. Supp. 2d at 507 ("it is doubtful that *Toscanino* remains authoritative") (Kaplan, J.); *Yousef*, 2011 WL 2899244 at *7 (referring to "the unlikely event that *Toscanino* remains good law"); *United States* v. *Umeh*, 762 F. Supp. 2d 658, 663 (S.D.N.Y. 2011) ("while the Second Circuit has never explicitly overruled *Toscanino*, the fact that both of the pillars on which it rests have been removed suggests that all that remains is a rhetorical facade wholly lacking in legal foundation"), *aff'd*, 527 Fed. App'x. 57 (2nd Cir. 2013), *cert. denied*, 134 S.Ct. 464 (Oct 15, 2013).

## B.     Discussion

### 1.     The Facts Proffered by Bouterse Are Either Inaccurate or Legally Irrelevant

While Bouterse's argument fails under controlling authority, Bouterse's statements about certain conduct by the Government also either are inaccurate or simply irrelevant to any legally pertinent issue in this case.

First, Bouterse argues that his discussions with the CSes about Bouterse receiving compensation for establishing a Hezbollah infrastructure in Suriname were "fundamentally unjust," and cites to *United States* v. *Cromitie*, 727 F.3d 194 (2d Cir. 2013), in support of his motion to dismiss. As an initial matter, the discussions about payments being made to Bouterse

---

[5] Moreover, *Brown* v. *Doe* relied heavily on the *Ker-Frisbie* line of cases when it wrote: "if there is no authority for barring the prosecution of a defendant who was illegally taken into custody, we are in no position to strip New York State of its power to try a defendant . . . who was lawfully arrested and convicted on untainted evidence." *Brown* v. *Doe*, 2 F.3d 1236, 1243 (2d Cir. 1993)**.**

by the CSes did not involve an unfair "financial inducement" being offered to Bouterse in exchange for committing a criminal act; rather, these discussions related to *compensation* for Bouterse's work to obtain fraudulent passports for dozens of Hezbollah operatives; to establish schools, lodging, and security for Hezbollah operatives in Suriname; to obtain heavy weapons – like the rocket launcher Bouterse wielded during the drug deal – to sell to these terrorist operatives; and to assist in transporting the operatives into his country over an extended period of time. Moreover, notwithstanding the defense's claims that the discussions about compensation were part of an "outrageous effort to entice" Bouterse to commit crimes (Def.'s Mem. at 11), there is no indication that the Government unjustly exploited any type of purported financial, intellectual, or power imbalance between the CSes and Bouterse. Throughout his dealings with the CSes, Bouterse was one of the most powerful men in his country, with access to government offices, armed personnel from the Counter-Terrorism Unit, weapons, cars, cash, narcotics, and other material goods. In addition, during the time when the CSes and Bouterse were discussing potential payments to Bouterse for his efforts to aid Hezbollah, Bouterse was engaged in discussions about *supplying to the CSes* millions of dollars' worth of cocaine and heavy arms. Bouterse was a wealthy and powerful man, who was working with the CSes to provide extraordinary – and costly – assistance to Hezbollah operatives in Suriname.

Second, with respect to the purportedly "unjustified" investigative focus on the defendant, the defendant fails to cite any legal authority explaining the relevance of this assertion to the motion to dismiss. The evidence in this case – including the fact that Bouterse, while leading his country's Counter-Terrorism Unit, sent cocaine to the United States, possessed additional cocaine and a rocket launcher while negotiating a drug deal, and provided a fraudulent

passport to someone he believed to be an international terrorist – requires no elaboration as to why Bouterse was a worthy target of a criminal investigation.

Third, with respect to the purported violations of Surinamese law, the defendant once again fails to cite any legal authority establishing the relevance of these purported violations of a foreign country's laws to his motion to dismiss. The sole cases cited by the defendant involve commentary, in *dicta*, by two courts regarding law enforcement officers who potentially violated U.S. law while pursuing criminal targets. (*See* Def.'s Mem. at 14-15). More broadly, it hardly requires an explanation as to why the DEA and the CSes did not seek from the Surinamese Government pre-authorization to participate in this investigation targeting, at least in part, the defendant, who had direct access to the very highest levels of his government. In any event, pursuant to the *Ker-Frisbie* doctrine discussed in the next section, this argument should be rejected as a basis for dismissal of the S2 Indictment.

