E7NMBOUC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                        13 Cr. 635 (SAS)

5   DINO BOUTERSE,

6                 Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           July 23, 2014
9                                          3:45 p.m.

10

    Before:
11
                      HON. SHIRA A. SCHEINDLIN,
12
                                           District Judge
13

14                           APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    ADAM FEE
17  MICHAEL LOCKARD
         Assistant United States Attorneys
18
    RICHARD H. ROSENBERG
19  MICHAEL HUESTON
    JOSE ARRUFAT-GRACIA
20       Attorneys for Defendant

21

22
    ALSO PRESENT:  BERNARD GROENEVELD, Interpreter (Dutch)
23

24

25

E7NMBOUC

1              (Case called)

2              THE COURT:  Good afternoon, Mr. Fee.

3              MR. FEE:  Good afternoon, your Honor.

4              THE COURT:  I understand Mr. Lockhart will be here in

5     a while.

6              MR. FEE:  Yes, your Honor.  Thank you.

7              THE COURT:  Good afternoon, Mr. Rosenberg.

8              MR. ROSENBERG:  Good afternoon, your Honor.

9              THE COURT:  Good afternoon, Mr. Hueston.

10             MR. HUESTON:  Good afternoon, your Honor.

11             THE COURT:  Good afternoon, Mr. Arrufat Garcia.

12             MR. ARRUFAT-GRACIA:  Good afternoon, your Honor.

13             THE COURT:  And the defendant, Mr. Bouterse, good

14     afternoon.

15             Are you a Dutch interpreter?

16             THE INTERPRETER:  Dutch.

17             THE COURT:  I understand from the defendant that he

18     does understand English, he speaks English, he understands

19     English, but just in case he wanted you here.  If he doesn't

20     understand something I say and wants to stop for a minute and

21     consult with you, that's okay, but you don't need to interpret

22     every word.

23             THE INTERPRETER:  Technical terms, mostly.

24             THE COURT:  Mr. Bouterse, if you want to speak to the

25     interpreter, just go like that.

E7NMBOUC

1              THE DEFENDANT:  Yes, your Honor.

2              THE COURT:  In some way indicate.  Just indicate.

3     I'll try to read slowly, but if you need to consult.

4              What I'm here to do today is to read into the record a

5     decision on the pending motions or motion.

6              Mr. Bouterse is charged with one count of

7     participating in a narcotics conspiracy, one count of using or

8     possessing a weapon in furtherance of that conspiracy, and one

9     count of attempting to provide material support to a foreign

10    terrorist organization.

11             Defendant now moves to dismiss the indictment or, in

12    the alternative, to suppress his postarrest statements and to

13    compel the government to produce certain discovery.

14             I start with the background by summarizing the

15    allegations in the indictment.  Mr. Bouterse is the son of the

16    current president of Suriname.  According to the United States

17    Government, he is also the head of Suriname counterterrorism

18    unit.

19             In early 2013, he became the target of a U.S. Drug

20    Enforcement Administration sting operation.  That's the DEA.

21    In February 2013, the defendant met with several individuals

22    who purported to work for Mexican narcotics traffickers but

23    who, in fact, were confidential informants for the DEA to

24    discuss how the defendant could facilitate narcotics

25    trafficking activities and assist the informants in obtaining

E7NMBOUC

1    weapons.

2          On June 27 and June 28, Mr. Bouterse met with the

3    informants to fill out the paperwork necessary to obtain false

4    Surinamese passports and further discussed plans to traffic

5    cocaine.  During the June 28 meeting, the defendant showed the

6    informants a rocket launcher that he kept in his office safe.

7          In late July, defendant and Edmund Muntslag, a

8    codefendant, arranged to ship a test load of 10 kilograms of

9    cocaine to Trinidad and Tobago.

10          On July 3, one of the confidential informants told the

11    defendant that he had associates connected with Hezbollah who

12    would like the defendant's assistance in obtaining weapons.

13          On July 31, Bouterse met with several individuals who

14    are also confidential informants, as well as an undercover DEA

15    agent who all purported to be members of Hezbollah.  Bouterse

16    said that he would both assist Hezbollah in getting 30 to 60

17    operatives into Suriname and provide them housing and training

18    facilities.  He also offered to provide false Surinames

19    passports and said that he would look into obtaining weapons

20    for the operatives.

