UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                            :

UNITED STATES OF AMERICA

                                            :

            - v. -                                    S2 13 Cr. 365 (SAS)

                                            :

DINO BOUTERSE,

                                            :

                        Defendant.

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney
Southern District of New York

Michael D. Lockard
Adam Fee
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Background ............................................................................................................................ 1

    I.   Bouterse's Offense Conduct .................................................................................... 1

        A.  The Confidential Sources' Introduction to Bouterse to Pursue Narcotics,
            Weapons, and Money Laundering Ventures with a Purported Drug Cartel
            and with Hezbollah .......................................................................................... 2

        B.  Bouterse Supplies the CSes with Surinamese Passports and
            10 Kilograms of Cocaine Intended for New York, Displays Cocaine and
            a Rocket Launcher in His Office, and Agrees To Meet With a
            Purported Hezbollah Representative in Greece .............................................. 4

        C.  Bouterse Travels to Greece to Meet With a Purported Hezbollah Member
            and Operative and Agrees To Help Hezbollah Establish a Base of
            Operations in Suriname .................................................................................... 5

        D.  Bouterse Travels to Panama to Supply a Purported Hezbollah Operative
            With a Surinamese Passport and Arranges to Meet the Operative in
            Suriname to Inspect Weapons and Facilities for Hezbollah's Use ............................ 7

    II.  Bouterse's Guilty Plea ............................................................................................ 8

    III. The Presentence Investigative Report ............................................................... 10

Argument ............................................................................................................................ 11

    I.   Applicable Law ...................................................................................................... 12

    II.  The Terrorism Enhancements Both Apply ........................................................ 13

    III. The Defense's Counter-Arguments Are Unavailing ....................................... 17

        A.  [To be added] ...............................................................**Error! Bookmark not defined.**

Conclusion .......................................................................................................................... 20

The Government respectfully submits this memorandum in connection with the sentencing of Dino Bouterse ("Bouterse" or "the defendant"), scheduled to be held March 10, 2015. For the reasons set forth below, Bouterse's properly calculated sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 360 months' imprisonment to life imprisonment, and a sentence within this range would be sufficient but not greater than necessary to serve the proper purposes of sentencing.

## BACKGROUND

### I.     Bouterse's Offense Conduct

The charges against Bouterse arise out of his conduct in connection with an undercover investigation by the Drug Enforcement Administration ("DEA") of international narcotics trafficking and narcoterrorism in Suriname and elsewhere in South and Central America. Bouterse is the son of Desiree Bouterse, the sitting President of Suriname. During the time of the offense, Dino Bouterse had a government position in the Surinamese National Security Agency and held himself out as the head of the country's Counter Terrorism Unit. During the course of the offense, Bouterse corruptly abused his powerful position and influence to facilitate drug trafficking and terrorism.

As part of the investigation, three confidential sources ("CSes") met with Bouterse and others, holding themselves out as representatives of a drug trafficking organization with ties to Hezbollah. Over the course of several months:

Bouterse agreed to facilitate the purported drug trafficking organization's distribution of cocaine into the United States and, in fact, supplied 10 kilograms of cocaine that were transported from Suriname to Trinidad aboard a commercial airline flight; discussed his willingness to supply the trafficking organization with weapons; provided the CSes with genuine Surinamese passports containing fraudulent identification information; showed the CSes a

rocket-propelled grenade launcher that Bouterse stored inside his government office, along with

a brick of cocaine; agreed to provide Hezbollah with a base of operations inside Suriname from

which to launch terror operations in North and South America; and supplied an undercover agent

posing as a Hezbollah operative with yet another genuine Surinamese passport containing

fraudulent identification information.

      A.     **The Confidential Sources' Introduction to Bouterse to Pursue Narcotics, Weapons, and Money Laundering Ventures with a Purported Drug Cartel and with Hezbollah**

In or about December 2011, the DEA began investigating Alfred Michael

Williams – referred to as "CC-1" in the Superseding Indictment – for money laundering and

narcotics offenses.  A confidential source ("CS-1")[1] working with the DEA subsequently began

meeting with Williams at the direction of the DEA.  During the course of these meetings,

Williams stated in part that he had high-level connections in Suriname, including connections

with Bouterse, the son of the president of Suriname.  Williams told CS-1 that Bouterse was

interested in pursuing both narcotics and money laundering ventures.  Williams subsequently

invited CS-1 and another confidential source ("CS-2")[2] to Suriname in order to discuss potential

criminal ventures with Bouterse.

