F3AKBOUS                    SENTENCE

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          13 CR 635 (SAS)

DINO BOUTERSE,

              Defendant.

------------------------------x

                                   New York, N.Y.
                                   March 10, 2015
                                   11:40 a.m.


Before:

                 HON. SHIRA A. SCHEINDLIN,

                                       District Judge


                       APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
MICHAEL LOCKARD
     Assistant United States Attorney

RICHARD ROSENBERG
MICHAEL HUESTON
JOSE GRACIA
     Attorneys for Defendant

ALSO PRESENT:  BERNARD GROENEVELD, Dutch Interpreter
```

F3AKBOUS                          SENTENCE

1           THE COURT:  Mr. Lockard?

2           MR. LOCKARD:  Good morning, your Honor.

3           THE COURT:  Mr. Rosenberg, good morning.

4           MR. ROSENBERG:  Good morning, your Honor.

5           THE COURT:  Mr. Hueston?

6           MR. HUESTON:  Good morning, your Honor.

7           THE COURT:  Good morning.

8           Mr. Gracia?

9           MR. GRACIA:  Good morning, your Honor.

10          THE COURT:  Good morning.

11          Mr. Bouterse, good morning.

12          THE DEFENDANT:  (In English)  Good morning, your

13   Honor.

14          THE COURT:  Who are you?

15          THE INTERPRETER:  I'm the Dutch interpreter, Bernard

16   Groeneveld.

17          THE COURT:  You're a Dutch interpreter?

18          THE INTERPRETER:  Yes, ma'am.

19          THE COURT:  Do you need the Dutch interpreter?

20          MR. HUESTON:  No, your Honor, but throughout these

21   proceedings, we've had one on standby just in case there's a

22   word or term he needs an explanation for.

23          THE COURT:  Okay.

24          MR. HUESTON:  So that's it.

25          THE COURT:  Okay.

F3AKBOUS                        SENTENCE

1          MR. ROSENBERG:  I'd also like to note, your Honor,

2     Mr. Bouterse appears here in his jail clothes.  We did deliver

3     a suit to MCC that your Honor had kindly signed an order for,

4     but somehow it didn't get to Mr. Bouterse.

5          THE COURT:  Sorry about that.

6          MR. ROSENBERG:  He would have liked to have been

7     dressed in a suit today.

8          THE COURT:  I'm sure he would have.  Okay.

9          I've reviewed the presentence report dated

10    November 21, 2014, together with the sentencing recommendation

11    and the addendum of the same date.  I have also reviewed a

12    submission from defense counsel dated March 2nd, 2015,

13    attaching many exhibits, including a letter from the defendant,

14    many letters from friends and family members, and a copy of the

15    objections to the presentence report that he filed with the

16    probation department.  The defense counsel also sent copies of

17    two sentencing transcripts and a video of film clips of the

18    defendant's friends and family members speaking on his behalf.

19    I've also reviewed a response from the government dated

20    March 6, 2015.

21          Mr. Rosenberg, are you taking the lead at this

22    sentence?

23          MR. ROSENBERG:  Yes, your Honor.

24          THE COURT:  Okay.  Have you reviewed the report, the

25    recommendation, the addendum, and the government's submission?

1     MR. ROSENBERG:  I have, but there also should be a

2  mitigation report.

3     THE COURT:  Oh, yes, I should have mentioned that.

4  Definitely, and I have read it, it's right here.

5     MR. ROSENBERG:  Okay.

6     THE COURT:  From Eric Mercer.

7     MR. ROSENBERG:  Yes.

8     THE COURT:  All right.  I should have added that I

9  read the mitigation report.

10     Anyway, you have gone over the report, the

11  recommendation, the addendum, and the government's letter?

12     MR. ROSENBERG:  Indeed we have.

13     THE COURT:  And you have gone over that with your

14  client?

15     MR. ROSENBERG:  Yes, indeed.

16     THE COURT:  Do you have any further objections to the

17  presentence report other than those that you have raised in

18  your submissions?

19     MR. ROSENBERG:  Well, many of those objections, your

20  Honor, are really interwoven with our arguments at sentencing.

21     THE COURT:  That's what I said.  Is there anything new

22  that I haven't already had a chance to consider in the written

23  submission?  I'm going to hear from you, but is there a new

24  objection that I've never heard before?

25     MR. ROSENBERG:  Same objections.

1          THE COURT:  Okay, good.

2          I already asked you if you went over all these

3     materials with your client.  Does he have any additional

4     objections other than all the issues that you have raised in

5     your written submissions?

6          MR. ROSENBERG:  No, your Honor.

7          THE COURT:  All right.

8          Mr. Lockard, have you reviewed the report, the

9     recommendation, the addendum, defense counsel's letter, and the

10    other materials I just described?  Which now I must say include

11    not only the video, but also the mitigation report, of course,

12    and the submission with all its attachments.  Have you reviewed

13    all of that?

14         MR. LOCKARD:  We have, your Honor.

15         THE COURT:  Okay.  Do you have any objections to

16    anything in the report that hasn't already been sort of issue

17    joined through the submissions?

18         MR. LOCKARD:  No, your Honor.

19         THE COURT:  All right.

20         Are there any fact issues here that would require a

21    Fatico hearing?  I did notice some fact disagreements, but I

22    don't know if either side wants to turn this into a Fatico

23    hearing.

24         MR. ROSENBERG:  I don't know if they rise to the level

25    where a Fatico hearing would be necessary, Judge.  Maybe we

1    can --

2              THE COURT:  Well, one of the big fact issues in

3    dispute is his position in the government.  That's a big one.

4    The government keeps saying he was the head of

5    counterintelligence, and I think you say he was never the head

6    of counterintelligence or he was no longer the head of

7    counterintelligence, but that was one of the biggest fact

8    disputes.

9              MR. ROSENBERG:  Well, this is a major factor in our

10   presentation here because I think the government is trying to

11   portray him as having a particularly powerful position.

12             THE COURT:  I know that.  And that's why I'm saying:

13   Is this an issue that requires a Fatico hearing?  I'm not

14   entirely sure what you're going to say his position was over

15   the years and was at the time of the events.  I'm not entirely

16   sure what the government is going to say.  So maybe we should

17   just hash that one out.

18             So you just said it may require a Fatico hearing.

19   Just tell me, on just that narrow issue, what will you say,

20   when you get your turn, was his position both prior to these

21   events and at the time of these events vis-a-vis the

22   government?

23             MR. LOCKARD:  Prior to these events, in 1998, he

24   served in a government function.

25             THE COURT:  What was the function?  That's the point.

1   He doesn't deny --

2          MR. ROSENBERG:  He was a diplomat in Brazil, but that

3   was short lived.  We're talking, though, in 2010, after his

4   father was elected to the presidency, he did assist and help

5   with the logistical formation of the counterintelligence unit.

6   That meant selecting and training individuals and being

7   responsible for that training and formation.  But he left that

8   position or association with the CTU by the end of 2011.

9          In fact, we have here today -- you have in one of the

10  exhibits a certified or certified copy of a letter -- we have

11  the original in court -- from a director of national security

12  of Suriname attesting to the fact that he had no official

13  position during the course of the events in this investigation

14  in this case.

15         THE COURT:  So tell me, what are the dates that he was

16  in the government setting up or forming this unit?

17         MR. ROSENBERG:  That would be 2010 to 2011.

18         THE COURT:  Till when in 2011?

19         MR. ROSENBERG:  The end of 2011, approximately