Finally, the purported "misrepresentations to Panama" cited by the defendant are not actually contained in the Diplomatic Note transmitted by the United States to Panama. Specifically, the United States did not represent that "[Hezbollah] will attempt to free [Bouterse] from custody" in Panama. (Def.'s Mem. at 15; *see* Ex. A). Thus, in addition to the dictates of the *Ker-Frisbie* doctrine, as discussed below, this argument should be rejected as a factual matter now that all of the parties have had the benefit of reviewing the Diplomatic Note actually transmitted to Panama.

###  2.  The *Ker-Frisbie* Doctrine Requires Rejection of the Defendant's Motion Without A Hearing

Bouterse argues that the manner in which he was investigated, detained, and brought to the United States was "extreme", "offend[ing] common sense and decency," and invokes *United States* v. *Toscanino*, 500 F.2d 267 (2d Cir. 1974), to assert an exception to the usual rule that

27

"the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction,'" *Frisbie* v. *Collins*, 342 U.S. 519, 522 (1952) (footnote omitted), known as the *Ker-Frisbie* rule.  (*See* Def. Mem. at 12).  But not only does Bouterse fail to address the authorities squarely calling *Toscanino* into doubt, he fails to explain how the conduct identified by Bouterse, even if it were true – and much of it is not – somehow fits within the scope of *Toscanino*.

　　　While the Second Circuit, in its summary order in *Umeh*, held that it "need not here decide what vitality, if any, *Toscanino* retains, because our precedent makes plain that it does not foreclose prosecution in factual circumstances similar to those alleged" in that case, *United States* v. *Umeh*, 527 Fed. App'x. at 64 (citations omitted), the court also expressed grave doubt about the continued vitality of *Toscanino,* describing it as "a decision that assumed the 'erosion' of the *Ker-Frisbie* doctrine, 500 F.2d at 273, a premise which has been undermined by subsequent decisions of the Supreme Court."  *Umeh*, 527 Fed.Appx. at 64 (citing *Alvarez-Machain* as "reaffirming *Ker* and holding that defendant's abduction did not warrant dismissal of indictment," and *Crews* as "holding prosecution not barred where defendant arrested illegally, because defendant 'is not himself a suppressible "fruit"'").

　　　Thus, Bouterse's reliance on *Toscanino* finds no solid foundation in this Circuit's precedents.  Yet, whatever continued vitality or breadth (if any) of the *Toscanino* holding, even if such a narrow exception to the *Ker-Frisbie* rule still remained it would the defendant to show an extraordinarily inhumane and outrageous course of conduct by the Government.  *See*, *e.g.*, *United States* v. *Reed*, 639 F.2d 896, 902 (2d Cir. 1981) (finding no violation of due process where "there was none of the 'cruel, inhuman and outrageous treatment allegedly suffered by Toscanino'") (quoting *Lujan*, 510 F.32d at 65); *Yousef*, 2011 WL 2899244 at *7 ("in the unlikely

28

event that *Toscanino* remains good law, Defendant must put forth truly disturbing facts to justify due process relief; otherwise, dismissal of the Indictment is unwarranted").

What Bouterse has alleged comes nowhere near to this standard.  Bouterse merely contends that:

- he was offered $15 million to work on establishing lodging, security, weaponry, schools, fraudulent identification, bank accounts, and more infrastructure for Hezbollah operatives looking to enter Suriname and prepare to attack the United States;

- he became the subject of a law enforcement investigation without "justification";

- the CSes engaged in certain purported violations of Surinamese laws relating to travel documents, cash reporting requirements, and foreign operations on Surinamese soil; and

- the Diplomatic Note purportedly included a factual misstatement.

These allegations come nowhere near the "torture, brutality and similar outrageous conduct" *Lujan*, 510 F.2d at 65, "'cruel, inhuman and outrageous treatment,'" *Reed*, 639 F.2d at 902 (quoting *Lujan*, 510 F.2d at 65), or "truly disturbing facts," *Yousef*, 2011 WL 2899244 at *7, required to fall within whatever may remain of *Toscanino*.  In *Reed*, for example, the Second Circuit considered an overseas arrest during which American agents enticed a defendant onto a plane and "made him lie on the floor of the small plane for thirty minutes, holding a cocked gun to his head and threatening to blow his brains out."  639 F.2d at 900-01.  This claimed conduct, the Circuit held, "was not 'gross mistreatment' but rather is little different from the circumstance of an ordinary arrest where officers may use a gun to make sure that the arrestee does not escape."  639 F.2d at 902.  "Indeed, the coercion was not even as serious as that involved in *Frisbie*, where the Supreme Court decline to vacate the conviction even though the defendant allegedly had been blackjacked before being abducted to another jurisdiction."  639 F.2d at 902 (citing *Frisbie*, 342 U.S. at 520).  Bouterse alleges nothing even approaching the conduct alleged