21          On August 29, Bouterse met with the undercover agent

22    and an informant in Panama, where he indicated that everything

23    was ready for the operative's arrival in Suriname and there

24    would be some toys available for the undercover agent to

25    inspect when he arrived in Suriname.  Bouterse also gave the

E7NMBOUC

undercover agent a Surinames passport with an exit stamp so
that it would appear as if the agent had previously left
Suriname with this passport.  Bouterse was promised $2 million
in good-faith money in exchange for providing the passport.

       Following this meeting Bouterse was arrested by
Panamanian officials.  Of course, those facts were taken from
the indictment.

       Now, turning to the procedural history of the case.
On August 15, that would be 2013, Bouterse was charged in a
sealed indictment with one count of participating in a
narcotics conspiracy and one count of using and possessing a
weapon in the course of that conspiracy.  A superseding
indictment issued on August 20 added Muntslag to the conspiracy
charge.  That was the first superseding indictment.  On the
same day a magistrate judge issued arrest warrants for both
defendants.

       On August 29, following Bouterse's arrest in Panama,
the United States Embassy transmitted a diplomatic note to the
Panamanian government seeking Bouterse's conditional release to
United States custody pursuant to Section 552A of Panama's
criminal procedure code.  And that section of the Panamanian
code says, and I quote:  For reasons of public safety and
social interest, and by way of an exception, the executive
branch will be able to grant the simple conditional surrender
of a foreigner to a requesting state with the agreement that

E7NMBOUC

1   once the judicial proceeding he was requested for had been

2   completed or once he has been tried in the requested state,

3   whether he was acquitted or found guilty, and in that case once

4   he has served his sentence, he will be returned to the Republic

5   of Panama to continue with his criminal case if one is pending.

6          Now, the diplomatic note that was from the U.S. to

7   Panama explained the charges in the first superseding

8   indictment and it attached a copy of the arrest warrant.  The

9   note also states, and I quote:  "Dino Bouterse represents a

10  danger to Panama's public security because he is a supplier to

11  international drug trafficking organizations which have access

12  to large amounts of funds derived from the trafficking of large

13  quantities of cocaine.  These organizations and their members

14  also regularly launder proceeds derived from their cocaine

15  trafficking activities.

16         Additionally, Dino Bouterse, the son of the current

17  president of Suriname, has indicated his interest in selling

18  military type weapons to Hezbollah, the transnational criminal

19  organization known to participate in international terrorist

20  activities, as well as setting up a training camp in Suriname

21  for Hezbollah and narcotics trafficking organizations.

22         Given the detailed information that Bouterse has about

23  the activities of narcotics organizations, it is possible that

24  he or members of these organizations may attempt to secure his

25  release from custody either by attempting to corrupt public

E7NMBOUC

1  officials or through the use of violence."

2          On the same day, Panama granted the request for

3  Bouterse's simple conditional surrender in an executive decree.

4  The decree stated in relevant part, and I quote:  "That the

5  American authorities have pointed out that Bouterse has

6  indicated his interest in selling military type weapons to

7  Hezbollah, an international criminal organization renowned for

8  its participation in international terrorist activities, as

9  well as in setting up a training camp in Suriname for Hezbollah

10  and for organizations related to drug trafficking.  The

11  diplomatic representatives go on to state that it is possible

12  that members of said international organizations will attempt

13  to free him from custody either by attempting to corrupt

14  officials or through the use of violence.  The ties of Bouterse

15  to extremely dangerous criminal organizations make his presence

16  in the Republic of Panama a risk to the community.  And his

17  simple conditional surrender is clearly grounded in reasons of

18  both public safety and social interest."  Bouterse was then

19  released into custody of DEA agents in Panama and transported

20  to New York.

21          The second superseding indictment was filed on

22  November 7, 2013, adding one count of attempting to provide

23  material support to a designated terrorist organization against

24  Bouterse.

25          Good afternoon, Mr. Lockard.

E7NMBOUC

1          MR. LOCKARD:  Good afternoon, your Honor.

2          THE COURT:  According to Bouterse, he was "kept in

3     detention by Panamanian law enforcement for approximately six

4     hours during which time he was leg shackled and handcuffed."

5     That comes from Mr. Bouterse's March 27, 2014 declaration at

6     paragraph 5.

7          He was then driven to an airport hanger and shown a

8     Spanish language document authorizing his removal from Panama.

9     Bouterse was then addressed by an individual who identified

10    himself as a United States federal agent and was told that he

11    would be taken to New York.  Once Bouterse was on the plane, an

12    agent gave him an advice of rights form and read it out loud.