On January 31, 2013, CS-1 and CS-2 flew to Paramaribo, Suriname with

Williams.  Upon arriving in Suriname, the aircraft was met by an individual, who stated that the

he was the head of security for Bouterse.  The CSs' passports were taken by security, and CS-1

---

[1]  During the course of this investigation, CS-1, who is Lebanese-American, was posing as an individual with expertise in money laundering and drug trafficking who has close ties to Hezbollah and, through CS-2, to an international drug-trafficking organization based in Mexico.

[2]  During the course of this investigation, CS-2, who was born in Mexico, was posing as a high-level drug trafficker associated with an international drug-trafficking organization based in Mexico.

and CS-2 were placed in a vehicle, which departed the Suriname airport in a police motorcade and was driven to a hotel.

The next day, February 1, 2013, CS-1, CS-2, and Williams were taken by Bouterse's chief of security to a compound to meet with Bouterse. During the course of this meeting, CS-2 stated that he was a high ranking Mexican cartel member and was interested in establishing an office in Suriname. Bouterse stated that he could facilitate narcotics trafficking activities for CS-1 and CS-2 in Suriname. CS-2 stated that CS-2's intention was to start a partnership with Bouterse and that while CS-2 had many drug suppliers, CS-2 wanted the ability to move drugs freely within Suriname. CS-2 explained that if Bouterse could provide the drugs and a safe way out of Suriname, then CS-2 could provide routes and customers through CS-2's cartel. CS-2 added that the cartel would be interested in obtaining weapons. Bouterse responded that he could provide both drugs and guns and indicated that he could supply a large quantity of guns. Bouterse stated that he (Bouterse) needed friends outside Suriname in order to continue engaging in criminal activities. After Bouterse asked if CS-1 and CS-2 had the ability to move money, CS-2 explained that CS-1 handled much of the cartel's money. CS-1 then began explaining several different methods that could be used to launder money. During the course of the discussion, Bouterse stated that the price in Suriname was $4,500 per kilogram of cocaine but that CS-1 and CS-2 would be able to take advantage of Bouterse's lower price.

Later that same day, CS-1, CS-2, Williams, and Bouterse had another meeting. During the course of this meeting, Bouterse stated that he would allow CS-2 to establish a base in Suriname for, among others, cartel members. CS-1 asked if Bouterse had any concerns with dealing with Hezbollah and noted that Hezbollah might be interested in purchasing weapons that Bouterse could provide. Bouterse responded that he was willing to work with anyone. CS-1

3

asked if Bouterse would be willing to travel in order to meet with potential weapons customers,

and Bouterse responded that he had diplomatic immunity and could travel where he wanted.[3]

Bouterse instructed CS-1 and CS-2 to have passport photos taken before they left Suriname so he

could arrange for CS-1 and CS-2 to receive new Surinamese identity papers.

      **B.**     **Bouterse Supplies the CSes with Surinamese Passports and 10 Kilograms of Cocaine Intended for New York, Displays Cocaine and a Rocket Launcher in His Office, and Agrees To Meet With a Purported Hezbollah Representative in Greece**

      From approximately June 26, 2013 through July 4, 2013, CS-1 and CS-2 traveled

again to Suriname, after Williams communicated to CS-1 that Bouterse wanted to meet again.

Over the course of several days, CS-1 and CS-2 met with Bouterse and Bouterse's associate, co-

defendant Edmund Quincy Muntslag, on multiple occasions.  During these meetings, which were

audio and video recorded, Bouterse confirmed his willingness to travel in order to meet with CS-

1's boss, who CS-1 indicated was a member of Hezbollah, in order to discuss a potential deal to

sell weapons to Hezbollah.  During these meetings, Bouterse also showed CS-1 and CS-2 a

kilogram of cocaine and a rocket launcher,[4] which he kept together in a safe in his office.