20  December of 2011.  The new commander of the CTU was named in

21  July of 2011.  In fact, we have the newspaper article from

22  Suriname --

23         THE COURT:  When did the events here begin?  When did

24  he have the first meeting?

25         MR. ROSENBERG:  February 2013.

F3AKBOUS                        SENTENCE

1          THE COURT:  That was his first meeting?

2          MR. ROSENBERG:  Yes.

3          THE COURT:  Okay.  Mr. Lockard, on that narrow issue

4     only, what is the government's claim with respect to his

5     official role?  Just please nothing else right now.

6          MR. LOCKARD:  Yes, just with respect to that issue.

7          THE COURT:  Yes, just that issue.

8          MR. LOCKARD:  The government's position is that

9     Mr. Bouterse did have an official position within the

10    government of Suriname.

11         THE COURT:  In February 2013?

12         MR. LOCKARD:  In February of 2013.

13         THE COURT:  And what do you claim was that official

14    position?

15         MR. LOCKARD:  I will lay out the facts.  Obviously we

16    don't have access to officials in Suriname, but we do have

17    Mr. Bouterse's diplomatic passport that he was traveling on in

18    Panama in August of 2013 that was issued --

19         THE COURT:  So he had a diplomatic passport.  I'm not

20    asking that.  What was his official position that you either

21    claim he had or can prove he had at a Fatico hearing?

22         MR. LOCKARD:  We believe he was a member of the

23    Presidential National Security Bureau and that he at least held

24    himself out to others as the head of the counterterrorism unit.

25         THE COURT:  People can hold themselves out as

F3AKBOUS                           SENTENCE

1    anything, they can lie, but if you had to prove his official

2    position, the best you would have is the diplomatic passport,

3    which just means he has diplomatic status.  And what else?

4              MR. LOCKARD:  Also at the time of his arrest in August

5    of 2013, he had business cards identifying himself as a member

6    of the presidential cabinet.

7              THE COURT:  A member of the presidential cabinet?

8    That's what the card says?

9              MR. LOCKARD:  It says specifically, "Cabinet of the

10   President of the Republic of Suriname, Dino D. Bouterse."

11             THE COURT:  Could you say it one more time?

12             MR. LOCKARD:  "Cabinet of the President of the

13   Republic of Suriname, Dino D. Bouterse."

14             He also had with him in August of 2013, when he

15   traveled to Panama, an identification card with his photograph

16   on it that says essentially in Dutch, "Cabinet of the President

17   of the Republic of Suriname National Security Bureau."

18             MR. ROSENBERG:  May I respond?

19             THE COURT:  Sure.

20             MR. ROSENBERG:  What Mr. Lockard just referred to were

21   two pistol licenses that have to be issued by the government.

22   Just as my driver's license doesn't make me a government

23   official of the State of New York, neither did his gun license

24   or permit, which we have in court copies of, make him an

25   official of the government.

1          THE COURT:  That's not what Mr. Lockard said.  He said

2     one was a business card, he said.

3          MR. ROSENBERG:  With no title.

4          THE COURT:  That is not what he said.  I asked him to

5     read it twice.  It said member of the cabinet.

6          MR. ROSENBERG:  No, it does not say member of the

7     cabinet.

8          THE COURT:  That's what I thought.  I can only repeat

9     what the lawyer tells me.  I don't have the card, but

10    Mr. Lockard has the card right here.

11         MR. GRACIA:  If I may, your Honor.  I think

12    Mr. Lockard is referring to two different documents.  One is a

13    business card that says cabinet of the president.

14         THE COURT:  Correct.

15         MR. GRACIA:  Dino Bouterse appears without title, it

16    doesn't say he's a member.

17         THE COURT:  No, no, it says cabinet of the president.

18         MR. GRACIA:  That's the heading of the card.

19         THE COURT:  The heading of the card?

20         MR. GRACIA:  Yes, the business card.  And then --

21         THE COURT:  But let's stick with the business card.

22    It also has his name on it?

23         MR. GRACIA:  Yes, your Honor.

24         THE COURT:  And it says cabinet of the president?

25         MR. GRACIA:  Correct, your Honor.

1          Your Honor, in the submissions, we have submitted a

2    document issued by the head of national security of Suriname.

3    In that document, it is explained that Dino Bouterse did held a

4    title as advisor to the president, an underwriter title as

5    advisor to the president.

6          THE COURT:  Got that.  Okay.

7          MR. GRACIA:  That business card is consistent with his

8    position as advisor to the president.

9          THE COURT:  I agree.

10         MR. GRACIA:  We do not dispute that he had

11   connections, but we don't -- what we are saying is that he was

12   not the head --

13         THE COURT:  No, I agree.

14         MR. GRACIA:  -- of the CTU.

15         THE COURT:  I agree.  I think I'm ready to make a

16   finding on this.  I don't think a hearing is needed.  I don't

17   need it.  I don't think the government could prove that he was

18   the head of the counterterrorism unit.  I don't think they

19   could prove that, period.  I think they could prove, and I

20   accept and you accept, because you agreed to the two points for

21   abuse of position of trust, that he did hold a position in the

22   government of Suriname through being on the president's

23   security detail or whatever it's called, or cabinet member, or

24   advisor to the president.

25         MR. GRACIA:  That's correct.

1     THE COURT:  I understand that, but there's no finding

2  that he's the head of counterterrorism.

3     All right.  You understand that, Mr. Lockard, that's

4  my ruling?

5     MR. LOCKARD:  Yes, your Honor.

6     THE COURT:  Clearly, he was in -- he had some status

7  in the government, and that's why there's abuse of position of

8  trust.

9     All right, we can move past that.  Is there any other

10  issue that might require a Fatico hearing?  Any other fact

11  issue?

12     MR. GRACIA:  Your Honor, this one detail:  On the

13  first date, the first arrival, on February -- I think it's

14  January 31st, when the undercover agents arrived, the

15  government claims there was a police motorcade.

16     THE COURT:  Yes, they do.  The government -- let's be

17  very clear -- that's the U.S. Attorney here we're talking

18  about?

19     MR. GRACIA:  Yes, right.

20     THE COURT:  The U.S. Attorney claimed?

21     MR. GRACIA:  Yes, they claimed there was a police

22  motorcade, your Honor.  We dispute there was a police

23  motorcade.

24     THE COURT:  Mr. Lockard, your evidence of a police

25  motorcade is what?

1     MR. LOCKARD:  Would be the testimony of the

2   confidential sources who were escorted by the police motorcade?

3     THE COURT:  Well, they think they were escorted by

4   police.

5     MR. ROSENBERG:  There were two cars that were sent.

6   We concede two cars that were sent to pick up the two CSs and

7   the two pilots because not everyone could fit in the car.  Two

8   cars does not make a motorcade, which most people would take or

9   imagine to be a line of official cars, and that's just not what

10   happened.

11     THE COURT:  Smaller country, smaller line.  Here, the

12   president is in New York, it's a line.

13     Okay, I don't think this --

14     MR. ROSENBERG:  They were not police cars.  It gives

15   the impression, also --

16     THE COURT:  Maybe they were government vehicles?

17     MR. ROSENBERG:  Yes.

18     THE COURT:  The bottom line is, this isn't going to

19   affect the sentence.  So there's no need for a finding, it's

20   not going to affect the sentence whether these were two police

21   cars or a line of police cars.  Whether they were police cars

22   or government cars, it's a pretty fine distinction.  I think

23   the facts are probably what you say, they were met by cars, and

24   they were escorted by cars, and those cars appeared to be

25   undercovers to be government vehicles.  Okay?  That's it.