in *Reed* and *Frisbie*, and fails to identify any analogous case where a court applied the holding in *Toscanino* to a claim similar to that of Bouterse. *Cf. Matta-Ballesteros*, 71 F.3d at 761, 764 (allegations that defendant was beaten and burned with a stun gun at the direction of United States Marshals while bound and with a black hood over his head on the floor of a car, and then beaten and tortured by a stun gun applied to various parts of his body, including his feet and genitals during his flight to the United States, alleged acts that "were not nearly as egregious as those committed in *Toscanino*"); *United States v. Cournoyer,* No. 12 Cr. 65 (SLT), 2012 WL 6539659, at *1-3 (E.D.N.Y. Dec. 14, 2012) (claims that Mexican authorities acting at the direction of the US government choked defendant to a near loss of consciousness, "stomped" on his hand, made threats he believed meant he would be killed if he failed to get on a plane to the United States, denied him food, drink and bedding for more than 32 hours, and, while he was on the plane, covered his head with a hood and shackled his hands and feet together and to the floor so he was forced to hunch over so his head was in his lap are not "remotely comparable to the deliberate and prolonged torture alleged in *Toscanino*").

Bouterse does not allege physical torture or cruelty. His complaint is that he was financially induced to commit crime, and was the "unjustified" focus of a DEA investigation. Bouterse has cited no case, and the Government is aware of none, in which such complaints have been held even close to sufficient to cause a case to fall within an exception to the *Ker-Frisbie* rule. *Cf. Ker*, 119 U.S. at 439 (the plea in abatement "is very full of averments that the defendant protested, and was refused any opportunity whatever . . . of communicating with any person or seeking any advice or assistance . . ."); *United States* v. *Cordero,* 668 F.2d 32, 37 (1st Cir. 1981) (evidence that defendants, while in Panamanian jails, were insulted, pushed, slapped, poorly fed, required to sleep on the floor and huddle in a corner to avoid the splashing of urine coming from

prisoners in other cells shows conditions that "are a far cry from deliberate torture" and "does not show the outrageous conduct involved in Toscanino") (Breyer, C.J.); *see generally United States* v. *Ceja*, — Fed. App'x. —, 2013 WL 5878915, at *4 (11th Cir. Nov. 4, 2013) (claims that Mexican agents pointed rifles at defendant's face, hit him and stole his personal property when they arrested him before bringing him to the Mexican–American border and turning him over to an American immigration officer "do not assert the kind of cruelty and inhumane treatment necessary to prompt [the Eleventh Circuit] to consider carving out an exception to the *Ker-Frisbie* doctrine"); *United States* v. *Awadallah*, 202 F. Supp. 2d 17, 42 (S.D.N.Y. 2002) ("'no court, including the *Toscanino* court which remanded the case for factual findings, has ever found conduct that rises to the level necessary to require the United States to divest itself of jurisdiction'") (quoting *Matta-Ballesteros* v. *Henman*, 896 F.2d 255, 261 (7th Cir. 1990) (footnote omitted)).

In sum, if *Toscanino* retains any vitality at all, Bouterse's allegations come nowhere near the truly disturbing conduct required to fall within its reach.  Bouterse's motion should be rejected without a hearing.  *See*, *e.g.*, *Yousef*, 2011 WL 2899244 at *8 ("[s]ince the allegations, taken entirely at face value and in the light most favorable to the defense, reveal no conduct that shocks the conscience, there is no need for an evidentiary hearing on this motion").

## III.   BOUTERSE'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENT SHOULD BE DENIED WITHOUT A HEARING

The defendant moves to suppress statements he made to law enforcement officers while traveling on a DEA plane on August 29, 2013 on the ground that they were obtained in violation of *Miranda* because, according to the defendant, the interview involved a "coercive scenario," which rendered his waiver involuntary.  The defendant's allegations about his interview by agents are insufficient to raise a disputed issue of material fact necessitating a hearing.