13    Bouterse signed the form but did not initial the spaces next to

14    certain rights.

15         After Bouterse signed the form the agents told him

16    about the drug charges.  And according to him they threatened

17    that unless he talked he would be facing terrorism charges in

18    New York.  Bouterse then began to answer the agent's questions.

19    According to the government, he told the agents, and this is a

20    quote:  "That if they wanted to slow drug trafficking in

21    Suriname, they needed to send more agents there."  An agent

22    asked Bouterse who supplied the 10 kilograms of cocaine shipped

23    in late July and Bouterse answered that Muntslag would know the

24    answer.  Bouterse then refused to answer any further questions.

25         Bouterse moves to dismiss Count One of the second

E7NMBOUC

 1    superseding indictment.  That's the charge of attempting to

 2    provide material support to a terrorist organization for

 3    violating the doctrine of specialty.  The doctrine of

 4    specialty -- and I quote from a recent Second Circuit case --

 5    "the doctrine of specialty prohibits prosecution of a defendant

 6    for a crime other than the crime to which he has been

 7    extradited."  Bouterse argues that because Panama only

 8    surrendered him to face the charges in the first superseding

 9    indictment, he may not be tried on the new count.

10            The government responds that the doctrine of specialty

11    applies only to removal by extradition treaty, not by mutual

12    cooperation.  Although the Second Circuit has not addressed

13    whether the doctrine of specialty applies in nonextradition

14    circumstances, the Ninth Circuit recently addressed this

15    question in a similar context.

16            In United States v. Stuckman, the defendant was a

17    United States citizen charged with tax fraud.  After the

18    indictment issued, Stuckman traveled to Panama on a tourist

19    visa and stayed there.  The United States Government vigorously

20    sought Stuckman's return and extensively communicated with the

21    Panamanian government to secure his deportation.  The district

22    court rejected Stuckman's motion to dismiss the indictment on

23    the grounds that his removal from Panama violated the

24    extradition treaty between the two stations.

25            The Ninth Circuit affirmed, holding that, and I quote,

E7NMBOUC

"persuasion and cooperation not necessarily add up to extradition.  Neither deportation nor surrender other than in response to a demand pursuant to a treaty, constitutes extradition."  That's all a quote from the Ninth Circuit case.

The Court went on to explain that "while the formalities of extradition may be waived, a demand in some form by the one country upon the other is required in order to distinguish extradition from the unilateral act of one country for its own purposes, reporting or otherwise unilaterally removing unwelcome aliens."

Bouterse argues that courts have applied the doctrine of specialty in cases where extradition was accomplished by comity rather than treaty.  But the only case to directly support defendant's premise is United States v. Evans, a 1987 decision from the Southern District of New York which said, in dicta, that the specialty doctrine is applicable when extradition is obtained through acts of comity by the surrendering government instead of by treaty.

In that case, the United States Customs Service wrote to and met with the Bermuda attorney general to seek the deportation of certain individuals who were charged in a sting operation for attempting to sell arms to Iran.  The offense was not covered by the United States Bermuda extradition treaty, but Bermuda granted the request for deportation and that decision was affirmed by a Bermuda court.

E7NMBOUC

1          The other two cases that were cited involve formal

2     extradition requests and extradition accomplished through legal

3     proceedings in the foreign state.  In <u>Fioconni v. The Attorney</u>

4     <u>General of the United States</u>, the United States embassy in Rome

5     requested the extradition of two individuals charged with drug

6     trafficking.

7          Although the U.S Italy extradition treaty did not

8     include narcotics crimes, a court in Italy granted the

9     extradition request as an act of comity because drug

10    trafficking was also a crime under Italian law.  In <u>United</u>

11    <u>States v. Gonzalez</u>, the U.S. Government requested the

12    extradition of an individual charged with armed robbery from

13    Colombia.  The Court in Gonzalez said:  "Although the United

14    States and Colombia have no extradition treaty, the request was

15    made pursuant to a December 1997 Colombian constitutional

16    amendment allowing extradition to the United States.  The

17    Colombian Supreme Court granted extradition of Gonzalez to the

18    U.S. on some but not all the charges filed in the superseding

19    indictment."