Bouterse discussed with CS-1 and CS-2 the transport of cocaine via commercial airline from

---

[3] The defendant's submission argues that he was not a government official at the time of the offense.  (Def. Mem. at 4).  During the offense, however, he indicated that he was the head of Suriname's Counter-Terrorism Unit, used police motorcades and security details for himself and for the confidential sources, claimed entitlement to diplomatic immunity, travelled to Panama on a diplomatic passport, obtained official Surinamese passports for the confidential sources, and at his arrest carried business cards and identification cards showing him to be a member of the "Kabinet van de President van de Republik Suriname - Bureau Nationale Veiligheid" (the Office of the President of the Republic of Suriname - National Security Agency).

[4] The defendant's submission argues that the rocket launcher—a "light anti-tank weapon"—was a "collector's relic." (Def. Sent. Memo. At 8).  The rocket launcher was no more a collector's relic than was the one-kilogram brick of cocaine that Bouterse stored next to it. There is no evidence that the rocket launcher was anything other than exactly what it appeared to be: an operable, functional destructive device, and an example of the types of weaponry that Bouterse would later offer to supply to cartels and Hezbollah.

Suriname to Trinidad, on to Fort Lauderdale, Florida, and, eventually, New York City.  Finally, Bouterse provided CS-1 and CS-2 with Surinamese passports which bore their photographs but not their true names.

From approximately July 21, 2013 through July 25, 2013, CS-1 and CS-2 traveled again to Suriname, and met with Bouterse and Muntslag on multiple occasions.  During these meetings, which were audio and video recorded, Bouterse agreed to travel to Greece to meet with CS-1's boss, who CS-1 indicated was a member of Hezbollah.  Bouterse and Muntslag agreed to send a test load of 10 kilograms of cocaine on board a commercial airline flight from Suriname to Trinidad, with the understanding that the cocaine ultimately would be transported to New York for sale.  CS-1 and CS-2 paid Muntslag (acting on behalf of Bouterse) $60,000 in exchange for the cocaine.

On July 27, 2013, Bouterse caused a suitcase containing 10 kilograms of cocaine to be transported from Suriname to Trinidad on board a commercial flight.  The cocaine was then seized by the DEA.

C.  **Bouterse Travels to Greece to Meet With a Purported Hezbollah Member and Operative and Agrees To Help Hezbollah Establish a Base of Operations in Suriname**

On July 31, 2013, Bouterse met in Athens, Greece, with CS-1, a confidential source ("CS-3") posing as a high-level Hezbollah leader, and a DEA undercover agent (the "UC") posing as a Hezbollah operative.[5]  During the meeting, which was both audio and video recorded, the participants discussed Hezbollah's plans, and Bouterse agreed to assist Hezbollah by providing them with a base of operations in Suriname.

---

[5]  During the course of this investigation, CS-3, who is Lebanese, was posing as a senior member of Hezbollah.

CS-3 stated that Hezbollah was fighting with the Americans and others.  CS-3 asked Bouterse if he could supply weapons to Hezbollah, including surface to air missiles, rocket propelled grenades, explosives such as Semtex and C-4, MP-5 submachine guns with silencers, and pistols with silencers.  Bouterse said he would need two months in order to provide a list of the weapons he would be able to provide.

Bouterse agreed to receive Hezbollah operatives in Suriname who could be trained there and kept there for later operations.  Bouterse stated that he could arrange for the operatives to reside in a secure compound in Suriname.  Bouterse ultimately agreed to accept an initial group of 30 to 60 Hezbollah operatives, to whom he would provide housing, food, clothing, and Surinamese passports.  In exchange, CS-3 stated that Hezbollah would donate money to Bouterse's father's reelection campaign and agreed to make an initial payment of two million dollars as a down payment for the reelection campaign after Bouterse provided a Surinamese passport for the UC, who would enter Suriname before the other operatives.  CS-3 provided Bouterse with passport photos of the UC, and Bouterse agreed to obtain a passport for the UC, who was posing as a Hezbollah operative. CS-3 also stated that some of the Hezbollah operatives traveling to Suriname would "operate in South America against American targets," which Bouterse confirmed that he understood.