```
 1              MR. ROSENBERG:  And the use of the term "compound"
 2     that's used throughout the government's -- meetings took place
 3     at his residence, and meetings took place at his gold mine
 4     where he had an office.
 5              THE COURT:  What does the government mean by
 6     "compound," Mr. Lockard?
 7              MR. LOCKARD:  A fenced area with multiple structures
 8     inside that fenced area.
 9              THE COURT:  Is that the gold mine?
10              MR. GRACIA:  No.  The house is fenced.
11              THE COURT:  The house is fenced.
12              All right.  Can we get past the question of the Fatico
13     hearing?  Is there anything further?
14              MR. GRACIA:  I believe there's a couple more items,
15     your Honor.  I believe there's a couple of more items.  One of
16     them is the passports, your Honor.  The passports that
17     Mr. Bouterse did provide to both the confidential sources and
18     later to the person portraying to be a Hezbollah operative.
19     Those passports, your Honor, they claim to have been obtained
20     through official channels.  Those passports, we claim they were
21     obtained through illegal channels.
22              THE COURT:  Through illegal?
23              MR. ROSENBERG:  They were obtained through illegal
24     channels.
25              MR. GRACIA:  Illegal channels.
```

F3AKBOUS                    SENTENCE

1          THE COURT:  Every time he says it, I hear a different

2     word.  You're saying, Mr. Rosenberg, illegal?

3          MR. GRACIA:  I'm saying illegal, too.  I apologize.

4          THE COURT:  Okay.  I just want to make sure.

5          Why is this an important point?

6          MR. GRACIA:  I don't know whether -- because I

7     believe, your Honor, that it comes to the fact that he was not

8     using his government position to obtain those passports.

9          THE COURT:  Well, I don't know that.  I'm not prepared

10    to make a finding that he was or he wasn't.  The bottom line

11    is, you've already agreed to the two-level enhancement for

12    abuse of position of trust --

13          MR. GRACIA:  We do, absolutely.

14          THE COURT:  -- so he used his position for something.

15    He must have held himself out as having power because he had an

16    official position, whatever that official position was.  You've

17    called it advisor to the president, so be it.  But that's it.

18    So whether he used it to obtain a passport, whether he used it

19    to get the two government vehicles to escort the undercovers,

20    it doesn't matter, he used his position in some way.  He

21    certainly had access to government officials.  I don't think it

22    matters much.

23          All right.  Anything further?  Are we ready?

24          MR. GRACIA:  Your Honor, the government claims that --

25    the government claims that our client did offer to provide them

F3AKBOUS                        SENTENCE

1    weapons.

2            THE COURT:  Yes, yes.

3            MR. GRACIA:  And he had camps ready in Suriname on --

4    I think they claim as of the day that he was arrested in

5    Panama.

6            THE COURT:  Right.  Because it seemed, according to

7    the government, that he's inviting the undercover to come look

8    at them.  I was confused by that point, too, whether --

9            MR. GRACIA:  That's correct.

10           THE COURT:  Mr. Lockard, your evidence is that he's

11   saying, come now and look at what I have?

12           MR. LOCKARD:  He's saying things are ready for you in

13   Suriname, the facilities --

14           THE COURT:  Things are ready for you in Suriname?

15           MR. LOCKARD:  Things are ready for you in Suriname to

16   inspect the facilities, and we will supply weapons for you to

17   inspect.

18           THE COURT:  And we will supply weapons for you to

19   inspect?  That's from a tape?

20           MR. LOCKARD:  Yes, your Honor.

21           THE COURT:  The tape says what it says.

22           MR. GRACIA:  The tape that -- we don't have -- that's

23   incorrect, your Honor.  There's no tape saying we have weapons

24   ready for inspection.

25           MR. LOCKARD:  I misspoke.  There are actually two

1    meetings where this issue comes up.  So one is recorded, and

2    one is unrecorded.  So let me just disambiguate that a little

3    bit.

4            So in the recorded meeting, which takes place before

5    Mr. Bouterse travels to Panama to deliver the passport --

6            THE COURT:  That's the recorded one.

7            MR. LOCKARD:  That's the recorded one is the earlier

8    meeting.

9            -- Mr. Bouterse does talk about providing the

10   undercover with the passport, and they talk about when it is he

11   will be able to provide it.  They talk about him using that

12   passport to travel into Suriname to make inspection of the

13   preparations that he's making, and they talk about bringing the

14   money in at that same time.

15           THE COURT:  Right.  So there's no comment there about

16   come see the weapons?

17           MR. LOCKARD:  There's discussion about the weapons,

18   and he says give me time to get that ready.

19           THE COURT:  That's right.  I know about the give me

20   time, that's one of their arguments, is that he didn't have any

21   weapons, but, okay.  So the tape, the recorded one, says give

22   me time to find these weapons?

23           MR. LOCKARD:  Right.

24           THE COURT:  Now, are you done with the recorded one?

25           MR. LOCKARD:  I'm done with the recorded one.

F3AKBOUS                            SENTENCE

```
 1                THE COURT:  Now, the unrecorded one?