In their memorandum, defense counsel argues that Bouterse's statement was coerced and/or the product of an involuntary waiver made as the result of purported threats and the "attitude of the agents." (Def. Mem. at 18). To the contrary, if the Court were to order a hearing on this issue, the Government expects that law enforcement witness(es) would testify that they engaged the defendant in a cordial interview, that the defendant reviewed and agreed to sign the waiver of rights form, and that he willingly agreed to speak with them – that is, until Bouterse terminated the interview and decided to spent the rest of his time on the flight eating, sleeping, and reading a book of his choosing. During the course of the voluntary, non-custodial interview, the defendant was never threatened, coerced, or subjected to "material misrepresentations" about the case against him.

For the reasons give below, even assuming *arguendo* that the facts proffered by the defendant are entirely accurate – which they are not – they do not create a disputed issue of material fact about the voluntariness of Bouterse's waiver of his rights.

### A.     Relevant Law

Statements made by a defendant in the course of a custodial interrogation are inadmissible unless the questioning was proceeded by "procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). Provided that the defendant is properly apprised of his *Miranda* rights, any waiver by the defendant of those rights is effective only if the waiver is knowing, voluntary, and intelligent. *United States* v. *Carter*, 489 F.3d 528, 534-35 (2d Cir. 2007). The government bears the burden of demonstrating waiver. *United States* v. *Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990); *see also United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir.1995) ("To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and

(2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right.").

A defendant seeking the suppression of evidence is not automatically entitled to an evidentiary hearing on his claim, but must first "state sufficient facts which, if proven, would [require] the granting of the relief requested." *United States* v. *Kornblau*, 586 F. Supp. 614, 621 (S.D.N.Y. 1984) (internal quotation and citation omitted); *see United States* v. *Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998); *United States* v. *Ortiz*, 99 Cr. 532 (DC), 1999 WL 1095592, at *1 (S.D.N.Y. 1999). To meet this burden, a defendant must present his claim through an affidavit of an individual with personal knowledge of the relevant facts. *See United States* v. *Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967); *United States* v. *Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989). In such an affidavit, the defendant must show "that disputed issues of material fact exist before an evidentiary hearing is required." *Viscioso*, 711 F. Supp. at 745 (internal quotation and citation omitted).

### B.    Discussion

No hearing is required because the defendant has failed to put any material fact in dispute with respect to his claims. Defense counsel summarized the following facts when outlining why Bouterse's waiver was not made voluntarily: (i) Bouterse was "arrested on foreign soil";(ii) Panamanian authorities did not initially inform Bouterse of the "reason for his detention"; (iii) on the DEA plane, Bouterse's "leg shackles were removed but he remained handcuffed"; (iv) Bouterse was purportedly told that "unless he talked he would face terrorism charges in New York"; and (v) Bouterse has "no experience in American law." (Def.'s Mem. at 18; accord Bouterse Decl.).

In his declaration, Bouterse echoes the facts discussed in the memorandum. However, Bouterse concedes, or does not place in dispute, the following:

- Bouterse read the advice of rights form.

- Bouterse understood the form and the rights that he was waiving.

- Bouterse signed the advice of rights form while on the plane with the DEA agents, and before making any incriminating statements to agents.

- No agent raised his or her voice, or otherwise engaged in any verbal abuse of Bouterse during the plane ride.

- Bouterse was advised of the "drug charges" he was facing at the time of his arrest;

- The sole "threat" perceived by Bouterse was the purported statement that, if he did not "talk," he would face terrorism charges in New York.

These undisputed facts plainly establish the voluntariness of Bouterse's waiver of his *Miranda* rights.  In addition, these undisputed facts are entirely corroborated by the other objective evidence in the record – consisting of the photographs of Bouterse during the interview, which reflect the generally relaxed nature of his exchanges with the agents, and the advice of rights form, which contains Bouterse's signature – that similarly shows that Bouterse made a knowing and voluntary waiver of his rights.

The facts pointed to by defense counsel do not offer a basis to alter this conclusion.  First, the defense's claims relating to the lack of information provided to Bouterse by Panamanian authorities upon his arrest in that country, and the details of his hours-long confinement in Panama, do not have any bearing on the voluntariness of Bouterse's waiver of his rights his subsequent interview with DEA agents.  *Cf. Colorado* v. *Spring*, 479 U.S. 564, 576–77 (1987) (a suspect is not entitled to "a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights") (quoting *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986)).

Second, Bouterse's lack of knowledge of "American law" does not present a compelling basis to find that his waiver was not voluntary; Bouterse does not make any allegation that even suggests he was unable to understand the substance of the advice of rights form, or that he lacked

34

the understanding that his interviewers were U.S. law enforcement agents.  Bouterse's

knowledge of the details of "American law" is not a factor that bears on voluntariness.