20         In both DOG and Gonzalez, extradition was accomplished

21    by a formal request from the U.S. Government and legal

22    proceedings in the foreign state.  Similarly, in Evans, a

23    Bermuda court ultimately approved the deportation order.  In

24    all three cases the countries agreed to extradite or deport as

25    an accommodation to the U.S. request and the decisions were

E7NMBOUC

affirmed by domestic legal proceedings.  These cases are

consistent with the Ninth Circuit's reasoning that a formal

demand is required in order to it distinguish extradition from

the unilateral act of one country for its own purposes,

deporting or otherwise unilaterally removing the unwelcome

aliens.

The facts here are distinguishable.  While the U.S.

requested Bouterse to surrender, Panama's decision to remove

Bouterse was made because Bouterse's ties to extremely

dangerous criminal organizations make his presence in the

Republic of Panama a risk to the community.  The Panamanian

executive branch, not the Court, made the decision to remove

Bouterse to preserve its own interests in public safety, not

merely to accommodate the U.S.' request.

Even if the doctrine of specialty did apply, which I

find it doesn't, Bouterse's challenge would be unsuccessful

because the Panamanian government was undisputed when informed

that Bouterse had "indicated his interest in selling military

type weapons to Hezbollah, as well as setting up a training

camp in Suriname for Hezbollah.

Defendant's contention that the doctrine of specialty

is violated because there is no mention in the diplomatic note

that the U.S. Government was intending to prosecute Bouterse

for such conduct is meritless.  Although Panama surrendered

Bouterse to face the charges in the first superseding

E7NMBOUC

indictment, there is no evidence that Panama would regard the

prosecution under the second superseding indictment as an

affront to its sovereignty in light of the fact that it knew of

the allegations connecting Bouterse to Hezbollah.

Bouterse also moved to dismiss the indictment based on

outrageous government conduct.  And I quote from United States

v. Al Kassar, (2d Cir. 2011).  The courts have acknowledged

that government involvement in a crime may, in theory, become

so excessive that it violates due process and requires the

dismissal of charges against the defendant even if the

defendant was not entrapped.  Still quoting from Al Kassar, to

establish a due process violation on this ground, a defendant

must show that the government's conduct was so outrageous that

common notion of fairness and decency would be offended where

judicial processes invoked to obtain a conviction."

Bouterse argues that considered in totality, the

government's extraordinary monetary inducement, as well as its

decision to focus on Bouterse and Suriname, a country not

considered by the U.S. Government to pose a substantial risk,

the alleged violations of Surinamese law committed by

informants and agents and alleged misrepresentations to the

Panamanian government justify the dismissal of the indictment.

According to Bouterse, an undercover agent told him that, and

this is a quote, $15 million has been authorized as payment by

Hezbollah for assistance in setting up training camps in

E7NMBOUC

1    Suriname.  That's a quote from the defendant's memorandum of

2    law.

3           Additionally, Bouterse was offered $2 million in

4    good-faith money upon delivery of the false Surinamese

5    passport.  The Second Circuit recently acknowledged, albeit

6    skeptically, and I quote from <u>Cromitie</u>, a recent Second Circuit

7    case, 2013, the Second Circuit recently acknowledged that an

8    offer of money might, in some unlikely circumstances, be so

9    large as to constitute outrageous government conduct.  The

10   Court in <u>Cromitie</u> explained that the amount of money that might

11   constitute a due process violation should be measured in

12   relation to the inducement available for a particular criminal

13   act for nongovernmental sources and the nature of the act

14   itself.

15          Although $15 million is a significant amount of money,

16   it is reasonable compensation for Bouterse's promise to obtain

17   fraudulent passports for dozens of Hezbollah operatives to

18   establish schools, lodging, and security for Hezbollah

19   operatives in Suriname.  To obtain heavy weapons several of

20   these terrorist operatives assist in transporting the

21   operatives into Suriname over an extended period of time.

22          The government also notes that the amount of the

23   proposed payment is further justified by the fact that Bouterse

24   was one of the most powerful men in his country with access to

25   government offices, armed personnel from the counterterrorism

E7NMBOUC

unit, weapons, cars, cash, narcotics, and other material goods.
In light of the circumstances, offering $15 million total, or
$2 million as good-faith money, is not outrageous government
conduct meriting dismissal of the indictment.

Bouterse's other examples of alleged government
misconduct are even less persuasive. Bouterse argues that, and
I quote, "there has never existed a link to justify a sting
operation against him." But he fails to otherwise explain why
this is relevant.

The government is afforded wide latitude in
investigating crime. The alleged violations of Surinamese law
committed by government informants and agents, such as entering
Suriname using false documents or failing to declare cash with
customs, would not constitute outrageous conduct, only if they
were violations of U.S. law.