Bouterse stated that he could also facilitate the travel of Hezbollah operatives from Suriname to the U.S. by applying for visas on their behalf and providing them with property and bank accounts so that they would appear to be legitimate Surinamese citizens. CS-3 made clear that the goal of establishing this Hezbollah base in South America was "to fuck these Americans," to which Bouterse responded by stating he was "totally behind you." Bouterse requested only that the Hezbollah operatives not attack the U.S. Embassy in Suriname.  CS-3

responded that Hezbollah would not launch attacks against U.S. interests in Suriname but that outside of Suriname, "we are going to fuck them good." Bouterse laughed in response and said outside Suriname was okay.

### D. Bouterse Travels to Panama to Supply a Purported Hezbollah Operative With a Surinamese Passport and Arranges to Meet the Operative in Suriname to Inspect Weapons and Facilities for Hezbollah's Use

On August 28, 2013, Bouterse traveled to Panama in order to meet with CS-1 and the UC. The purpose of the meeting was, among other things, (a) for Bouterse to provide the UC with a Surinamese passport, and (b) to arrange for CS-1 and the UC to provide payment to Bouterse. Following this meeting, the UC was to travel to Trinidad, meet with Muntslag, and then continue with Muntslag to Suriname to meet with Bouterse and inspect both weapons and facilities that Bouterse had prepared for the UC's arrival.

Bouterse met with CS-1 and the UC on August 29. The UC was again posing as a Hezbollah operative with responsibility for traveling to Suriname to assist in preparing it as a base for other Hezbollah operatives. During the meeting, Bouterse provided the UC with a genuine Surinamese passport bearing the photograph of the UC and false identification information, which would enable the UC to pose as a Surinamese citizen and ease the UC's travel into and out of Suriname. Bouterse had arranged for an exit stamp to be placed in the passport so that, when the UC traveled to Suriname, it would appear that he was returning from a trip abroad. Bouterse personally signed the exit stamp.

Bouterse told the UC that Bouterse's associates were waiting in Suriname for the UC's arrival, and that they had "toys," or weapons, ready for the UC's inspection. When the UC

asked if the training camp was ready for inspection, Bouterse stated that "everything was ready at home."[6]

Bouterse told the UC that the plan was for the UC to fly from Panama to Trinidad and Tobago with the $2 million in cash that CS-1 had promised to Bouterse as payment. Bouterse stated that his "right hand," Edmund Munstlag, was waiting in Trinidad to meet the UC and to accompany him to Suriname with the cash. Upon the UC's and Muntslag's arrival in Suriname, Bouterse and his security associates would take possession of the money. When the UC asked Bouterse if Muntslag was also involved in planning for the arrival of Hezbollah operatives, Bouterse said yes and stated that dealing with Muntslag was as good as dealing with himself (Bouterse).

Bouterse was subsequently arrested. Muntslag was also arrested in Trinidad, the location where Bouterse told the UC that Muntslag would be in order to meet the UC and accompany him into Suriname.

## II.    Bouterse's Guilty Plea

On August 29, 2014, Bouterse pled guilty to Counts One, Two, and Three of superseding indictment S2 13 Cr. 365 (SAS) (the "Indictment"), pursuant to a plea agreement with the Government. Count One of the Indictment charged the defendant with attempt to

---

[6] The defendant's submission incorrectly argues that "Mr. Bouterse did nothing in furtherance of CS-1's interest in obtaining weaponry." (Def. Sent. Memo. at 8; *see also id.* at 10-11). While this is Bouterse's convenient position in connection with sentencing, at the time of the offense conduct his position was exactly the opposite: when giving the UC a passport in Panama, Bouterse told the UC that when he (the UC) traveled to Suriname *using the very passport that Bouterse supplied at the same meeting*, weapons and facilities would be available for the UC's inspection. And Bouterse had a strong history of living up to his promises: he promised three genuine Surinamese passports with false identities, and he delivered them. He promised 10 kilograms of cocaine, and he supplied them. He promised a safe way to transport cocaine on board commercial flights out of Paramaribo, and he supplied it. He displayed a rocket launcher to CS-1 and CS-2. There is every reason to believe that Bouterse intended, not only to show the UC weapons and facilities, but also to sell the UC weapons for Hezbollah's use.