 2                MR. LOCKARD:  Where Mr. Bouterse actually delivers the

 3    passport --

 4                THE COURT:  So this was in person?

 5                MR. LOCKARD:  This is in person in Panama.

 6                THE COURT:  But not recorded?

 7                MR. LOCKARD:  But not recorded.

 8           Delivers the passport and advises the undercover that

 9    when he travels to Suriname, he'll be able to inspect the

10    facilities that they have ready for his inspection, and that he

11    will be able to inspect weapons.

12                THE COURT:  Not recorded?  That's what the undercover

13    would testify to under oath.  What can I say?  And your client

14    would take the stand and say he didn't say it.  It's going to

15    be a tough one.

16           One other question.  Let me just make sure I

17    understand the money, Mr. Lockard.  How much money actually was

18    given to Mr. Bouterse, the 60,000, right?

19                MR. LOCKARD:  The 60,000.

20                THE COURT:  And?

21                MR. LOCKARD:  That's all that was physically

22    delivered, was 60,000.

23                THE COURT:  The rest was promised?

24                MR. LOCKARD:  That's right.

25                THE COURT:  No other money.  That's what I thought.
```

F3AKBOUS                          SENTENCE

1          MR. ROSENBERG:  Promised and never delivered.

2          THE COURT:  He just said that.  Mr. Lockard disagreed.

3          The 2 million was never delivered, right?

4          MR. LOCKARD:  Correct.

5          THE COURT:  Right.

6          MR. ROSENBERG:  Your Honor, I think that segues into

7     the whole argument --

8          THE COURT:  I'm not ready for that.  I'm trying to get

9     past do we need a Fatico hearing to resolve fact disputes.

10          MR. ROSENBERG:  Sorry.

11          MR. GRACIA:  Your Honor, if I may?

12          THE COURT:  Yes.

13          MR. GRACIA:  The discussions around weapons are as

14     follows:  There's a meeting in June recorded --

15          THE COURT:  I think we just took care of that.  The

16     unrecorded meeting would be, if we had a hearing, a contest of

17     credibility.  The undercover would come into this courtroom,

18     take the oath, and say, Mr. Bouterse said when you come, you

19     will view the compound, and you will view the weapons.

20     Mr. Bouterse will say, that never happened.  I'm going to be in

21     a tough position.  One witness will say one thing, and one

22     witness will say another, and I don't know if there are other

23     witnesses.

24          How many people, Mr. Lockard, were at this unrecorded

25     conversation?  And why was it unrecorded?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. LOCKARD:  I think there was an equipment failure,

2     so --

3          THE COURT:  Equipment failure?

4          MR. GRACIA:  I think, your Honor, there is a

5     recording.  I think that that recording is a very poor quality,

6     but there is a recording.

7          I think, your Honor, if I can go back, at the meeting

8     in Greece, which happens in -- July 31st, Mr. Bouterse, when

9     he's asked about camps, he says, we have no camps in Suriname.

10    He's clear in the transcripts.  When he's asked about weapons,

11    he says, I will need months to see what I can provide.

12         THE COURT:  Correct.

13         MR. GRACIA:  This is July 31st.

14         THE COURT:  Correct.

15         MR. GRACIA:  This email correspondence with the CSs on

16    August the 22nd, that's one week before the arrest in Panama --

17         THE COURT:  Okay.

18         MR. GRACIA:  -- where Mr. Bouterse makes clear that

19    until he gets his down payment, which is the discussion whether

20    it's 5 or 2 million, he's not going to do anything, and then

21    when he's asked in Panama whether what he has -- he thinks

22    already, but he's talking about what has been arranged in

23    Greece, which is the nephew to come and visit sites in

24    Suriname.

25         So to add to that, the weapons, I think, is really not

F3AKBOUS                          SENTENCE

1    supported.

2            THE COURT:  Well, again, I wasn't prepared to make a

3    finding.  If you think we should stop everything, and bring

4    this undercover in, and have him testify, and have Mr. Bouterse

5    testify exactly what was said on the date the undercover

6    apparently did wear a wire, but there was an equipment failure,

7    and we don't, therefore, have a recording that we can hear, I

8    don't know what was said, I can't make a finding.

9            MR. LOCKARD:  And, your Honor, it sounds like there

10   may not -- maybe I'm not hearing the argument correctly, but

11   there may not be as much of a factual difference as it sounds

12   like.  If I hear the defense argument correctly, it sounds like

13   they're saying, in these meetings, we concede that he said we

14   will work to get these things ready for you.  It sounds like

15   what they're saying is, he didn't have the camp ready for

16   people to move into.

17           THE COURT:  Nor did he have any weapons.  But he said

18   he would work on it, it would take months.  Your version is

19   basically you can come anytime because you can inspect the

20   camp, and you can inspect the weapons, which would mean he

21   already gathered them.

22           MR. LOCKARD:  Right.

23           THE COURT:  When I went through all the materials, I

24   will tell you factually, no question, I had this same question,

25   had he already gathered them and was ready to invite them to

F3AKBOUS                          SENTENCE

1   look at it or was it still I'm working on it, I'll get them,

2   when I get them, you can come and look at them.  But does he

3   ever say I'm already, the camp's ready, the weapons are ready,

4   come and see them?

5        MR. LOCKARD:  So we don't say he ever said the camps

6   are ready.  What he's saying is we've got places for you to

7   check out, and we're going to make the camp out of the places

8   you check out.

9        THE COURT:  What about the weapons?

10        MR. LOCKARD:  And then about the weapons, again, I

11   think the discussions have been between the confidential

12   sources, and the undercover, and Mr. Bouterse, these are the

13   types of things we're interested in, and then he's saying, I

14   can get those for you, and I will have some samples for you to

15   look at, so you can decide what you want to buy.

16        THE COURT:  I got all that, but does he ever say now

17   come look, I got them?

18        MR. LOCKARD:  He's saying you will be able to inspect

19   them when you get to Suriname.

20        THE COURT:  You will be able to inspect them when you

21   get to Suriname, which, again, sounds like I've already

22   collected them, come see.

23        MR. LOCKARD:  That's what it sounds like to us.

24        THE COURT:  Right.  And I don't know the answer

25   because it's not recorded, and he might deny, if he took the

F3AKBOUS                        SENTENCE

1    stand under oath, that he ever said come see what I've

2    collected or come see the samples I now have.  He might deny

3    that that was ever said.  So I don't know whether he ever got

4    any samples at all.

5           I know what the negotiations were.  I know there was a

6    very specific list of what they wanted.  I know he said, I can

7    get them, but it could take months.  There's no evidence that I

8    know of that he actually obtained any weapons.

9           MR. ROSENBERG:  Nor has he been charged with that.

10   He's charged with an attempt.

11          THE COURT:  I know that.

12          MR. ROSENBERG:  And, your Honor, not to beat a dead

13   horse, but Mr. Bouterse -- clearly, there's no independent

14   evidence.  There's no -- they've had his texts, they had his

15   emails.  There's nothing in those texts or emails that shows

16   any action, discussions --

17          THE COURT:  We're going to get to your argument.  We

18   really are.

19          So I think we need to finally move on.  With respect

20   to what I have just said, I adopt the findings of fact in the

21   presentence report with the exception of the one or two issues

22   at this argument that I said I couldn't make a finding on, and

23   with the exception of the one finding I did make with respect

24   to his position within the government.  I actually made a

25   finding today there's no proof that he was the head of the

F3AKBOUS                         SENTENCE

1    counterterrorism unit, but there's proof that he had some

2    advisory or official role in the government.

3              So with those exceptions, I do accept the findings of

4    fact in the presentence report.

5              MR. ROSENBERG:  Except, your Honor, then we took issue

6    with some of the interpretations of the conversations.

7              THE COURT:  We're getting to that.  Interpretations is

8    not a finding of fact.

9              MR. ROSENBERG:  There's attributions of Mr. Bouterse

10   making certain representations in the presentence report.

11             THE COURT:  I think you better hold that for argument.

12             Defendant pled guilty pursuant to a plea agreement to

13   three counts.  Count One is an attempt to provide material

14   support to a foreign terrorist organization.  This count

15   charged that the defendant attempted to provide property,

16   lodging, training, false documentation and identification,

17   facilities and weapons to Hezbollah, a designated foreign

18   terrorist organization, knowing that Hezbollah had engaged in

19   and was engaging in terrorist activity:  The base offense level

20   for this crime is 26 and is found in guideline Section

21   2M5.3(a).  Because the defendant abused a position of public or

22   private trust in a manner that significantly facilitated the

23   commission of this offense, two levels are added to level 28,

24   pursuant to Section 3B1.3 of the guidelines.

25             However, there remain two contested issues before the

1    guideline on Count One is finalized.  The first contested issue

2    is whether there should be a two-level enhancement pursuant to

3    Section 2M5.3(b)(1)(E) based on defendant's knowledge, or

4    intent, or reason to believe that the material support or

5    resources he intended to provide would be used to commit or

6    assist in the commission of a violent act.

7         The second contested issue is whether there should be

8    a 12-level enhancement pursuant to Section 3A1.4 based on the

9    fact that the felony offense of conviction; namely, material

10   support, involved or was intended to promote a federal crime of

11   terrorism.  This is defined as an offense that is "calculated

12   to influence or affect the conduct of government by

13   intimidation, or coercion, or to retaliate against government

14   conduct."

15        The government argues that Mr. Bouterse's discussions

16   with the undercover and the confidential sources made it clear

17   that the planned Hezbollah operations were in retaliation

18   against the U.S. Government.  The government also argues that

19   those same discussions made clear to Bouterse that the

20   purported Hezbollah representative intended the base of

21   operations in Suriname, which Bouterse would help them to

22   establish, would be used to launch attacks against American

23   interests.

24        The government also points out that during his guilty

25   plea, Mr. Bouterse acknowledged that he knew at the time he

F3AKBOUS                    SENTENCE