Finally, Bouterse's claim that he was told that "unless he talked he would face terrorism

charges in New York" does not render his waiver involuntary.  Even assuming *arguendo* that this

statement was made to Bouterse by someone on the plane – which it was not – it simply does not

rise to the level of a statement that could be considered coercive.

Nowhere does Bouterse allege that the purported statement about a potential terrorism

charge was the reason that he signed the form waiving his *Miranda* rights.   Based on Bouterse's

version of events, he first signed the advice of rights form, and then "during the course of the

interrogation" he was told about the possibility that he may face terrorism charges in New York.

(*Id.* ¶¶ 11-12).  By Bouterse's own account, at the time he heard the purported threat, he had

already decided to waive his *Miranda* rights, executed the waiver form, and begun speaking with

the agents.  It is therefore not surprising that Bouterse has failed to explain how the purported

statement about potential leniency actually "coerced him to confess" – Bouterse had already

decided to confess before the statement was made.  *See United States* v. *Calvente*, No. S3 12 Cr.

732 (WHP), 2013 WL 4038952, at *3 (S.D.N.Y. July 26, 2013) ("To raise a contested issue of

material fact, Colon must allege how he was pressured and what promises of leniency he

received, as well as how those circumstances coerced him to confess. Colon offers none of those

specifics.").

In addition, Bouterse concedes that, at around the time he was told he could face

terrorism charges, he was also told that he was facing "drug charges."  (*See* Bouterse Decl. ¶ 12).

Bouterse does not allege that he was told he could avoid the drug charges if he "talked" to the

DEA agents on the plane.  Thus, even under Bouterse's version of events, he understood that

whether he talked or not, he would still be being brought to New York to face federal criminal charges.  The inevitability of Bouterse facing serious criminal charges in the U.S. renders the purported threat less meaningful – Bouterse knew that, whether he talked or not, he was being hailed into a U.S. court on U.S. criminal charges.

Finally, the purported statement about a potential terrorism charge falls squarely within the line of authorities in the Second Circuit holding that "vague promises of leniency for cooperation . . . generally will not, without more, warrant a finding of coercion."  *United States* v. *Gaines*, 295 F.3d 293, 299 (2d Cir. 2002); *see also United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("[the defendant] received a proper *Miranda* warning; it was not vitiated by any assurance that cooperation would help the defendant").  "[T]here is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him. Both are true." *Id.* Here, even assuming that one of the agents made vague promises of potential leniency based on Bouterse's cooperation, it does not render Bouterse's waiver involuntary, especially where it is undisputed that Bouterse was not otherwise threatened or coerced by the agents and that Bouterse had already agreed – both orally and in writing – to waive his *Miranda* rights prior to hearing this purported threat.

## IV.    THE DEFENDANT'S REQUESTS TO COMPEL DISCOVERY ARE EITHER PREMATURE, MOOT, OR WITHOUT MERIT

The defendant requests the production of three categories of information: (i) communications between the United States and Panama regarding his transfer to U.S. custody; (ii) certain audio and video recordings of meetings involving the CSes and co-conspirators not named as defendants in the S2 Indictment; and (3) the "DEA Operational File."  (Def.'s Mem. at 20).   To the extent any items from these categories are within the Government's disclosure obligations under Rule 16 and *Brady*, the Government has produced such items – including the

Diplomatic Note and the audio and video recordings referenced in Bouterse's memorandum – and will produce any additional items that come into its possession.

The defendant's request to compel the disclosure of exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963) is moot.  The Government recognizes its obligations under *Brady* and has acknowledged its *Brady* obligations in correspondence with defense counsel.  Should the Government become aware of *Brady* material, it will promptly produce it. As a result, the defendant's request for an order pertaining to the disclosure of *Brady* material should be denied.  *See, e.g., United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any Brady material to the defense well before trial"); *United States* v. *Yu*, No. 97 Cr. 102 (SJ), 1998 WL 57079, at *4-5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Finally, the defendant's request for notice of the evidence the Government seeks to introduce at trial pursuant to Federal Rule of Evidence 404(b) is premature at this time, before the Court has even set a trial date in this matter.  The Government will provide Rule 404(b) notice prior to trial in accord with the schedule set by the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motions should be denied in their

entirety.

Dated: New York, New York
May 26, 2014

<div style="margin-left: 50%;">

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:      <u>*/s/ Adam Fee*</u>
      Adam Fee / Michael D. Lockard
      Assistant United States Attorneys
      (212) 637-1589 / 2193

</div>