More importantly, Bouterse cites no legal authority to
explain why violations of a foreign country's law would
constitute outrageous government conduct meriting dismissal.
Finally, Bouterse argues that the diplomatic note led to the
misimpression that Hezbollah agents posed a threat to the
Panamanian government. A plain reading of the diplomatic note,
however, leads to no such impression. But even if it did, the
impression is not do to an affirmative misrepresentation by the
U.S. Government, but rather the confusing wording or the
potential for mistranslation.

E7NMBOUC

1          I turn now to the motion to suppress.  The government

2     bears the burden of proving the statements made in the course

3     of interrogation were made knowingly and voluntarily by a

4     preponderance of the evidence.  The government must show that

5     based on the totality of the circumstances, the investigating

6     agents did not overbear the defendant's will and that the

7     statements were a product of a rational intellect and a free

8     will.

9          Even accepting all of the allegations in Bouterse's

10    affidavit as true, there is no basis for granting his motion to

11    suppress.

12         Bouterse's allegations that he was held by Panamanian

13    authorities for several hours without being given information

14    about his arrest or detention is irrelevant to the

15    voluntariness of his statements to the DEA agents on the plane.

16    Bouterse does not allege that he was tortured or otherwise

17    mistreated by Panamanian or American officials.

18         Bouterse's affidavit also does not establish a basis

19    to conclude that his statements were involuntary.  The DEA

20    agents advised Bouterse of his Miranda rights in writing and

21    orally before asking questions.  Bouterse speaks English and

22    does not claim that he did not understand the form he signed.

23    The only allegedly coercive statement Bouterse claims was made

24    was that "unless he talked, he would face terrorism charges in

25    New York."  Bouterse states that he signed the waiver but did

E7NMBOUC

not answer questions until after the statement was made.

First, the Second Circuit has repeatedly held that truthful statements about potential criminal liability, sentencing exposure or the benefits of cooperation are not coercive.  And I cite <u>United States v. Ruggles</u> (2d Cir. 1995) which said that statements to the effect that it would be to a suspect's benefit to cooperate are not properly coercive.

And an older case, <u>United States v. Vine</u> (1990), the mere mention of the possible sentence facing a defendant does not convert otherwise proper encounters between the police and the accused into a coercive and overbearing experience.

Second, Bouterse admits that he signed the waiver before the statement was allegedly made, although he says that he only spoke after the statement.  Nevertheless, because the facts alleged in his affidavit are insufficient to merit suppression, no hearing is necessary and the motion is denied.

Bouterse also moves to compel production of audio and video recordings of meetings involving the confidential sources, communications with the Panamanian government, internal DEA files, as well as Brady material and disclosure of 404(b) evidence.  The government represents it has now produced the materials that falls into a Rule 16 and Brady disclosure obligation.

In his reply memorandum Bouterse claims that the government still has not produced several recordings and phone

E7NMBOUC

 1    records requested by the defense.  So I am going to ask the

 2    government, have you now produced all the recordings and phone

 3    conversations that the defense has requested?

 4              MR. FEE:  Your Honor, there are three outstanding

 5    items of discovery.  We produced the ones referenced in the

 6    memorandum.  The three things are, there was an iPhone

 7    recovered from the defendant.  It has now been unlocked by

 8    Apple.  They have a tremendous backlog.  As of last Tuesday,

 9    Apple gave us back the unlocked phone.  We will have that for

10    the defense within a week or two at the most, as soon as we

11    download the information.

12              The second item was an e-mail search warrant which

13    just returned from Google last Monday.  I have a copy today.  I

14    will give that to defense.

15              The last outstanding actual recordings in the case

16    concern people other than the defendant which, in the

17    government's view is not Rule 16.  We have agreed to turn it

18    over to the defense, to interpret all of our disclosure

19    obligations broadly, as we should.

20              We attempted to turn over a hard drive.  There was a

21    technical failure.  We are going to work as quickly as we can

22    hopefully within the next two weeks to get another copy.

23    Again, these are recordings between sources and another

24    unindicted coconspirator, not Mr. Bouterse.  That's the

25    landscape today.

E7NMBOUC

1      THE COURT:  They were all meetings that he was at that

2   had been turned over.

3      MR. FEE:  Have long ago been turned over.

4      THE COURT:  How about communications with the

5   Panamanian government?

6      MR. FEE:  Your Honor, we don't really think there is

7   any provision of a Rule 16 or any other disclosure obligation

8   that would bring those into the ambit of discovery in this

9   case.