provide material support to a Foreign Terrorist Organization from in or about December 2011 up to and including in or about August 2013, in violation of Title 18, United States Code, Sections 2339B(a)(1), 2339B(d)(1)(C), 2339B(d)(1)(E), 3238, and 2. Count Two of the Indictment charged the defendant with conspiring to import five kilograms or more of cocaine into the United States from in or about December 2011 up to and including in or about August 2013, in violation of Title 21, United States Code, Sections 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(B), and 963. Count Three of the Indictment charged the defendant with using and carrying, or aiding and abetting the use and carrying of, a firearm or during and in relation to the drug-trafficking crime charged in Count Two, in violation of Title 18, United States Code, Section 924(c)(1)(A).[7]

Pursuant to the terms of Bouterse's plea agreement with the Government, the parties stipulated to the application of certain provisions of the Guidelines, but did not stipulate to the application of two Guidelines provisions: (1) the applicability of § 2M5.3(b)(1)(E) with respect to Count One, which would increase the offense level by two levels if the offense involved the provision of other material support or resources with the intent, knowledge, or reason to believe they were to be used to commit or assist in the commission of a violent act; and (2) the applicability of § 3A1.4 with respect to Count One, which would increase the offense level by 12 levels and would increase the defendant's criminal history category to VI if the offense was a felony that involved or was intended to promote a federal crime of terrorism.

---

[7] Count Three of the Indictment charged the defendant with using and carrying a destructive device, to wit, a Light Antitank Weapon, during and in relation to the drug-trafficking crime charged in Count Two, thereby triggering the enhanced statutory sentencing provisions of Title 18, United States Code, Section 924(c)(1)(B)(ii). Under the terms of the plea agreement, the Government accepted a guilty plea allocution from the defendant to using and carrying a firearm during and in relation to the drug-trafficking crime charged in Count Two, in satisfaction of Count Three. Accordingly, the applicable statutory provision is Section 924(c)(1)(A)(i), which is a lesser included offense of Section 924(c)(1)(B)(ii).

Bouterse contends that neither of these provisions apply, which would result in a total offense

level of 35, a Criminal History Category of I, and a sentencing Guidelines range of 168 to 210

months' imprisonment, with a mandatory minimum term of 180 months' imprisonment, resulting

in a Guidelines range of 180 to 210 months' imprisonment.  However, as explained more fully

below, both provisions apply and the properly calculated total offense level is 41, the defendant's

Criminal History Category is VI, and the sentencing Guidelines range is 360 months'

imprisonment to life, with a mandatory minimum term of 180 months' imprisonment.[8]

During his guilty plea allocution, Bouterse acknowledged, among other things,

that he "knowingly provided a false Surinamese passport to a person I believed to be associated

with Hezbollah, an organization I knew was designated to be a terrorist organization by the

United States."  *See* Transcript, *United States* v. *Bouterse*, 13 Cr. 635 (SAS), August 29, 2014

("Tr.") at 31.  When the Court asked "[d]id you believe that the passport would be used in

support of I guess activities conducted by the Hezbollah organization," the defendant responded

"yes," and that he believed that at the time he provided the passport.  *Id.* at 31-32.

## III.    The Presentence Investigative Report

The Probation Department issued its Presentence Investigation Report in this case on

November 24, 2014.  The Probation Department, determining that both § 2M5.3(b)(1)(E) and

§ 3A1.4 apply with respect to Count One, calculated a total offense level of 41, a Criminal

History Category of VI, and a resulting applicable Guidelines range of 360 months'

imprisonment to life imprisonment, with a statutory mandatory minimum term of imprisonment

of 180 months.  *See* PSR ¶¶ 44-67, 70, 94-95.

---

[8]   The Stipulated Guidelines Range in the plea agreement, reflecting lack of
agreement on the application of these two Guidelines provisions, is 180 months' imprisonment to
life imprisonment, and the defendant's appeal waiver applies to any sentence of imprisonment
imposed within this range.

The Probation Department recommended a term of imprisonment of 35 years'
imprisonment.  *See* PSR p. 24.  In arriving at this recommendation, the Probation Department
observed that Bouterse's position as the head of the counter terrorism unit and his family's
powerful political position facilitated his ability to obtain the genuine, but fraudulent, passports
delivered to confidential sources that he believed were involved in narcotics trafficking and
terrorist organizations.[9]  *Id.* at 25-26.  Furthermore, if Bouterse had actually accomplished the
goals of trafficking cocaine and supporting Hezbollah that he believed he was working towards,
his actions "could have resulted in catastrophic events in the U.S."