```
 1    provided the passport to the undercover, that it would be used

 2    to support activities conducted by Hezbollah, and I cite the

 3    government's submission at page 17, quoting to the plea

 4    transcript at page 32.

 5            If this enhancement applies, defendant's Criminal

 6    History Category would be VI rather than I in addition to the

 7    12-level knock-up.

 8            I'm now ready for argument on the two-level

 9    enhancements.  I hope we can do that efficiently.

10            Who wants to be heard on the two enhancements?

11            MR. ROSENBERG:  I'll go first, your Honor.

12            THE COURT:  Okay.

13            MR. ROSENBERG:  Your Honor, in our papers, I think we

14    laid out why these enhancements fall short in their

15    application.  In the first instance, this offense, which we say

16    was the delivery of the passport, and that there was no other

17    action taken going forward to provide weapons --

18            THE COURT:  That's why you pointed out, it's charged

19    as an attempt.

20            MR. ROSENBERG:  Yes.

21            THE COURT:  Go ahead.

22            MR. ROSENBERG:  But that act itself, that delivery of

23    the passport, is insufficient to show that it was calculated to

24    influence government through coercion or intimidation,

25    et cetera.  That was far attenuated.
```

F3AKBOUS                        SENTENCE

1          Secondly, it did not promote, for similar reasons, a

2     crime of terrorism because what would have had to happen?

3     First, we're talking about trainees being received in Suriname.

4     There would have to have been arrangements made to even first

5     get these teenagers into the country the way it was proposed.

6     There would have to be education, housing, feeding, basically

7     hosting these teenagers for a considerable period of time

8     before they were so-called prepared.  This, we argue, is so far

9     attenuated from the actual conduct that Mr. Bouterse

10    participated in.

11          We point to United States versus Banol-Ramos, the case

12    where the Court of Appeals said that knowledge of an

13    organization's terrorist goals, and even an agreement with

14    their goals, an agreement to provide support, is not enough.

15    In that case, the Court of Appeals sent it back for a hearing,

16    and it was only after it was determined that that defendant not

17    only knew about the organization, knew its goals, supported it,

18    but, in fact, was a member of a terrorist organization, FARC,

19    did, in fact, supply weapons, did, in fact, actually possess a

20    weapon and shoot at somebody, before the Court of Appeals could

21    find that the terrorism enhancement applied.

22          This case is similar to Banol-Ramos even if you want

23    to say that Mr. Bouterse agreed, which we say he never did,

24    because it was all dependent upon money in his eyes.  We talk

25    about -- the government talks about he's always a man of his

1    word, he delivered what he said he'd deliver.  But, on the

2    other hand, the cooperators never delivered what they promised

3    to deliver.  They never delivered the money for the first two

4    passports, they never sent back the profits that were supposed

5    to have been generated by that ten-kilogram shipment of

6    cocaine, and Mr. Bouterse's own correspondence with the CS, his

7    conversations that there are no camps, that he's not going to

8    do anything until he receives money to do it.  Now, you want to

9    take that as an agreement, it's no more than trying to get, if

10   you will, about $2 million --

11            THE COURT:  It's like a contract, you pay me, I'll do

12   it.  That's an agreement.  But, okay, go ahead.

13            MR. ROSENBERG:  Even if it were, assuming it were, I'm

14   saying that it's not enough.  It's simply -- this is not a case

15   where Mr. Bouterse did, in fact, supply a weapon.  It's not a

16   fact --

17            THE COURT:  He supplied a passport to a member of

18   Hezbollah knowing that person was going to come to the country

19   to inspect the camps and weapons and then bring others over to

20   be trained.

21            MR. ROSENBERG:  In the future.  Again, some

22   unspecified target at an unspecified time, just generally

23   speaking, in most general terms.  And most of this talk, I must

24   add, was all done in the sting scenario where these operatives

25   are trained, as in the drug stings, to say certain things about

1   how easy it is to make huge sums of money because we control

2   the routes, and we control the supply, and all we need is your

3   airport to transship.  It's an overreach, it's an overstatement

4   to say that Mr. Bouterse knew or was intending, intending, that

5   that passport was going to result or intended to do harm.

6          Mr. Bouterse, unfortunately at that Greece meeting,

7   said things he didn't believe himself, but it was more an

8   agreement, yes, we have a problem with Americans.  They don't

9   have a problem with Americans in Suriname.  There is a good

10  relationship between the two countries.

11         THE COURT:  No, I understand all that.

12         MR. ROSENBERG:  And it's something that was said in a

13  meeting with a roomful of people that were posing as

14  operatives, and he's being offered a huge amount of money, and

15  so he is agreeing.

16         An interesting part about that conversation that's

17  not -- that's largely inaudible is after the meeting with the

18  chief, he and the original CS1, the Lebanese money launderer,

19  had their own conversation afterwards, and there was obvious

20  reluctance from Mr. Bouterse where the CS says, well, if you

21  want, you can think about it or change your mind.  And

22  unfortunately, largely inaudible, but there was little

23  snippets, and the fact that he did not undertake any search for

24  weapons, he did not establish any campsites that -- and the

25  fact of the matter is that such a scenario could not have

F3AKBOUS                    SENTENCE

played out in Suriname.  The type of country that it is, the

type of people they are, they would not have countenanced this.

It could not have been done secretly.  He did not have a

position of power to carry this off, but he had the criminal

channels to supply a passport.  That, he could do.

  And for that passport -- and he makes clear on

August 22nd, I'm not doing anything until I get my $2 million,

and nothing else was done.  And the government has all of his

texts, all of his emails, and there's not one shred of

conversation or evidence that he undertook anything in

furtherance, not a conversation, not an action, not even an

email of Mr. Williams, who is referred to as the original

target of this investigation, who I might add, by the way, when

he was approached for weapons prior to Mr. Bouterse's entrance

into this investigation, was able to provide a list by email or

text message of weapons that he could provide.  But

Mr. Bouterse never, never did the same thing or say anything

similar.

  So, your Honor, what we're saying is, number one, that

by law, both enhancements should not apply; and, number two,

what the enhancements do is they really undercut the whole

meaning of 3553(a) by not allowing the Court to take into

consideration an individual's background, his --

  THE COURT:  Wait.  I'm sorry, that last argument lost

me.  I may have lost focus for a minute, but whether the

1    enhancement applies or not, one still considers 3553.  They

2    don't set a mandatory minimum, right?

3              MR. ROSENBERG:  Well, they don't consider what things

4    are normally considered by a Court in 3553 --

5              THE COURT:  Am I misunderstanding?  I'm not locked

6    into a different mandatory minimum if the enhancement applies;

7    is that right?

8              MR. ROSENBERG:  Understood, Judge.

9              THE COURT:  Right.  The only mandatory minimum here is

10   the drug conspiracy --

11             MR. ROSENBERG:  Correct, your Honor.

12             THE COURT:  -- and the consecutive time.

13             MR. ROSENBERG:  And what we're saying, too, in our

14   papers, and I will say again, is this results in a

15   disproportionate sentence for his offense conduct --

16             THE COURT:  Disproportionate guideline, not a

17   disproportionate sentence, because you don't know what the

18   sentence will be.

19             MR. ROSENBERG:  No, disproportionate.

20             THE COURT:  Guideline.

21             MR. ROSENBERG:  Advisory guideline.

22             THE COURT:  That's correct.  And then the factors do

23   apply, then I go through all the factors anyway, right?

24             MR. ROSENBERG:  Yes.

25             THE COURT:  Okay.

F3AKBOUS                          SENTENCE

1          All right.  Mr. Lockard?

2          MR. LOCKARD:  Yes, your Honor.  The government's

3    argument was ably summarized by the Court and set forth in our

4    sentencing submission.

5          I think the defense's argument about whether these two

6    enhancements apply does a couple things.  It confuses events

7    with intent, and it also confuses motive with intent.

8          THE COURT:  What about the case?  What they're saying

9    in the case is, what the Second Circuit has said was the

10   agreement alone, even if it expresses the willingness to

11   further these terrorist acts, is not enough, and they sent it

12   back for a hearing, and it wasn't until there was evidence that

13   this defendant had really done things and was himself a

14   terrorist, might have even fired a gun, et cetera.  That's the

15   only one that worried me, was that Second Circuit decision.

16   Can you distinguish it?

17         MR. LOCKARD:  Well, I think what's different here is

18   the facts that we do have.  We don't need a hearing about what

19   Mr. Bouterse knew, what it is he intended, and what it is that

20   he did.

21         THE COURT:  No, but we have evidence of something

22   beyond the agreement.

23         MR. LOCKARD:  Correct.

24         THE COURT:  It was a question:  Do we have evidence of

25   something beyond the agreement?

1      MR. LOCKARD:  We do.  We have his actions, what he did

2  and what he supplied.

3      THE COURT:  Namely?

4      MR. LOCKARD:  Namely, he supplied that passport.  That

5  passport is what it is that he supplied, and as he admitted in

6  his allocution, he knew that that passport was going to be used

7  not just by an individual, who also was a member of Hezbollah,

8  he knew it was going to be used for Hezbollah, and he knew

9  exactly what Hezbollah was because he had talked about it at

10  great length in meetings before he ever provided that passport.

11      And there were a lot of discussions about what the

12  purpose of the passport was, what it was going to be used for,

13  that it was going to be used for that person to travel into

14  Suriname to establish those training camps that Mr. Bouterse --

15      THE COURT:  Right.  But then Mr. Rosenberg's argument

16  is, that's a long way from actually having the camp operative,

17  having these teenagers come in to be trained, then having them

18  get into the U.S. and commit an act.  He's saying all of that

19  is so down the road, so attenuated, that at most, the passport

20  goes to a member of Hezbollah who is going to use the passport

21  to come to Suriname to look over a facility, not that he's

22  going to use the passport to go to Times Square and blow

23  something up.

24      MR. LOCKARD:  Well, the discussions were clear that

25  that was, in fact, the whole point of the passport.  The whole

F3AKBOUS                        SENTENCE

1    point of the passport was to come to Suriname to establish a

2    place to attack Americans.  And the fact --

3               THE COURT:  Down the road.  But what Mr. Rosenberg

4    argues is that's many steps attenuated, that's so distant that

5    it really -- this case looks like the Second Circuit case.  It

6    really just had the agreement, but you don't have any action,

7    right?  If you distinguish it by saying the action is the

8    providing of the passport, so be it, but I want your argument

9    clear for the record and for potential appellate review.

10              MR. LOCKARD:  Correct.  So it's the provision of the

11   passport, which he traveled all the way to Panama to deliver --

12              THE COURT:  Yes.

13              MR. LOCKARD:  -- which he signed himself with a fake

14   signature.

15              THE COURT:  There's no question he provided a false

16   passport.  Go ahead.

17              MR. LOCKARD:  And so the discussions are clear, again,

18   this guideline focuses on intent, what it is that the defendant

19   knew and intended, and he may have been motivated by money --

20              THE COURT:  No, I want you to talk about the Second

21   Circuit case and how you distinguish it.  I know what the

22   guideline says.

23              MR. LOCKARD:  Correct.  So it was clear from the

24   evidence and from what he did, that this is the first step that

25   had the sole purpose of resulting in attacks on Americans, and,

1   in fact, there was discussion at the meeting where he was

2   told --