10      THE COURT:  You are not turning these over.

11      MR. FEE:  To the extent we have any, we are not

12   turning them over.  I actually don't think we have any.

13      THE COURT:  They are talking about internal DEA files.

14   I am not sure what that means other than Jencks material, 3500

15   material, which is not due yet.

16      MR. FEE:  We have turned over some DEA reports

17   reflecting the statements of Mr. Bouterse.

18      THE COURT:  But at the appropriate time, if there are

19   DEA statements of witnesses, you'll turn them over.

20      MR. FEE:  As soon as the Court tells us to do so.  Of

21   course, your Honor.

22      THE COURT:  How about 404(b)?

23      MR. FEE:  Your Honor, when and if the appropriate time

24   is here, we will do so.  We don't even have a trial date yet,

25   as the Court is aware.

E7NMBOUC

| | |
|---|---|
| 1 | THE COURT:  I assume that the government has met its |
| 2 | disclosure obligations subject to some defense counsel telling |
| 3 | me something specific that I can discuss today.  I assume that |
| 4 | the government will continue to comply with those obligations. |
| 5 | So I will set a schedule for 404(b) and for 3500 |
| 6 | material as I set the trial date, which I think, now that the |
| 7 | motions are denied, is the next step. |
| 8 | Just before I do that, do any of the defense counsel |
| 9 | want to say anything more about discovery issues? |
| 10 | MR. HUESTON:  Your Honor. |
| 11 | THE COURT:  Yes, Mr. Hueston. |
| 12 | MR. HUESTON:  Thank you, your Honor. |
| 13 | I am going to get right to it.  What we are really |
| 14 | looking for, we detailed them in our memo.  There is N80 or |
| 15 | N23.  They are conversations between an unindicted |
| 16 | coconspirator when he's on an airplane after meetings with |
| 17 | Mr. Bouterse with the confidential sources. |
| 18 | THE COURT:  Is that what you referred to, Mr. Fee, is |
| 19 | that you are going to produce, even though you don't think you |
| 20 | are really obligated to do it, in the spirit of all |
| 21 | cooperation, you plan to do that in the next couple of weeks? |
| 22 | MR. FEE:  Yes, your Honor.  That's exactly the two |
| 23 | items I referred to. |
| 24 | THE COURT:  That's coming your way. |
| 25 | MR. HUESTON:  That's that issue. |

E7NMBOUC

1          With respect to the 404(b), I take the government's

2     representations we are going to have a timeline set out for

3     that and the 3500 material.

4          THE COURT:  Correct.

5          MR. HUESTON:  The issue about the operational file, as

6     we see it, your Honor, the operational file, we see it as there

7     is a Brady issue.  So, obviously, if the government does seek

8     Brady material in the operational file, that's something that

9     we do think they should look at and notify us about.

10          One of the concerns that we have in terms of the

11     defense and Mr. Bouterse -- and I understand the Court's

12     rulings.  However, the decision to turn the investigation

13     towards Suriname in December of 2011, we believe that the

14     operational file would answer that and we do think in terms of

15     perhaps an entrapment issue further on down the line in terms

16     of making our defense, that file would be very important --

17          THE COURT:  I am not sure I'm understanding what file

18     you are referring to.

19          MR. HUESTON:  Your Honor, the operational file, as we

20     understand it, talks about issues in terms of what's the

21     authority of the confidential sources in terms of their actions

22     towards a suspect or a person that the United States government

23     has targeted for investigation.

24          In this case what we learned is that there was a

25     preceding investigation against an unindicted coconspirator

E7NMBOUC

1    that went on for less than a year.  And then at some point in

2    December 2012, there was a change and a focus on Mr. Bouterse.

3    I misspoke before when I said December 2011.  So we believe the

4    operational file gives the directions or the overviews to the

5    confidential sources and what was their authority to act and

6    target Mr. Bouterse in this case.

7              Also, in that --

8              THE COURT:  I don't think that goes to the potential

9    entrapment defense.  Their actions are their actions.  The real

10   issue is his response.  You can target any subject you choose

11   and the reasons they target the subject are really not your

12   concern.  Once that person is targeted, that's when one starts

13   to analyze entrapment.  But the targeting is a decision that

14   the law enforcement branches get to make.