## ARGUMENT

Bouterse agreed to engage in enormously serious criminal conduct: facilitating
large-scale drug trafficking from Suriname to the United States, and providing support and
protection to Hezbollah in Suriname so that the terrorist organization could launch operations
throughout the Americas and against the United States.  He betrayed and abused his position as a
senior counterterrorism official and his political influence in Suriname for these heinous goals.
And he did all of this for the basest of reasons: personal financial gain.  Because Bouterse knew
that his actions were intended to assist in the commission of violent acts and to promote
terrorism, his properly calculated total offense level is 14, his Criminal History Category is IV,
and his Guidelines sentencing range is 360 months' imprisonment to life imprisonment.  A

---

[9] In the defense sentencing memorandum, Bouterse's counsel claims that the
defendant held some position in Suriname's Counter-Terrorism Unit ("CTU") but was not the
head of the CTU.  Def. Mem. at 4.  To be clear, in addition to the defendant identifying himself
as the leader of the CTU to the CSes during the course of the charged offenses, the *defendant
himself* told the Probation Office that he "served as the head of the counter-terrorism unit and the
security department" in Suriname through the end of 2011.  (PSR ¶ 87).  And as discussed
above, Bouterse continued to hold an official position within the Surinamese government at the
time of the offense.  *Supra* at 4 n.3.

sentence within this range would be sufficient but not greater than necessary to serve the proper

goals of sentencing, and Probation has recommended a term of imprisonment of 420 months.

## I.     Applicable Law

The United States Sentencing Guidelines (the "Guidelines") still provide strong

guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States*

v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer

mandatory, it held also that the Guidelines remain in place and that district courts must "consult"

the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  "[A] district

court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

range"—that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552

U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in

Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and

the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate

purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3);

the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing

Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among

defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.*

§ 3553(a)(7).  *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing,

which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## II.     The Terrorism Enhancements Both Apply

United States Sentencing Guideline § 2M5.3, applicable to offenses involving providing material support to designated terrorist organizations, provides that 2 levels are added to the offense level if, among other things, "the offense involved the provision of . . . funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used

to commit or assist in the commission of a violent act."  U.S.S.G. § 2M5.3(b)(1)(E).  "Material

support or resources" means

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

Application note (1); 18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4).

Furthermore, § 3A1.4 provides that for any felony offense "that involved, or was

intended to promote, a federal crime of terrorism," the offense level is increased by 12 levels and

the defendant's criminal history category shall be VI.  U.S.S.G. § 3A1.4(a), (b).  A "federal

crime of terrorism" means an offense that "is calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against government conduct;" and is a

violation of, among other things, 18 U.S.C. §§ 32 (relating to destruction of aircraft or aircraft

facilities), 37 (relating to violence at international airports), 81 (relating to arson within special

maritime and territorial jurisdiction), 229 (relating to chemical weapons), 842(m) or (n) (relating

to plastic explosives), 844(f)(2) or (3) (relating to arson and bombing of Government property

risking or causing death), 844(i) (relating to arson and bombing of property used in interstate

commerce), 930(c) (relating to killing or attempted killing during an attack on a Federal facility

with a dangerous weapon), 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons

abroad), 1114 (relating to killing or attempted killing of officers and employees of the United

States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or

internationally protected persons), 1203 (relating to hostage taking), 1362 (relating to destruction

of communication lines, stations, or systems), 1363 (relating to injury to buildings or property

within special maritime and territorial jurisdiction of the United States), 1366(a) (relating to

14

destruction of an energy facility), 1992 (relating to terrorist attacks and other acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air), 2155 (relating to destruction of national defense materials, premises, or utilities), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2332f (relating to bombing of public places and facilities), 2332g (relating to missile systems designed to destroy aircraft), 2339 (relating to harboring terrorists), 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), 2339C (relating to financing of terrorism), or 2339D (relating to military-type training from a foreign terrorist organization).  Application note (1), 18 U.S.S.C. § 2332b(g)(5).