3               THE COURT:  You keep going back to the facts of this

4   case.  How does that distinguish the Second Circuit case?

5               MR. LOCKARD:  I think it distinguishes it because,

6   number one, the provision of the passport, again, was for the

7   purpose of traveling in --

8               THE COURT:  And at the time the Second Circuit heard

9   that case, the only evidence was an oral agreement with no

10  steps in furtherance.  Is that the record they had at the time

11  that they ruled?

12              MR. LOCKARD:  I don't want to misspeak about what the

13  record was in front of the Second Circuit, your Honor, so I'd

14  want to double-check what the record was.

15              THE COURT:  All right.

16              MR. LOCKARD:  But I think, again, the evidence here

17  about what was Mr. Bouterse's intent when he provided that

18  support.

19              THE COURT:  No, I know.

20              MR. LOCKARD:  Correct.

21              THE COURT:  I was trying to get more of a handle on

22  distinguishing that case, but, okay.  So it is time to rule and

23  move on.

24              The terrorism -- I find that the terrorism enhancement

25  applies.  There is no doubt that Bouterse agreed to provide

1    weapons and training camp accommodations to members of

2    Hezbollah, whom he knew were planning to attack targets within

3    the U.S. or Americans abroad.  He understood the goals of

4    Hezbollah and did not hesitate to agree to assist in those

5    goals.  During the course of taped conversations, Bouterse

6    acknowledged his awareness of the goals of Hezbollah, and

7    expressed his support for those goals, and that he would do his

8    part to further those goals.

9          Bouterse also agreed to arrange for a purported

10   Hezbollah operative to inspect weapons for Hezbollah upon

11   arrival in Suriname.  Bouterse's attempt to provide material

12   support is a violation enumerated in 18 U.S.C. Section

13   2332b(g)(5)(B).  However, there can be little doubt that the

14   underlying felony; that is, attempting to provide material

15   support for Hezbollah, is calculated to influence or affect the

16   conduct of government by intimidation or coercion.

17         Bouterse knew that Hezbollah planned to use the

18   intended base of operations in Suriname for politically

19   motivated attacks against American interests.  Whether or not

20   he agreed with these motives is irrelevant for this analysis,

21   as he had the specific intent to provide material support for

22   these attacks and expressed, whether he meant it or not, his

23   agreement with those goals.

24         The two-level enhancement pursuant to Section

25   2M5.3(b)(1)(E), known as the weapons enhancement, is also

F3AKBOUS                        SENTENCE

imposed.  This enhancement only requires that the offense

involved material support with the intent, knowledge, or reason

to believe that they will be used to commit or assist in the

commission of a violent act.  Surely, Bouterse knew, when he

agreed to find weapons and provide training camps, that the

long-run purpose was to assist the Hezbollah to commit violent

acts both within and outside the U.S.  Even providing the false

passport to a Hezbollah operative to enter Suriname was for the

purpose of eventually providing training of other Hezbollah

recruits to commit violent acts.

        Thus, the final offense level for Count One is 42,

which includes the previously calculated level of 28, plus the

two for the weapons, plus the 12 for the terrorism enhancement.

        With respect to Count Two, conspiracy to import

cocaine into the United States, the defendant is charged with

agreeing to import five kilograms or more of cocaine into the

U.S.  Pursuant to Section 2D1.1(a)(5) of the guidelines, the

base offense level is 32 because the conspiracy involved more

than five, but less than 15 kilograms of cocaine.

        Pursuant to Section 3B1.1, a two-level, to level 34,

are added because the defendant was an organizer, leader,

manager, or supervisor in criminal activity that did not

involve five or more participants.  Pursuant to Section

2D1.1(b)(14)(C), an additional two levels, to level 36, are

added because the defendant was directly involved in the

1    importation of a controlled substance.

2           Finally, an additional two levels, to 38, are added

3    because the defendant abused a position of public or private

4    trust in a manner that significantly facilitated the commission

5    of the offense.

6           Now, with respect to Count Three, using and carrying a

7    firearm during and in relation to a drug trafficking crime:

8    This charged the defendant with carrying a weapon during and in

9    relation to the narcotics conspiracy charged in Count Two.  The

10   guidelines for this offense is found at Section 2K2.4(b), which

11   requires that the guideline sentence be the minimum term of

12   imprisonment required by statute for 18 U.S.C. Section 924(c),

13   which is 60 months.  This five-year term must be imposed

14   consecutively to any other term of imprisonment.

15          Pursuant to the grouping analysis in Sections 3D1.2, 3

16   and 4, Counts One and Two are two separate groups.  The offense

17   level for group 1 is 42, and the offense level for group 2 is

18   38.  Group 1 is one unit, and group 2 is an additional unit,

19   and the offense level is increased by two units, to 44.  A

20   three-level reduction to offense level 41 is then warranted

21   based on defendant's timely acceptance of responsibility.

22          Because Section 3A1.4(a) of the guidelines of the

23   terrorism enhancement applies to this case, the defendant falls

24   in Criminal History Category VI, the highest category, even

25   though he's never had a prior conviction.

1          The defendant's guideline at offense level 41,

2     Criminal History Category VI, is 360 months to life in prison.

3          With that, Mr. Rosenberg, do you now want to be heard

4     as to the appropriate sentence?

5          MR. ROSENBERG:  Yes, your Honor.

6          What we argue is that those guidelines adjusted by the

7     terrorism enhancement really does not reflect the true

8     character, nature, and background of Mr. Bouterse.  We pointed

9     out quite a bit in our memorandum that he is not a jihadist,

10    that he is not a terrorist, he is not a terrorist sympathizer,

11    he has grown up in a country that is culturally diverse.  In

12    fact, the culture of Suriname is for people of all religions to

13    get together harmoniously and in unity, and I think you saw

14    that in the video --

15         THE COURT:  I did.

16         MR. ROSENBERG:  -- presentation.

17         THE COURT:  I did.

18         MR. ROSENBERG:  So who Mr. Bouterse is is important

19    because one of the factors in sentencing would be the concern

20    about a recidivism, especially when the Court is dealing with

21    somebody who is ideologically aligned with a particular

22    organization that so believes in what he's doing, that is

23    committed to it with his lifeblood.  That's not who

24    Mr. Bouterse is.

25         Now, what he's done is serious enough, and a

1    sentence -- exposure that he would have under the guidelines

2    without these terrorism enhancements reflect a profoundly

3    serious sentence of at least 15 years, and in the case of the

4    guidelines, up to 210 months if the terrorism enhancement did

5    not apply.  So these are substantial penalties and sentences

6    that Mr. Bouterse is facing that, I submit, should be reserved

7    for those people of the most venal, the most evil, and the most

8    countersocietal manner possible.  That is not who Mr. Bouterse

9    is.

10          As you've seen from the submission and the letters, he

11   is a man that is devoted to family, devoted to charity and

12   causes.  He's a person of good heart and good intentions in his

13   own country.  And you saw the touching -- when I say

14   touching -- interviews of people who did not know him, that he

15   was perfect strangers with, that he reached out and helped.

16   His actions and his words that he spoke are awful, and they're

17   reproachable, and he's going to suffer for that in a profound

18   sentence, as we say, even in the best of circumstances, Judge.

19          What we're saying is that the sentence that is

20   calculated under the guidelines, as your Honor has found, is

21   greater than necessary, and far greater than necessary, to

22   address all the goals of sentencing.  Mr. Bouterse is going to

23   spend a substantial amount of years in jail.  He's going to

24   miss, and his children are going to miss a father in their

25   lives through their entire childhood and into adulthood.  So

F3AKBOUS                        SENTENCE

1    this is not a case where the public's perception of the

2    administration of justice is going to be damaged by a sentence

3    in the range of the guidelines without the enhancements or the

4    mandatory minimums that are in place already in this case.

5            He's a man who's greatly ashamed of what he did,

6    driven, as he was, by the law, if you will, of great monies.

7    It doesn't make it better, but it does in the sense, as I said,

8    that this is not an idealogue, a person that we have to be

9    concerned is going to leave prison with still the same

10   ideological holdings and beliefs that would make him a future

11   threat.

12           The fact is, Judge, and other courts have considered

13   this, this is and was a sting.  There was no harm that was

14   caused.  There was no harm that, we submit, could have been

15   caused.  This proposal, if you will, or this agreement had no

16   chance of success, no chance whatsoever in the country of

17   Suriname.

18           So Mr. Bouterse, your Honor, by his simple act in this

19   case -- and, yes, your Honor has found with the knowledge that

20   it was going to Hezbollah with all of their horrible terrorist

21   goals, but he did not take further action, he did not cause

22   harm, and this was a sting operation.

23           Your Honor, we submit that under all the circumstances

24   that have been presented, that your Honor has seen, that

25   mandatory minimum, or, at worst, the guidelines without the

1    terrorism enhancement is a sufficient, but not greater than

2    necessary sentence.

3              THE COURT:  Thank you, Mr. Rosenberg.

4              Mr. Bouterse, is there anything you wish to say before

5    I actually impose the sentence?

6              MR. HUESTON:  Yes, your Honor.

7              THE COURT:  Okay.

8              THE DEFENDANT:  Your Honor, I want to apologize to

9    you, the American and the Surinamese people, my family,

10   especially my mother and sister, and other relatives who took

11   their valuable time to come all the way from Suriname to be

12   here with me today.

13             Your Honor, what I did does not represent my country,

14   my country, Suriname.  Suriname is a small country in South

15   America with a multiethnic society, where there is no place for

16   religious extremists.  Our society is an embracing one.  It's

17   one that looks up to the values that uphold on the level of all

18   races, all cultures, and all creeds.

19             In my country, Suriname, you will see one of the most

20   powerful images of love, tolerance, and forgiveness in the

21   world, and that is a mosque and a synagogue, Jewish temples,

22   brotherly side by side sharing one parking lot and sometimes

23   even one caretaker.

24             Your Honor, I really regret my actions, and I am

25   deeply, deeply, deeply ashamed of myself.  I take full

F3AKBOUS                     SENTENCE

1    responsibility of my irresponsible actions.  I'm going to

2    repeat that:  I take full responsibility of my irresponsible

3    actions.  My family and my children had absolutely nothing to

4    do with this.  They have, because of my actions, suffered

5    enormously and paying heavily -- and are paying heavily.

6         Your Honor, because of my actions and wrongful deeds,

7    my kids have lost their father for their entire childhood and

8    their main source of income.  I have left dozens of family with

9    no means of support.  Other families have insecurities about

10   their futures.  This is because the mining company that I was

11   managing was heavily affected, and has ceased operation after

12   my arrest, and lost a multimillion-dollar investment deal that

13   had been necessary to maintain operations.  It is very hard for

14   me having to deal with all of this, and not an hour goes by

15   that I do not remember the damage I have caused, and I regret

16   it.

17        A great enjoyment during my life that gave me a sense

18   of accomplishment was helping relieving the problems of others.

19   Now to be the one myself that lets my children, family,

20   friends, employees, loved ones, and the people of the Republic

21   of Suriname down is the most terrible thing I've ever

22   experienced.

23        Your Honor, I humbly request that you take into

24   account that your sentence will not only affect me, it will

25   also affect the lives of my children, aged two to nine --

F3AKBOUS                              SENTENCE