15             MR. HUESTON:  One of the issues in terms of

16   predisposition, your Honor, and we do think that's going to

17   be -- if there is a trial, that would be a hotly contested

18   issue -- is that there is a DEA office that's in Suriname

19   that's tasked to deal with issues of narcotics trafficking.

20   And part of the operational file, what we would want to know

21   is, in terms of intelligence, what the United States, the

22   information they had on Mr. Bouterse's predisposition with

23   respect to it.

24             THE COURT:  That may come to you as 404(b).  If they

25   have evidence of similar acts, prior drug dealing that they

E7NMBOUC

1    would like to talk to a jury about, for the purposes that are

2    permitted under 404(b), they are going to make that known and

3    set a date now.  I think that's what you are driving at, does

4    this file reflect that they had information of other narcotics

5    deals or didn't they.  Did they just sort of target it cold or

6    did they already have information.  That may come out as part

7    of 404(b).

8            MR. HUESTON:  I think there is one other area in terms

9    of where an operational file would be helpful to the defense.

10   This goes to whether or not the confidential sources violated

11   any restrictions or any guidelines that they were supposed to

12   follow.

13           THE COURT:  What if they did?  What does that have to

14   do with the defendant and his guilt or innocence of his defense

15   and his trial if they violated some guidelines that may be an

16   entirely different issue?  I don't think that helps to

17   exonerate him.

18           MR. HUESTON:  The issue in terms of, as I look at it,

19   in terms of credibility of an individual, I do think that's

20   always an issue.  And if there are guidelines or regulations

21   that they are violating, they are violating the United States

22   law, that's something that they should be questioned about.

23           THE COURT:  I don't think you are right.

24           Mr. Fee, have you reviewed this operational file or

25   can you do so to be certain that there is nothing in there that

E7NMBOUC

1   upon further review you think should be turned over either to

2   impeach the credibility of an agent or an informant, or for the

3   purpose of understanding the predisposition/entrapment issue?

4          MR. FEE:  Your Honor, as with you, I share some

5   befuddlement as to what an operational file is.  We have

6   reviewed plenty of internal DEA reports, files, many of which

7   are in the hands of the defense.  It sounds like with that last

8   point, he is plainly describing Jencks Act and Giglio material.

9          THE COURT:  No.  I am not sure of that.  He is saying

10  there may be sort of a background file that one opens when one

11  starts an investigation, and that file might say we are

12  targeting this guy because he's a well-known narcotics

13  trafficker or he has done this six or eight times, or it might

14  show him talking about the confidential informant.  We have had

15  a problem with this informant before.  He has taken money or

16  bribes when he shouldn't.  I'm making this up for the record.

17  They are hypothetical.  I just ask you to review any such file

18  that they had started this operation.  Maybe they had code

19  names.  These operations have code names.  If there is such a

20  file, look it over to assure yourself for Brady impeachment

21  purposes, for potential entrapment defense, whatever the

22  theories Mr. Hueston was able to articulate.  I'm asking you to

23  just take a close look and make sure you're meeting all your

24  obligations.

25          MR. FEE:  Yes, of course.  Those are our obligations

E7NMBOUC

1     and we will continue to do so.

2            THE COURT:  I think it's helpful for you, Mr. Hueston,

3     for the kinds of things that might be there that the government

4     should look for.  I think these assistants will do that, with

5     your hypotheticals or my hypotheticals in mind.

6            MR. HUESTON:  I appreciate that, your Honor.

7            To get further guidance, in our submission attached to

8     the notion of notice is my declaration and paragraph 12, your

9     Honor, I note a March 21, 2014 demand letter, which I described

10    some of the things.  I don't know if they really encompassed

11    everything we have talked about today, but the government does

12    have that in terms of what the defense is asking them to review

13    in this area.  Thank you.

14           THE COURT:  I'm sure that's helpful if you point them

15    to that, and they can use that as a guide to be sure that all

16    such materials may be reviewed.  It may not be anything that

17    anything needs to be produced.  Maybe it does.  And I'll take a

18    look at that.

19           It is time to look for a trial date.  If this has to

20    go to trial, Mr. Fee, how long do you think the trial will

21    take.

22           MR. FEE:  The government's case would be two to three

23    weeks on the conservative end, your Honor.

24           THE COURT:  When do you think, from the government's

25    perspective, the case will be ready to be tried?