        Both of these Guidelines provisions apply to Bouterse's offense conduct. § 2M5.3(b)(1)(E) applies because Bouterse provided material support or resources—specifically, a genuine Surinamese passport with false identification information—to a purported Hezbollah operative for the express purpose of allowing that operative free travel into and out of Suriname in order to establish a base of operations for Hezbollah to use to launch operations against American interests in South America and elsewhere.  Bouterse knew that these operations would be violent in nature because, among other things, he had discussed with the UC, CS-1, and CS-3 Hezbollah's plans to launch violent attacks (Bouterse simply asked that they not take place in Suriname), and because Bouterse in fact agreed to arrange for the UC to inspect weapons for Hezbollah upon the UC's and Bouterse's arrival in Suriname.

        Moreover, the evidence is clear that Bouterse's provision of this genuine, but falsified, passport was a considered step taken by the defendant to assist a group of individuals he knew to

15

be Hezbollah operatives intent on carrying out attacks against the U.S.  As the facts recited above reflect, Bouterse was first asked to provide this passport on July 31, 2013, during a meeting in Greece with three men he believed to consist of a Hezbollah leader, Hezbollah operative, and Hezbollah-related money launderer.  After receiving a photograph of the UC at the Greece meeting, over the next four weeks, Bouterse had a genuine Surinamese passport prepared bearing entirely false information as well as the UC's photograph.  Bouterse then traveled abroad again—this time, to Panama—on August 28, 2013 in order to deliver the passport to the UC, and to arrange for the UC's travel into Suriname—using the falsified passport provided by Bouterse—so that the UC could check on the progress of the preparations Bouterse had been making to receive and train Hezbollah operatives in Suriname.

Nothing about this sequence of events reflects anything other than Bouterse's deep commitment to assisting members of Hezbollah with their terroristic objectives.  Bouterse had detailed discussions with individuals whom he believed to be Hezbollah leaders and operatives, prepared one falsified passport for a purported Hezbollah operative and promised dozens more, engaged in extensive foreign travel for the purpose of meeting with the purported terrorists he was assisting, and promised the availability of weapons and facilities for inspection by a Hezbollah operative to whom Bouterse had just supplied a passport to be used to travel to Suriname *for those very inspections*.  The individuals posing as Hezbollah members made it absolutely clear to Bouterse what they intended to do once the training commenced in Suriname: attack Americans and American interests.  Bouterse's response proves his awareness of this intention: he asked that no attacks occur inside Suriname.

Thus, the evidence is clear that Bouterse intended, knew, or had reason to believe that his attempted material support for Hezbollah was to be used to commit or assist in the commission of violent acts.

The evidence is similarly clear that Bouterse's offense involved and was intended to promote a federal crime of terrorism under § 3A1.4.  The offense "involved" a federal crime of terrorism because the offense itself was an attempted violation of 18 U.S.C. § 2339B, and Bouterse's discussions with the UC and CSes made it clear that the planned Hezbollah operations were in retaliation against the United States government.  The offense was also "intended to promote" a federal crime of terrorism, because those same discussions made clear to Bouterse that the purported Hezbollah representatives intended the base of operations in Suriname, which Bouterse would help them to establish, would be used to launch attacks against American interests—in violation of one or more of the provisions that are included in the definition of "federal crime of terrorism."  Indeed, during his guilty plea, the defendant expressly acknowledged that he knew at the time he provided the passport to the UC that it would be used to "support . . . activities conducted by the Hezbollah organization."  Tr. at 32.

III.    **The Defense's Counter-Arguments Are Unavailing**

    A.    **The Defense's Arguments Regarding the Application of the Terrorism Enhancements Lack Merit**

The defendant first argues that the enhancement in Section 3A1.4 does not apply because the offense involved was not calculated to influence or affect the conduct of government.  (Def. Mem. at 12).  In support, the defendant claims that his "delivery of the false passport" was not specifically intended to "influence or retaliate against the government."  *Id.*  This is incorrect as a factual matter.  Bouterse's provision of the falsified passport had no purpose other than to assist a purported Hezbollah operative achieve his plainly stated objective: to further the plan to train

17

Hezbollah operatives to fight and attack the United States.  Indeed, the defendant's submission fails even to suggest an alternate purpose.  That is because there is no credible reason that Bouterse provided that passport to the UC—and took all the interstitial steps that he did to create and deliver the passport—other than to assist Hezbollah in attacking the United States.  And, as described above, Bouterse made clear that he not only understood Hezbollah's stated goals—to attack the U.S.—Bouterse specifically stated that he was "totally behind" their plans.