```
 1   excuse me, aged 2 to 19.  Because of my actions, this sentence
 2   will make me lose their childhoods, but I want to be able to be
 3   with them as they live their lives.
 4         Further, I would like to add that I have, and will
 5   continue, to use my time in prison wisely, and I will transform
 6   my life.  One of my goals will be to start the specialization
 7   of agriculture, animal husbandry and fishery, so that when I
 8   return home, I can act on what I have built while incarcerated.
 9         Your Honor, I am to blame for the suffering of my
10   children, and nobody else.  But if you could, please think of
11   the 11 most sweet, most adorable children --
12         THE COURT:  I'm sorry, the what?  Please think of
13   what?
14         THE DEFENDANT:  Please think of the 11 most sweet,
15   most adorable children.
16         THE INTERPRETER:  Eleven children.
17         THE COURT:  Okay.
18         THE DEFENDANT:  They can't visit me because upon my
19   arrest, all their visas were canceled, and the recent requests
20   for new visas to travel to see me have been denied.
21         Your Honor, before my arrest, I had never visited the
22   United States, but I respect the United States.  For instance,
23   in honor of the SEAL team that killed Osama bin Laden, I,
24   together with my friends, gave a paintball group the name Team
25   Six, and it was widely known in my country.
```

1       Madam, I want you to understand that while my actions

2  were wrong, bad, and reprehensible, I am certainly not a cartel

3  member, terrorist, or extremist sympathizer, and I ask you to

4  please sentence me in a way that allows me to be reunited with

5  my family, so I can take an active, positive part in their

6  life.

7       In Hawaiian indigenous terms --

8       THE COURT:  I'm not getting that.

9       MR. HUESTON:  In Hawaiian indigenous terms.

10      THE COURT:  Oh, okay.

11      THE DEFENDANT:  -- I close by saying, I'm sorry, I

12  love you, and thank you.

13      THE COURT:  Thank you.

14      Okay.  Mr. Lockard?

15      MR. LOCKARD:  Your Honor, this case was a sting, and

16  what that sting exposed is that Mr. Bouterse was a powerful

17  person in Suriname, we've had a lot of discussion about exactly

18  what that role was, but I suggest part of what that exposes is

19  that the lines between official and unofficial influence in

20  Suriname are perhaps a little bit blurry when it comes to

21  Mr. Bouterse.

22      Because we know what it is he was able to do.  We know

23  that he was able to travel internationally on his diplomatic

24  passport to meet with individuals that he believed to be

25  members of Hezbollah and Hezbollah operatives, we know that he

F3AKBOUS                          SENTENCE

was able to provide at least three Surinamese passports with
false identification information for those individuals, and we
know that he agreed to open up his country, Suriname, to host
terrorist training camps.  And, in fact, Mr. Bouterse, when we
were talking about the numbers of operatives who can travel, he
is the one who suggested that they can bring in 60 members to
be in that camp.  He is the one who said that he could provide
passports for all 60 of those members.  He is the one who asked
for a personal security force of ten hardened terrorist
operatives to be his own personal shock troops.  He is the one
who did these things, and he was perfectly willing to open up
Suriname to those camps knowing full well that they were
represented to be used as a base of operations against
Americans and for those people to travel to the United States.
In fact, he is the one who suggested, in fact instructed how to
provide a better Surinamese cover story to increase the chances
of getting a U.S. visa for those people.  And we know that he
said those things when he did not know he was being watched.

        The very multiculturalism and diversity that he is now
relying on as part of his sentencing submission, he used as an
advertisement to the confidential sources for why Suriname
would be such a good place to make this happen, because it's
multicultural, because it would be easy to hide the operatives
when they got there.

        And the potential danger of that conduct not only to

F3AKBOUS                        SENTENCE

1    the country of Suriname, but to the security of the entire

2    region and the United States is difficult to underestimate.

3            THE COURT:  Well, that's only if you think that all

4    the steps along the way would have succeeded.  And I accept the

5    argument for applying the enhancements, but it's a lot of steps

6    down the road.  I don't know that there was something that was

7    imminent.  I don't know that there was a threat that it all

8    would have materialized.  I understand that there was a lot of

9    money being offered, and he certainly said all the things you

10   say he said because he wanted to get all that money, but

11   whether it ever would have come to fruition, I don't know.

12   It's not as if there were terrorists on our doorstep.

13           MR. LOCKARD:  That is correct, your Honor.  That's

14   correct, your Honor.

15           THE COURT:  So I don't know.

16           MR. LOCKARD:  And we're not saying that there were.

17   What we're saying is, this investigation exposed that corrupt

18   nature within him, it exposed his willingness to go down this

19   path, it exposed the price that it would cost to buy that

20   protection.

21           THE COURT:  That's all true.  That's all true.  This

22   is what he would do for money if he could successfully do it.

23           MR. LOCKARD:  That's correct.  And along the way, he

24   also managed to successfully export ten kilograms of cocaine.

25           THE COURT:  No question about that.  That's the

F3AKBOUS                         SENTENCE

1    easiest part of the case.

2              MR. LOCKARD:  So, your Honor, we respectfully submit

3    that a serious sentence is warranted in this case, not only to

4    deter and punish Mr. Bouterse, but also as a deterrent to any

5    other corrupt officials who may be willing to sell their

6    access, to sell their facilities to dangerous cartels and to

7    dangerous terrorist organizations, and that is conduct that is

8    incredibly serious, and that needs serious deterrence.

9              THE COURT:  Let me just go over one last thing.  The

10   Count Three weapon consecutive five years, which weapon?  Is

11   this the light antitank weapon in the office?  Is that the

12   weapon we're talking about for that count, Mr. Lockard?

13             MR. LOCKARD:  I don't know if the defense agrees on

14   which weapon it was, but the weapon --

15             THE COURT:  I'd like to know what you think.

16             MR. LOCKARD:  Right.  The weapons involved were both

17   the light antitank weapon, and, also, Mr. Bouterse personally

18   carried a firearm in a lot of these meetings.

19             THE COURT:  So it was both.

20             MR. LOCKARD:  Either one is sufficient.

21             THE COURT:  Oh, either one is sufficient, I understand

22   that, but your argument would be or is that it was both.

23             MR. LOCKARD:  I think the defense would argue that a

24   rocket launcher was not in furtherance of, we would argue that

25   it was.

1          THE COURT:  But it doesn't matter because you would

2     say he carried a pistol to a number of the meetings.

3          MR. LOCKARD:  Correct.  Correct.

4          MR. ROSENBERG:  Just to be clear, Judge, we would

5     argue that that antitank weapon was not in furtherance of the

6     drug case.

7          THE COURT:  But you can't --

8          MR. ROSENBERG:  We conceded the pistol, and so for the

9     purposes of the application of the consecutive five-year

10    sentence --

11         THE COURT:  No, I understand that.

12         I just want to clarify, I think I'm following your

13    argument, but, Mr. Rosenberg, the guideline you were referring

14    to would be a 35, Criminal History Category I; is that right?

15    Because his offense level on the narcotics was 38 and --

16         MR. ROSENBERG:  Yes.

17         THE COURT:  And because of the grouping, there would

18    be no addition to the 38, the 38 would be reduced by three to

19    35.

20         MR. ROSENBERG:  Correct.

21         THE COURT:  The Criminal History would be Category I,

22    so what you kept arguing was without the enhancement, the range

23    would have been 168 to 210, but effectively 180 to 210.

24         MR. ROSENBERG:  Correct.

25         I know it's been a long wait, Mr. Bouterse.  You

F3AKBOUS                          SENTENCE

1    obviously want to know the sentence.  So while I have many

2    pages to read about my reasoning, I'm going to start with the

3    sentence, so you don't have to wait.

4          Based on my review of all of the statutory factors

5    that I will describe in a moment, I intend to impose a

6    nonguideline sentence of 135 months on Counts One and Two, to

7    be served concurrently, and then to be followed by 60 months on

8    Count Three to be served consecutively to the sentence on the

9    first two counts, for a total of 195 months in custody.  It's

10   easy for you to see how that got reached, that is the middle of

11   what would have been the guideline range of 180 to 210.

12         You can all be seated.  This is very long.  I have

13   much to say.

14         No supervised release is imposed, as the defendant is

15   an alien who will be deported upon completion of his custodial

16   sentence.

17         In addition, Mr. Bouterse is required to pay a

18   mandatory assessment of $300, which payment is due immediately.

19         No fine is imposed based -- oops.

20         On the required forfeiture, I did mean to ask you

21   that, Mr. Lockard.  I forgot.  Is there an order of forfeiture

22   here?  Because I have to impose the forfeiture at the sentence,

23   but not the order, not the amount.

24         MR. LOCKARD:  Correct.

25         THE COURT:  You're seeking a forfeiture?

1        MR. LOCKARD:  We would seek an order of the forfeiture

2   of the proceeds of the offenses and the property involved in

3   the drug offenses, and we will submit an order specifying that.

4        THE COURT:  Have you yet negotiated that amount with

5   your adversary?

6        MR. LOCKARD:  We haven't, but I think we can do that

7   promptly.

8        THE COURT:  But you haven't done it yet?

9        MR. LOCKARD:  Not yet.

10        THE COURT:  So at this time, I will only say there

11   will be a forfeiture, the amount is not yet determined, but

12   because of that, I'm not imposing a fine.

13        So the terms of the forfeiture order will be submitted

14   in a timely manner within the statutory time frame.

15        Now, let me turn to the reasons.  Based on all the

16   sentencing factors set forth in 18 U.S.C. Section 3553, I

17   conclude that a nonguideline sentence totaling 195 months in

18   custody, which, as I already said, is the middle of what the

19   guideline would be absent the terrorism enhancement, is

20   sufficient, but not greater than necessary to serve the

21   required purposes of sentencing.

22        I begin with the nature and circumstances of the

23   offense.  In 2011, the DEA began an investigation of a

24   businessman from Aruba who was suspected of money laundering

25   and narcotics trafficking.  Bouterse knew this target as a

broker on various commercial projects in the Caribbean.  This

relationship between this businessman from Aruba and

Mr. Bouterse led the DEA to seek a meeting with Bouterse.  They

first met him in February 2013.  The undercover told Bouterse

that one of them was a Lebanese money launderer and the other a

member of a Mexican drug cartel.  They asked whether Bouterse

would be interested in weapons and narcotics deals.  He was

receptive.

When asked if Bouterse had any concerns dealing with

Hezbollah, who might be interested in purchasing weapons, he

replied that he was willing to work with anyone.  They did not

meet again until June 27, 2013.  At this meeting, they

discussed possible narcotics deals, and the money launderer

mentioned that he was involved with Hezbollah.

The next day they met again to discuss narcotics, and

Bouterse showed them a light antitank weapon that he kept in

his safe.  I know the defense says it's a relic, the government

says it's not a relic, but it doesn't matter, he showed them

that weapon.

A week later, on July 3rd, 2013, Bouterse supplied

false passports to the men.  At this meeting, the undercover

talked about sending men to Suriname to be educated and trained

and said he would pay Bouterse $20 million to set up training

camps in Suriname.  Bouterse also agreed to search for weapons

in return for payment, but there is no evidence that he ever

began such a search, although specific weapons were discussed in some detail.

On July 27, Bouterse arranged for a suitcase carrying ten kilograms of cocaine to be transported from Suriname to Trinidad on a commercial flight where it was then seized by the DEA.

Bouterse again met with the undercover agent on July 30th in Greece.  At this meeting, Bouterse expressed his agreement with the anti-American statements made by the undercover in the course of the meeting.  When asked if he could supply weapons to Hezbollah, he replied that he would need several months to provide a list of weapons he would be able to provide.  Following the meeting, Bouterse again obtained a false passport for one of the undercovers.  He personally delivered the passport four weeks later in Panama believing that person to be a member of Hezbollah and was arrested.

Turning now to the history and characteristics of the defendant:

This 42-year-old defendant was born in 1972 in Holland, but moved with his family to Suriname when he was a young child.  His father had a military career and eventually became the president of Suriname.  His mother worked for the Surinamese airways.  He has two siblings, both of whom wrote supportive letters, as did his mother and many friends.

F3AKBOUS                         SENTENCE