E7NMBOUC

| | |
|---|---|
| 1 | MR. FEE:  Your Honor, we have been hanging around a |
| 2 | while. |
| 3 | THE COURT:  You are ready. |
| 4 | MR. FEE:  We are ready, your Honor. |
| 5 | THE COURT:  We all need to look at our calendars.  Let |
| 6 | me ask the defense this, which I don't know which lawyer is |
| 7 | going to speak to it.  But Mr. Hueston has been speaking so |
| 8 | far.  If you were a guessing man, do you think this is likely |
| 9 | to be a disposition or a trial at this point?  I can only ask |
| 10 | for a prediction of likely, not for a commitment, just your own |
| 11 | guess. |
| 12 | MR. ROSENBERG:  We are in some discussions, your |
| 13 | Honor, with the government and I think they owe us a phone call |
| 14 | at this point. |
| 15 | THE COURT:  Would you say it's a 50/50, could go |
| 16 | either way? |
| 17 | MR. ROSENBERG:  Yes. |
| 18 | THE COURT:  You can't say more than that at this |
| 19 | point. |
| 20 | MR. ROSENBERG:  Yes. |
| 21 | THE COURT:  I am just trying to use that for planning |
| 22 | purposes.  Because two to three weeks is a bit of a block.  I |
| 23 | need to give that serious thought. |
| 24 | MR. ROSENBERG:  I would estimate for the defense case |
| 25 | approximately a week. |

E7NMBOUC

1          THE COURT:  It could be a month-long trial.  I am not

2     going to consider the government's calendar, but I would like

3     to know what conflicts defense counsel have in September or

4     October.

5          MR. ROSENBERG:  Your Honor, I have a trial scheduled

6     for early September with Judge Pauley.  I don't know if that's

7     going to go.  I have two trials scheduled in January, one of

8     which --

9          THE COURT:  I intend to try this before January.

10          MR. ROSENBERG:  I was going to say, Judge, I think the

11     fall is reasonable for me, for a November or late October date.

12          THE COURT:  How about October 6.  I am sure that's

13     earlier than you expected, but that's a good time for me.

14          MR. ROSENBERG:  I prefer a little bit later in the

15     month, Judge, but if that's your schedule.

16          THE COURT:  Yeah.  That's my schedule.  I have a

17     two-week commitment early November to sit in another court.  I

18     don't want to run into that.  I promised.  So I need to start

19     October 6.  That's what it is.  That's a Monday.

20          Now, assuming we stick with the October 6 trial date

21     and if there really is a trial, I would need all pretrial

22     submissions by no later than September 12.  That would be voir

23     dire, requests to charge, fully briefed motions in limine, so

24     you may have to work between yourselves and say, when do I have

25     to make the motion and have a response and reply and everything

E7NMBOUC

1  done by September 12 without giving you the most time I can.

2  That's only three weeks before trial.  Everything has to be

3  fully submitted September 12.

4        404(b), if there is any, I would say a full month

5  before trial.  That would be September 5.  Give notice if you

6  plan to produce any 404(b).

7        With respect to 3500, it's really only something the

8  Court can request the government to do.  The Court can't order

9  early production.  But the government in this district is

10  generally willing to produce it the week before trial, at some

11  point during that week.  So if you're amenable to that,

12  Mr. Fee, I would ask you to produce it in the week of 29th of

13  September.

14        MR. FEE:  Of course, your Honor.

15        THE COURT:  You'll have the 3500 before the trial,

16  which is basically a generous act by the government because the

17  law is they don't have to do it, as you know, until after the

18  witness has testified, but they tend to do it in this district

19  before.

20        I think that takes care of all the pretrial dates,

21  unless there is something you think I've missed.

22        Now, the motions are decided, so the speedy trial

23  clock begins to run again today.  I have to ask the defense, in

24  view of the fact that you requested a trial late in October --

25  I could accommodate you next week if you want or the week

E7NMBOUC

1     after, but I don't think that's your preference -- would it be

2     your request that the time between today, which is July 23, and

3     our trial date of October 6 be excluded so you will have the

4     time to continue your talks with the government in hope of

5     reaching a disposition and/or properly prepare for trial?

6               MR. ROSENBERG:  That is our application, your Honor.

7               THE COURT:  Any objection?

8               MR. FEE:  We join.

9               THE COURT:  At the request of the defense and without

10    objection from the government, the time between July 23 and

11    October 6 is excluded for the reasons stated on the record.

12               Is there anything further from any lawyer today?

13               MR. FEE:  Not from the government, your Honor.

14               MR. ROSENBERG:  Nothing from us.  We are all set.

15    Thank you.

16                              o0o

17

18

19

20

21

22

23

24

25