The defendant also argues that the enhancement in Section 3A1.4 does not apply because his motive in assisting Hezbollah was not "ideological" but simply financial.  (*See* Def. Mem. at 13-14).  Of course, the defendant's motive is irrelevant to the application of this enhancement: the enhancement applies because the defendant committed these crimes intending to assist Hezbollah in furthering their plans to attack the U.S.

But though Bouterse's motive is irrelevant to the application of the Guidelines enhancement, it does shed light on the dangerousness of his conduct and the need for a just sentence to deter others.  Bouterse was willing to betray his home country and abuse his position and influence for mere greed, and his mercenary motive means that he was potentially open to supporting attacks on *anyone* based on *any* ideology.  The defendant's argument that he should receive sentencing leniency because his loyalties are for sale, as long as cartels and terrorist organizations can meet his price, is an astonishing one.

**B.     The Defense's Request for Leniency Is Not Merited In this Case**

The defense asks this Court to impose the statutory minimum sentence of 180 months' imprisonment, citing, among other things, the Section 3553(a) factors, the need to avoid unwarranted sentencing disparities with purportedly similar defendants, and the fact that this case involved a government "sting."  (*See, e.g.*, Def. Mem. at 18-25).  Put simply, these

18

arguments fail to take account of the egregious and extended nature of the defendant's crimes and do not merit leniency for the defendant in this case.

The defendant argues for a non-Guidelines sentence because this case was "entirely orchestrated by the government" and involved Bouterse simply being "promised a large amount of money to provide a single passport." Def. Mem. at 25. These are absurd claims, and reflect that, even at this stage of the proceedings, Bouterse has failed to take responsibility for what he actually did. The government did not supply Bouterse with a police motorcade to escort the confidential sources (whom Bouterse understood to be a drug trafficker and a money launderer) though the streets of Paramaribo. The government did not give Bouterse a rocket launcher and a kilogram of cocaine to store in his office. The government did not supply 10 kilograms of cocaine and a secure method of shipping those kilograms on board a commercial flight out of Suriname for importation into the United States, as a test run for larger shipments in the future. The government did not supply Bouterse with three genuine Surinamese passports bearing false identification information for Bouterse to pass out to believed drug traffickers and Hezbollah operatives. The government did not agree to make weapons and facilities available in Suriname for Hezbollah to inspect and use as a base of operations for terror attacks. Bouterse did each of these, and he used his considerable position and influence in Suriname to make them happen.

Bouterse's conduct was incredibly serious, it was entirely voluntary, and it laid bare his corrupt and dangerous influence in Suriname. His conviction thwarted a serious danger to the security of the region and the United States by eliminating the ability of dangerous cartels and terror organizations to buy what was so plainly for sale: Dino Bouterse's blessing, support, and protection for drug trafficking and terror activities and his supply of cocaine and cocaine routes. His sentence should justly punish this serious offense and serve as a severe warning to others

19

who would similarly sell their services to the most dangerous of individuals and organizations.
This case represents the unique opportunity to send a clear message to powerful individuals and
officials who may be confronted with similar criminal opportunities: corruptly assisting those
who would import drugs into the United States and those who would attack Americans and
American interests, will result in the imposition of an extremely severe punishment.

## CONCLUSION

For the reasons set forth above, the Court should sentence Bouterse to a term of
imprisonment within the properly calculated Guidelines sentencing range of 360 months'
imprisonment to life imprisonment.

Dated: New York, New York
          March 6, 2015

                                     Respectfully submitted,
                                     PREET BHARARA
                                     United States Attorney
                                     Southern District of New York


                            By:    _____/s/_____
                                     Michael D. Lockard
                                     Adam Fee
                                     Assistant United States Attorneys
                                     (212) 637-2193/1589

20