His parents separated when he was 14, and he lived
with his mother until the age of 22.  Although he never
married, he has -- I thought he had ten children, now you say
11, but he has many children by eight different women and is
reported to be an excellent father.

He served in the Surinamese army for two years and was
honorably discharged.  He has never abused drugs or alcohol,
that I know of.  He is a high school graduate, he has always
worked, most recently as a manager in a gold mining business.
For a period of time, he worked for the government -- I think
that's been discussed here in great detail -- in the security
department that protected his father.  He has also been
involved in various business ventures.

According to the many letters that I reviewed, and the
DVD that the defense prepared, and the mitigation report, he
has been a very helpful and charitable person, providing less
fortunate people with money, housing, food, or tuition when
they were in need.

The next factor is the need for the sentence imposed.

Obviously the crimes of which defendant stands
convicted require a lengthy period of incarceration.  The only
question is how long is needed to properly punish this
defendant, and I have concluded that 195 months in custody is
sufficient for the following reason:  This is a sting operation
in which the government set out to make a case against Dino

F3AKBOUS                           SENTENCE

1   Bouterse for crimes that could be charged and prosecuted in an

2   American court.  In support of the terrorist enhancement, which

3   I have found technically applies here, the government relies on

4   the words of the defendant in reaching an agreement with agents

5   of the U.S. Government posing as drug dealers, money launderer,

6   and members of Hezbollah.  The agreement was tentative, and

7   very few steps were taken in furtherance of the plan.  As

8   Mr. Lockard himself argued, Mr. Bouterse seemed to be waiting

9   for the money, and he wasn't going to do much until the money

10   was in hand.  The only concrete act performed by the defendant

11   with respect to providing material support, which is a crime

12   that underpins the terrorism enhancement, was providing a

13   Surinamese passport to a purported member of Hezbollah.  But,

14   in fact, as I've said, the entire operation was a sting, there

15   was no Hezbollah connection.

16          During the negotiations in which the defendant was

17   offered tens of millions of dollars, he did express his

18   willingness to go along with supporting attacks on America, but

19   these were words, not actions.  People use words in

20   negotiations, and, yes, Mr. Lockard, you're right, the

21   government found the price that could buy Mr. Bouterse.

22          Even the words themselves, however, were not terribly

23   convincing.  When first asked whether he would have any

24   concerns in dealing with Hezbollah, he responded only that he

25   was willing to work with anyone.  He didn't indicate his

F3AKBOUS                         SENTENCE

1   support for or agreement with any terrorist objectives at that

2   first meeting.  At subsequent meetings, he did agree with the

3   undercover operatives' anti-American sentiments, but nothing in

4   his history indicates that these statements reflected his

5   personal beliefs.  Rather, he was expressing agreement with

6   people who were going to pay him a lot of money.

7           The government has no evidence that Bouterse was a

8   member of Hezbollah, shared the goals of Hezbollah, ever

9   supplied any weapons to Hezbollah, or provided housing and

10  training for any Hezbollah operatives.  Though he did agree to

11  provide this support, it's not clear to me that he ever would

12  have been able to actually do it.  Absent the government's

13  targeting of this defendant through the sting operation, there

14  is no evidence that this defendant was an international arms

15  dealer or had any access to sophisticated weapons.

16          During the negotiations, he told the agents more than

17  once that it would take him several months to locate the

18  weapons that they sought.  He certainly didn't have them, and

19  it is unclear if he ever had the connections to actually find

20  the weapons specified by the undercovers.

21          The terrorism enhancement is a very blunt instrument.

22  It applies an equal weight to a hardcore member of a terrorism

23  organization who may actually have killed many Americans and/or

24  destroyed a huge amount of property.  It also applies to an

25  arms dealer who actually supplied or had the capability of

F3AKBOUS                        SENTENCE

supplying sophisticated weapons to terrorists.  Here, a

relatively minor official of a small country in South America

is tempted by millions of dollars to agree to supply arms and

training space, but never did, in fact, do that.  He did supply

the passport.  That's what he really was able to do and did do.

The rest, we don't know.  Nothing in his history shows that he

is a terrorist or that he had any terrorist sympathies.  What

his history shows is that his greed certainly got the better of

him, and he agreed to do whatever he could in return for the

millions of dollars that he was being offered.

　　　　　Finally, the jump in his Criminal History Category

from Category I to Category VI is simply unreasonable here.

Yes, the defendant was a drug dealer, there's no question about

that, but it is unclear that he could have aided any real

terrorist.  In view of this circumstance, it would be

unconscionable for me to sentence him in the range supplied by

the additional 12 offense levels and the additional five

Criminal History Categories required by the terrorism

enhancement which produce that range of 360, which is 30 years

to life.

　　　　　The sentence must also reflect the seriousness of the

offense, and promote respect for the law, and provide just

punishment.  I believe that a sentence of the length I have

given, which is significant, is sufficient to do that.  We

sometimes use the number of months and don't reflect on what it

1    means.  This is more than 16 years in custody.

2         The sentence has to afford adequate deterrence to

3    criminal conduct.  The sentence imposed, again, I believe, does

4    that.  For his agreement, as well as his drug-dealing, he will

5    serve 16 years in a U.S. prison.  This is a significant

6    sentence and should help to deter others from agreeing to help

7    terrorists in return for money.  That's a long time to be in

8    custody.  Considering that no one here was hurt or was even in

9    danger of being hurt, this is a very severe sentence.

10        The next factor is to protect the public from further

11   crimes of the defendant.  I can't conclude that this defendant

12   poses a risk to the public.  As noted, he has no prior criminal

13   history.  He is not and never was an international arms dealer.

14   He has no ties, that I know of, to any terrorist organization.

15   He doesn't appear to be a threat to anyone.

16        Now, I don't know how much drug-dealing he did before

17   this event.  I don't know whether he was a consistent and

18   continuous drug dealer, because I do consider that a threat to

19   society, but maybe he has a good sense to know that when he is

20   released and starts a second life, it's not going to be as a

21   drug dealer.  That's been a failure.  Hopefully, he'll find a

22   better line of work.

23        And then the next, it's really a subfactor, is to

24   provide the defendant with needed educational or vocational

25   training, medical care, or other correctional treatment.  This

F3AKBOUS                          SENTENCE

1  defendant really doesn't have the need for any of those, so

2  that's not a factor, but he says he will take advantage of any

3  programs that he can while in jail, and that's hopefully true.

4  Hopefully that will be a good thing, and hopefully you can make

5  something good out of a bad situation.

6          The next factor is the kind of sentences available.

7  Here, there was only one kind, the mandatory minimum alone

8  required 15 years, so jail was absolutely required.

9          Then there's the guideline sentence and applicable

10 policy statements.  And I realize this is somewhat repetitive,

11 but I have to do it.  So I have given serious consideration to

12 the guidelines and policy statements that I found, but I don't

13 find that the guidelines here produce a reasonable sentence.

14         First of all, the use of the terrorism enhancement to

15 increase the offense level by 12 and then place the defendant

16 in Criminal History Category VI creates an extraordinary high

17 guideline range that is fundamentally unfair to this defendant

18 given all of the circumstances both of this offense and of him

19 as a person.

20         In addition, a number of the other enhancements that

21 the guidelines required ratcheted up the final offense level,

22 too.

23         I have already explained the unique circumstances here

24 that make this case unusual, and I don't want to repeat all

25 that, except to say in a single sentence that this defendant

F3AKBOUS                              SENTENCE

1    responded to an opportunity to sell arms and provide a training

2    camp requested by U.S. agents who offered him millions of

3    dollars in return for these services.  But there's no evidence

4    that this defendant was actively looking for an opportunity to

5    become involved with any terrorist organization, nor is there

6    any evidence that he had any interest in attacking Americans

7    prior to the approach of these agents.  It seems that his sole

8    motivation was to take the millions offered to him without

9    caring much about the consequences, which is clearly wrong and

10   must be punished, but the guidelines create an unreasonable

11   range -- sentencing range for this defendant.

12          Then there is the need to avoid unwarranted sentencing

13   disparity, which remains an important goal that survives the

14   Booker analysis.  However, this case is different from most of

15   the terrorism cases that have been prosecuted in this district.

16   The vast majority of terrorism cases are individuals who sought

17   out opportunities to join a terrorist organization for the sole

18   purpose of harming Americans or American interests.  I think we

19   have recently had several trials in this building with such

20   people.  This is not the case here.

21          As I repeatedly said, no such evidence exists against

22   Mr. Bouterse.  Yes, he embraced an opportunity to make money by

23   supplying a terrorist organization, and he claimed he had the

24   means to do it, but he didn't seek out this opportunity because

25   of any long-held ideological beliefs or antipathy towards

1    Americans or American policy.  For these reasons, the

2    nonguideline sentence I am imposing creates no unwarranted

3    sentencing disparity.

4           Are there any legal objections before sentence is

5    actually imposed?  I don't want to make a legal error.  I'm not

6    looking for reargument.  Any legal errors?

7           MR. GRACIA:  No, your Honor.

8           THE COURT:  Mr. Lockard?

9           MR. LOCKARD:  No, your Honor.

10          THE COURT:  Pursuant to the Sentencing Reform Act of

11   1984, it is the judgment of this Court that the defendant, Dino

12   Bouterse, is sentenced to 135 months on Counts One and Two, to

13   run concurrently, and then 60 months on Count Three, to run

14   consecutively to the sentence on Counts One and Two.  He is

15   further required to pay the mandatory assessment of $300, which

16   is due immediately, and the forfeiture is imposed, although the

17   terms and the amount are not yet determined.

18          I order this sentence imposed as stated.

19          Mr. Bouterse, you have the right to appeal your

20   sentence within 14 days, but only to the limited extent

21   permitted by your plea agreement.  If you cannot pay the cost

22   of an appeal, you have the right to apply for leave to appeal

23   in forma pauperis.

24          Now, are there any specific requests with respect to

25   designation?

F3AKBOUS                      SENTENCE

1          MR. ROSENBERG:  Yes, your Honor.  We would ask that

2     you recommend to the Bureau of Prisons that it be within the

3     State of Florida, perhaps even the Southern District of

4     Florida, or any district in Florida that's closer to Suriname

5     and makes it easier for family, should they eventually get

6     visas to come and visit.

7          THE COURT:  Okay.  I have no reason not to make that

8     recommendation.  Being proximate to family is always a good

9     thing, especially for a lengthy sentence like this.  So if

10    that's his request, I will make a recommendation.  He must

11    understand, I don't designate the prison.  That's up to the

12    Bureau of Prisons.  I have no say in the matter.  So they'll do

13    what they'll do, and they take account of this whole case and

14    sentencing proceeding.  So I will recommend Florida, but I

15    can't say that it will be followed.

16         Mr. Lockard, is there anything to dismiss here?

17         MR. LOCKARD:  There are no -- actually, there are open

18    counts that the government moves to dismiss at this time.

19         THE COURT:  Sorry.

20         MR. LOCKARD:  There are open counts that the

21    government moves to dismiss at this time.

22         THE COURT:  That's too general.  What are they?

23         MR. LOCKARD:  The underlying indictment.

24         THE COURT:  Right.  If you can be more specific.  I'm

25    sure I will ask you to contact my clerk, so I can get it exact

F3AKBOUS                          SENTENCE

1    in the judgment and conviction form, but at this time, I

2    dismiss the counts in the underlying indictment.

3              Is there anything further at this time?

4              MR. ROSENBERG:  No, your Honor.

5              THE COURT:  We're all set.  Thank you.

6                              * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25